1  BRAD SELIGMAN (SBN 083838)
   JOCELYN D. LARKIN (SBN 110817)
2  THE IMPACT FUND
   125 University Avenue
3  Berkeley, CA 94710
   Telephone:   (510) 845-3473
4  Facsimile:   (510) 845-3654

JOSEPH SELLERS
CHRISTINE WEBBER
CHARLES TOMPKINS
JULIE GOLDSMITH
COHEN, MILSTEIN, HAUSFELD & TOLL
1100 New York Avenue, West Tower - Suite 500
Washington, DC 20005-3964
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

6
7  IRMA D. HERRERA (SBN 98658)
   DEBRA A. SMITH (SBN 147863)
   EQUAL RIGHTS ADVOCATES
8  1663 Mission Street, Suite 550
   San Francisco, CA 94103
9  Telephone:   (415) 621-0672
   Facsimile:   (415) 621-6744

STEPHEN TINKLER
MERIT BENNETT
TINKLER & BENNETT
309 Johnson Street
Santa Fe, NM 87501
Telephone:   (505) 986-0269
Facsimile:   (505) 982-6698

10 SHEILA Y. THOMAS (SBN 161403)
   EQUAL RIGHTS ADVOCATES
11 5260 Proctor Avenue
   Oakland, CA 94618
12 Telephone:   (510) 339-3739
   Facsimile:   (510) 339-3723
13

DEBRA GARDNER
PUBLIC JUSTICE CENTER
500 East Lexington Street
Baltimore, MD 20212
Telephone:   (410) 625-9409
Facsimile:   (410) 625-9423

14 STEVE STEMERMAN (SBN 067690)
   ELIZABETH LAWRENCE (SBN111781)
15 DAVIS, COWELL & BOWE
   100 Van Ness Avenue, 20th Floor
16 San Francisco, CA 94102
   Telephone:   (415) 565-4685
17 Facsimile:   (415) 565-4854

SHAUNA MARSHALL (SBN 90641)
HASTINGS COLLEGE OF THE LAW
200 McAllister Street
San Francisco, CA 94102
Telephone:   (415) 565-4685
Facsimile:   (415) 565-4854

18 Attorneys for Plaintiffs

19                    UNITED STATES DISTRICT COURT

20

21                    NORTHERN DISTRICT OF CALIFORNIA

22 BETTY DUKES, PATRICIA SURGESON,          CASE NO. C-01-2252 MJJ
   EDITH ARANA, DEBORAH GUNTER,
23 CHRISTINE KWAPNOSKI, CLEO PAGE,          **PLAINTIFFS' MOTION FOR**
   KAREN WILLIAMSON, on behalf of themselves  **CLASS CERTIFICATION AND**
24 and all others similarly situated,        **MEMORANDUM OF POINTS**
                                              **AND AUTHORITIES**
25            Plaintiffs,

26    v.                                      Date: July 25, 2003
                                              Time: 10am
27 WAL-MART STORES, INC.                      Courtroom: 11
28    Defendant.

Plaintiffs' Motion For Class Certification           Case No. C-01-2252 MJJ

**TABLE OF CONTENTS**

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 1

II. FACTS ................................................................... 4

A. Wal-Mart Has A Uniform Store and Management Structure with Centralized
Control from the Bentonville Corporate Headquarters ..................... 4

B. Wal-Mart Has A Strong Corporate Culture and Has Been Permeated By
Stereotypes ......................................................... 10

   1. Wal-Mart Has An Unusually Strong Corporate Culture,
     Which Reinforces Consistency in Practices and Attitudes ........... 10

   2. There Is Strong Evidence That Gender Stereotypes Permeate Wal-Mart
     and Wal-Mart Has Resisted Changes to Make the Company More
     Hospitable to Women ......................................... 12

C. Under Wal-Mart's Compensation System, Women Are Consistently
Paid Less than Men ................................................. 16

D. Wal-Mart's Promotion Policies Rely on Excessive Subjectivity and Act To
Exclude Women .................................................... 20

E. Wal-Mart's Workforce Data Reveals that Discretionary Compensation
and Promotion Decisions Have Consistently Disadvantaged
Female Employees .................................................. 25

   1. Female Employees Are Consistently Paid Less Than Their Male Employees
     in the Same Position Even Though They Have Higher
     Average Performance Evaluation Scores, More Seniority and Lower
     Turnover Rates ............................................... 25

   2. Female Employees in Wal-Mart Stores Are Far Less Likely to Be
     Promoted Than Their Male Counterparts and, When They Are
     Promoted, Women Take Longer Than Do Men .................... 28

   3. The Representation of Women in Management at Wal-Mart is Far
     Lower Than That of Comparable Employers Operating in the
     Same Labor Markets .......................................... 30

F. Wal-Mart Senior Management Has Been Aware of the Adverse Effects of Its
Personnel Policies on Female Employees for Many Years But Has Failed
to Take Effective Steps to Redress These Problems ..................... 31

   1. Wal-Mart Management Has Long Known of the Adverse
     Consequences of Its Policies on Female Employees ............... 31

   2. The Numerical Goals for Women in Management Are Arbitrarily
     Set and Lack Any Mechanism for Holding Managers Accountable .... 36

i

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   A.    All Requirements of Rule 23(a) Are Met . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

         1.    The Proposed Class is Sufficiently Numerous . . . . . . . . . . . . . . . . . . . . . 38

         2.    The Claims of the Named Plaintiffs Are Typical of the Class
               They Seek to Represent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

         3.    There Are Questions of Law and Fact Common to the Class. . . . . . . . . . 40

         4.    The Named Plaintiffs and Their Counsel Are Adequate
               Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

   B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2). . . . . . . . . . . . 43

         1.    The Court Should Certify a Class for Liability, Injunctive and Equitable
               Relief Under Rule 23(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

         2.    The Court Should Certify Plaintiffs' Claims for Punitive Damages Under
               Rule 23(b)(2) With Notice and Right to Opt Out . . . . . . . . . . . . . . . . . 44

         3.    The Court Could Also Certify the Case Pursuant to Rule 23(b)(3) . . . . . 47

   C.    Proposed Trial Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

ii

1                                **TABLE OF AUTHORITIES**

2                                    **FEDERAL CASES**

Page(s)

3    *Adams v. Pinole Point Steel Co.*,
         1994 WL 515347, 65 FEP 774 (N.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
4
     *Allison v. Citgo Petroleum Corp.*,
5        151 F.3d 402 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

6    *Amchem Prods., Inc. v. Windsor*,
         521 U.S. 591, 117 S. Ct. 2231 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
7
     *Arnold v. United Artists Theatre Circuit, Inc.*,
8        158 F.R.D. 439 (N.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

9    *Barefield v. Chevron U.S.A., Inc.*
         No. C-86-2427 TEH, 1987 WL 65054 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . 38
10
     *Barefield v. Chevron U.S.A., Inc.*,
11       48 F.E.P. Cases 907, 910 1988 WL 188433 (N.D. Cal. 1988) . . . . . . . . . . . 44, 45, 46, 48

12   *Beck v. The Boeing Co.*,
         203 F.R.D. 459 (W.D. Wa. 2001), *modified by slip op* December 27, 2001,
13       *affirmed in part, vacated in part by unpublished decision*, 2003
         WL 683797, 83 Empl. Prac. Dec. ¶ 41,313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48
14
     *Bouman v. Block*,
15       940 F.2d 1211 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

16   *Butler v. Home Depot*,
         No. C-94-4335 SI, 1996 WL 421436 (N.D. Cal. Jan. 25, 1996); . . . . . . . . . . . . . . 45, 46
17
     *Butler v. Home Depot*,
18       984 F. Supp. 1257 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

19   *Caridad v. Metro.-North Commuter R.R.*,
         191 F.3d 283 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 41
20
     *Contreras v. City of Los Angeles*,
21       656 F.2d 1267 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

22   *Cooper Indus. v. Leatherman Tool Group*,
         532 U.S. 424 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
23
     *Day v. NLO*,
24       851 F. Supp. 869 (S.D. Ohio 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

25   *Domingo v. New England Fish Co.*,
         727 F.2d 1429 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
26
     *EEOC v. Dial Corp.*,
27       Civ. Action No. 99-C-3356, *slip op* (N.D. Ill. Feb. 14, 2003) . . . . . . . . . . . 45, 46, 48, 49

28                                        iii

*EEOC v. O & G Spring & Wire Forms Spec. Co.,*
    38 F.3d 872 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Eubanks v. Billington,*
    110 F.3d 87 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*In re Exxon Valdez,*
    229 F.3d 790 (9th Cir. 2000) and 270 F.3d 1215 (9th Cir. 2001) . . . . . . . . . . . . . . . . . 46

*Gen. Tel. Co. of Southwest v. Falcon,*
    457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Gotthardt v. Nat'l R.R. Passenger Corp.,*
    191 F.3d 1148 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 43

*Harriss v. Pan American World Airways, Inc.,*
    74 F.R.D. 24 (N.D. Cal. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Hazelwood School Dist. v. United States,*
    433 U.S. 299 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hilao v. Estate of Marcos,*
    103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 49

*Jefferson v. Ingersoll Int'l Inc.,*
    195 F.3d 894 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Jordan v. Los Angeles County,*
    669 F.2d 1311(9th Cir. 1982) *judgment vacated on other*
    *grounds at* 459 U.S. 810 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Kolstad v. American Dental Ass'n,*
    527 U.S. 526 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Lerwill v. Inflight Motion Pictures, Inc.,*
    582 F.2d 507 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Molski v. Gleich,*
    318 F.3d 937 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Moore v. Hughes Helicopters, Inc.,*
    708 F.2d 745 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Morgan v. UPS,*
    169 F.R.D. 349 (E.D. Mo. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Pettway v. America Cast Iron Pipe Co.,*
    494 F.2d 211 (5th Cir. 1974) ............................................... 49

*Piva v. Xerox Corp.,*
    70 F.R.D. 378 (N.D. Cal. 1975) ............................................ 38

*Probe v. State Teachers' Ret. Sys.,*
    780 F.2d 776 (9th Cir. 1986) ............................................ 44, 45

*Robinson v. Metro.-North Commuter R.R. Co.,*
    267 F.3d 147 (2d Cir. 2001) ............................................. 45, 46

*Rodriguez v. Carlson,*
    943 F. Supp. 1263 (ED. Wash. 1996) ......................................... 45

*Salinas v. Roadway Express,*
    735 F.2d 1574 (5th Cir. 1984) ............................................ 44

*Segar v. Smith,*
    738 F.2d 1249 (D.C. Cir. 1984) ......................................... 27, 49

*Shores v. Publix Super Mkts, Inc.,*
    No. 95-1162-CIV-T-25(E), 1996 U.S. Dist. LEXIS 3381
    (M.D. Fla. March 12, 1996) ................................................ 41

*Staton v. Boeing,*
    313 F.3d 447 (9th Cir. 2002) ........................................... 39, 41

*Stender v. Lucky Stores,*
    803 F. Supp. 259 (N.D. Cal. 1992) ........................................ 10

*Stender v. Lucky Stores, Inc.,*
    1990 U.S. Dist. LEXIS 19985 (N.D. Cal. June 8, 1990) ....................... 39

*Stewart v. Gen. Motors Corp.,*
    542 F.2d 445 (7th Cir. 1976) ............................................. 49

*Taylor v. Union Carbide Corp.,*
    93 F.R.D.1 (S.D. W. Va. 1980) ............................................ 39

*Teamsters v. United States,*
    431 U.S. 324 (1977) ..................................................... 40

*Wagner v. The NutraSweet Co.,*
    170 F.R.D. 448 (N.D. Ill. 1997) .......................................... 41

*Watson v. Fort Worth Bank of Trust Co.,*
    487 U.S. 977 (1988) ..................................................... 41

*Wofford v. Safeway Stores, Inc.,*
    78 F.R.D. 460 (N.D. Cal. 1978) ..................................... 39, 40, 41

v

1                              **STATUTES**

2  Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

3  Title VII, 42 U.S.C. § 2000e-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

4                              **TREATISES**

5  5 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §3.10 (3d ed. 1992) . . . . . . . 40

6  7A Wright, Miller, & Kane, *Federal Practice and Procedure: Civil 2d*, § 1763 (1986) . . . . . . 40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    vi

*Stender v. Lucky Stores, Inc.*,
1990 U.S. Dist. LEXIS 19985 (N.D. Cal. June 8, 1990) . . . . . . . . . . . . . . . . . . . . . . . . 39

*Stewart v. Gen. Motors Corp.*,
542 F.2d 445 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Taylor v. Union Carbide Corp.*,
93 F.R.D.1 (S.D. W. Va. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Teamsters v. United States*,
431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Wagner v. The NutraSweet Co.*,
170 F.R.D. 448 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Watson v. Fort Worth Bank of Trust Co.*,
487 U.S. 977 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Wofford v. Safeway Stores, Inc.*,
78 F.R.D. 460 (N.D. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 41

## STATUTES

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Title VII, 42 U.S.C. § 2000e-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

## TREATISES

5 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §3.10 (3d ed. 1992) . . . . . . . 40

7A Wright, Miller, & Kane, *Federal Practice and Procedure*: *Civil 2d*, § 1763 (1986) . . . . . . 40

1 **NOTICE OF MOTION**

2 Please take notice that, on July 25, 2003, at 10:00 a.m. before the Honorable Judge

3 Martin J. Jenkins, United States District Court, Courtroom 11, 450 Golden Gate Ave., San

4 Francisco, California, Plaintiffs will seek an order certifying this case as a class action under Fed.

5 R. Civ. Proc. Rule 23(b)(2). The plaintiffs will proceed upon this motion, the memorandum of

6 points and authorities, the accompanying declarations, and any further briefing and arguments of

7 counsel.

8 **RELIEF SOUGHT**

9 Plaintiffs request that this Court: 1) certify this case as a class action under Fed. R. Civ.

10 Pro. 23(b)(2); 2) appoint plaintiffs' counsel to serve as counsel to the class; and 3) authorize

11 notice to the class of the pending action and of their right to opt-out under Fed R. Civ. Proc. Rule

12 23(d)(2).

13 **I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

14 Since at least 1997, female employees of Wal-Mart Stores have been paid less than

15 comparable male employees in every year and in every Wal-Mart region despite having, on

16 average, higher performance ratings and more seniority. Instead of improving, this pay disparity

17 has steadily widened over the last five years.

18 Female employees at Wal-Mart Stores also receive far fewer promotions to management

19 than do male employees, and those who are promoted must wait longer than their male

20 counterparts. Although the vast majority of Wal-Mart managers are drawn from the ranks of

21 hourly employees, and women comprise over *two-thirds* of those hourly ranks, women receive

22 only *one-third* of all promotions to management positions. This pattern of under-promotion has

23 been true since at least 1975 and occurs in every region in which Wal-Mart operates. Wal-Mart's

24 track record is entirely anomalous in the retail industry, where women typically hold over 50% of

25 management jobs. Indeed, Wal-Mart's own internal documents recognize that "we are far behind

26 the rest of the world."

27 It is not surprising that Wal-Mart's discriminatory promotion and pay policies and

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION    Case No. C-01-2252 MJJ    PAGE 1

1   practices have manifested themselves consistently throughout the company. Wal-Mart's

2   corporate headquarters in Bentonville, Arkansas monitors and controls – perhaps to an extent

3   never before seen in corporate America – the minute details of operations at its far-flung stores,

4   down to the temperature it sets for each store's heating and cooling system and the music played

5   in each store. The company's success is due in large part to its ability to closely monitor

6   activities in the field and maintain strict compliance with its internal policies and practices. Wal-

7   Mart has a highly sophisticated information technology system that allows the Bentonville Home

8   Office to monitor a wide range of each store's daily activities. Through dozens of daily reports

9   and regular store visits, Home Office ensures that all stores are on the company program. In

10   addition, Wal-Mart has carefully constructed and aggressively maintains a distinct, consistent

11   corporate culture throughout its operations. Every employee is educated daily on the culture, and

12   employees are rewarded for following the "Wal-Mart Way." The strong culture encourages

13   universal compliance with personnel policies and practices. As a result, store managers are

14   frequently moved across districts and regions without any loss in consistency of company

15   policies and practices.

16         Within Wal-Mart, the gateway from low-paying hourly jobs to the higher-paying

17   management positions is the management training program. An employee must complete the

18   management training program to become an Assistant Manager, the first rung on the

19   management ladder. Until three months ago, on the eve of the discovery cut-off, Wal-Mart

20   selected employees for the program entirely through a "tap on the shoulder" system. By design,

21   there was no system by which an employee could apply for, or even express an interest in, the

22   program. No written information was available to hourly employees about the program. Instead,

23   district and regional managers applied their own subjective views about who would be

24   appropriate for management. And, in the majority of all cases, a man was selected for the

25   training program rather than a woman, even though women comprised almost 80% of all hourly

26   supervisors. This lop-sided result is not surprising, as it is well understood that such highly

27   arbitrary and subjective systems are particularly vulnerable to the influence of unconscious

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ     PAGE 2

1 stereotypes. There is strong evidence that negative gender stereotypes permeate Wal-Mart at all
2 levels.

3     Pay decisions for both hourly and management employees are similarly left to the
4 manager, to whom company guidelines provide broad discretion to compensate store employees
5 according to his particular subjective assessment. As with promotions, these compensation
6 decisions disproportionately favor men in every major job category.

7     Wal-Mart executives at the highest level have long been aware that women have been
8 disproportionately excluded from management positions and underpaid compared to men. Wal-
9 Mart management prides itself – and rightly so – on quickly and effectively addressing
10 intractable problems when they adversely affect the company's bottom line. In sharp contrast, to
11 address the identified obstacles to equal opportunity for its female workers, Wal-Mart has
12 belatedly implemented a few half-hearted measures for which no one at any level of management
13 has been held accountable. Although Wal-Mart pays lip service to the idea of diversity, it is
14 singularly uninterested in why so few women are promoted or whether its pay practices
15 disadvantage its female employees.

16     The Named Plaintiffs in this action, like women in every region of the United States,
17 have been the victims of Wal-Mart's systemic discriminatory pay and promotion practices.[1]
18 They seek to certify a class of female employees in the Wal-Mart and Sam's Club retail stores in
19 the United States who have been or will be subject to Wal-Mart's pay and promotion policies and
20 practices in violation of Title VII. The case is appropriate for certification under Fed. R. Civ. P.
21 23(b)(2) because the class has been subject to a common set of practices for which they seek
22 injunctive relief, back pay and punitive damages.

23     In support of this motion, plaintiffs' experts have prepared detailed statistical, economic
24 and sociological studies. The statistical evidence of discrimination is of a consistency and

25

26

_____

27 [1] Plaintiffs propose Plaintiffs Betty Dukes, Patricia Surgeson, Christine Kwapnoski, Deborah Gunter, Edith Arana, and Cleo Page as Class Representatives.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION    Case No. C-01-2252 MJJ     PAGE 3

1  strength rarely seen before in Title VII gender litigation. The statistical significance of gender

2  disparities in compensation and promotion at Wal-Mart is vastly greater than levels described by

3  the Supreme Court as establishing a *prima facie* case. The statistics show that these disparities,

4  and the inference of discrimination that they create, consistently permeate the company, across

5  job categories, geography and time. Plaintiffs also submit the declarations of over 110 current

6  and former female employees whose stories explain this case in human terms that the numbers

7  cannot. The declarations document the struggles of each of these women to receive equal pay or

8  a chance to advance into management, often in the face of openly-expressed gender bias. While

9  these women have worked in stores from Anchorage, Alaska, to Ormond Beach, Florida, their

10  stories are remarkably and painfully similar. Together, this body of powerful evidence compels

11  the conclusion that these claims deserve class treatment.

12  **II.  FACTS**

13      **A.  Wal-Mart Has A Uniform Store and Management Structure with
           Centralized Control from the Bentonville Corporate Headquarters**

14
      Wal-Mart is the largest retailer in the world. Wal-Mart 10-K, 2003, Ex. 70 at 2.[2] Wal-

15
   Mart's corporate headquarters, known as Home Office, is located in Bentonville, Arkansas. *Id.*

16
   In 2002, Wal-Mart had over 3400 stores in the United States. *Id.* Wal-Mart operates discount

17
   stores selling general merchandise. Larger stores that include a complete line of groceries, in

18
   addition to general merchandise, are known as Supercenters, and stores that sell items in bulk are

19

20

21

22
      [2] All references to exhibit numbers throughout the brief refer to Exhibits to the

23  Declaration of Christine Webber. For convenience, all references to deposition testimony in this
   brief are abbreviated as [Witness' Last Name] Dep. There is only one deposition cited for each

24  witness with the exception of Kevin Harper and Jeffrey Reeves, who were first deposed as

25  30(b)(6) witnesses on organizational structure for Wal-Mart Stores and Sam's Club, respectively,
   and deposed a second time in their individual capacities. The first is referred to as Harper I Dep.

26  (or Reeves I) and Harper II Dep. (or Reeves II). Plaintiffs use a similar system for declarations.
   Declaration of Betty Dukes is abbreviated as "Dukes Decl." Where there is more than one

27  witness or declarant with the same last name, a first initial is inserted (*e.g.* R. Harper Dep.).

28

1      known as Sam's Clubs.[3] Ex. 70 at 8-10.

2          The field operations are divided geographically into six Wal-Mart divisions and one

3 Sam's Club division, each headed by a Divisional or Senior Vice President. Harper I Dep. at

4 215:3-4, Ex. 1; Sam's Club Organizational Charts, Ex. 71 at WMHO157785. Each division

5 contains approximately six regions. Harper I Dep. at 215:18-216:1, Ex. 1. There are a total of

6 41 regions: 35 Wal-Mart regions and six Sam's Club regions. Harper I Dep. at 176:5-7, Ex.1;

7 Reeves I Dep. at 76:21-23, Ex.2. Each region is supervised by a Regional Vice President (RVP),

8 who is based in Bentonville and travels for three weeks out of each month to the region. Harper I

9 Dep. at 184:1-10, Ex. 1. Because the regional management is based in Bentonville, Wal-Mart

10 has an unusually high concentration of executives and managers based in the Home Office.

11 Bendick Decl. at n.29. Regional management meets at least weekly with Bentonville-based

12 corporate and executive leadership to discuss developments in the individual stores. Martinez

13 Dep. at 164:13-18, 165:2-3, Ex. 3.

14          Each region, in turn, contains approximately eleven districts; each district contains

15 approximately six to eight stores. Harper I Dep. at 141:20-21, Ex. 1; Butler Dep. at 39:14-18,

16 Ex. 4. Each district is run by a District Manager, who lives in the field. Harper I Dep. at 162:12-

17 22, Ex. 1. At Sam's Club, district managers are called Directors of Operations, but the job

18 responsibilities are identical. Burner Dep. at 145:17-24, Ex. 5. On personnel matters, District

19 Managers work in conjunction with Regional Personnel Managers (RPM). *See* RPM

20 Responsibilities Ex. 72 at WMHO 369676. The RPMs are based in Bentonville and are

21 responsible for recruiting and assist in selecting store management and monitoring personnel

22 policies. Harper I Dep. at 155:3-23, 190:3-6, Ex. 1; Ludwig Dep. at 132:13-18, Ex. 6. RPMs

23 visit the stores on a weekly basis and submit reports to five People Directors in the Home Office.

24 Ludwig Dep. at 136:22-137:15, Ex. 6; Wigger Dep. at 68:12-69:22, Ex. 7.

25

26

27     [3] There are also approximately fifty smaller stores which sell primarily groceries, called Neighborhood Markets. Harper I Dep. at 19:1-5, (Ex. 1); Ex. 70 at 8.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ     PAGE 5

1    Each Wal-Mart store has the same job categories, job descriptions and management

2  hierarchy. Harper I Dep. at 32:14-40:12, 45:25-46:7, 58:18-59:9, Ex. 1; Burner Dep. at 144:16-

3  145:12, 148:24-149:13, Ex. 5; Reeves I Dep. at 72:1-16, Ex. 2; Winkler Dep. at 172:7-15, Ex.

4  73; Ruiz Dep. at 130:22-25-131:1-3, Ex. 8; Job Descriptions, Ex. 74. At the bottom of the

5  ladder, the primary entry level hourly positions are cashier, sales associate and stocker. Harper I

6  Dep. at 42:15-43:10, Ex. 1; Wal-Mart Store Matrix of Essential Job Functions, Ex. 75. The first

7  step up is hourly Department Manager. Weaver Dep. at 45:3-9, Ex. 9. Other hourly supervisor

8  positions include Customer Service Manager (CSM), known as Check-Out Supervisor (COS) at

9  Sam's Club. Eldridge Dep. at 40:7-12, Ex. 10. The highest level hourly manager at Wal-Mart is

10  Support Manager. Harper I Dep. at 108:16-109:10, Ex. 1; Butler Dep. at 128:1-5, Ex. 4; *see also*

11  Wal-Mart Corporate Policy: Support Managers, Ex. 76.[4]

12    The next step up is to management trainee, a four-to-five month program which prepares

13  employees for positions as Assistant Managers. Harper II Dep. at 195:7-15, Ex. 11; Memo

14  regarding New Management Training Program, Ex. 77; Schaffner Dep. at 79:17-80:10, Ex. 12;

15  Kintzele Dep. at 44:6-11, 56:20-57:1, Ex. 13. The first salaried management position is

16  Assistant Manager. Harper I Dep. at 35:24-36:11, Ex. 1. Each store has several Assistant

17  Managers, varying with the size of the store. *Id.* The next level is Co-Manager, a position used

18  only in larger stores. *Id.* Harper I Dep. at 150:25-151:19, Ex. 1. The top store position is Store

19  Manager, called General Manager in Sam's Clubs. Reeves I Dep. at 165:20-166:9, Ex. 2.

20    The stores contain 40-50 different departments. Drogin Decl. at ¶ 31, Table 14. Certain

21  departments are highly gender segregated.[5] In 2001, women made up over 95% of workers in the

22

23    [4] The equivalent management positions at Sam's Club are Front End Manager and
24  Receiving Manager. They report to Assistant Managers and are salaried. Reeves I Dep. at
    165:20-166:9, Ex. 2.

25    [5] *See, e.g.,* S. Hall Decl. at ¶ 2 (when she asked to transfer to Hardware, male Support
26  Manager asked, "[y]ou're a girl, why do you want to be in Hardware?"); Collier Decl. at ¶ 9
    (during manager meeting, male Store Manager was asked by female District Manager why he
27  always put women Assistant Managers over Softlines and he said it was "because that's what

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 6

1    Jewelry, Infant/Toddlers, Health and Beauty Aids, Hosiery and Ladies Sportswear. *Id.* In

2    contrast, the Hardware, Dairy, Meat, Produce and Tire Balancing Departments were between 6%

3    and 27% female. *Id. See* Bielby Decl. at ¶ 22.

4         Women comprised 67% of all hourly workers and 78% of hourly Department Managers

5    in the stores in 2001. Drogin Decl. at ¶ 18, Table 3; ¶ 23, Table 7. In contrast, women made up

6    only 35.7% of Assistant Managers, 23% of Co-Managers and 14.3% of Store Managers. Drogin

7    Decl. at ¶ 23, Table 7. Moreover, at the top, Wal-Mart is, and always has been, run

8    predominantly by men. The Wal-Mart Executive Committee, the top 14 or 15 executives at Wal-

9    Mart, was comprised entirely of men until December 2000. Swanson Dep. at 61:9-14; 62:24-

10   63:1, Ex. 14. Tom Coughlin, the Executive Vice President of Wal-Mart Corporation, is

11   responsible for all aspects of Wal-Mart and Sam's Club retail operations. Coughlin Dep. at 12:4-

12   12, Ex. 15. Coleman Peterson, the Executive Vice President for People (the company's term for

13   "human resources"), has overall responsibility for personnel matters company-wide. Peterson

14   Dep. at 8:6-17, Ex. 16. All divisional vice presidents for Wal-Mart Stores' field operations are

15   men. Williams Dep. at 47:14-24, Ex. 17. Wal-Mart Stores and Sam's Clubs have 41 Regional

16   Vice Presidents, of whom only 5 are women. Drogin Decl. at ¶ 21; Jim Haworth Dep. at 174:16-

17   18, Ex. 18. At the district manager level, approximately 9.8% of the positions are held by

18   women. Drogin Decl. at ¶ 25, Table 9. Table 7 from the Drogin Declaration vividly portrays the

19   steady disappearance of women as one ascends the corporate hierarchy:

20

21   women know."); McKenna Decl. at ¶ 4 (despite having been a Sporting Goods associate, when
     McKenna expressed an interest in becoming Sporting Goods department manager, male assistant
22   manager told her, "[y]ou don't want to work with guns."); Deno Dep. at 151:22-153:10, 209:1-
23   211:14, Ex. 69 (when she expressed an interest in a meat cutter position, male meat manager told
     her that Wal-Mart does not hire women as meat cutters.); Page Decl. at ¶ 10 (store manager gave
24   sporting goods department manager position to male; "needed a man in the job.") Christensen
25   Decl. at ¶ 5 (District Manager told him female associate could not be promoted to the a.m.
     assistant manager position because she was female) Jaso Decl. at ¶ 10 (denied position as
26   Electronics Department Manager because it was a man's job that carried a lot of responsibility
     and required heavy lifting) Mott Decl. at ¶ 17 (told by male co-manager that she wouldn't want
27   to be Domestics Department Manager because lifting furniture was a "man's job").

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ        PAGE 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

**PERCENTAGE OF WOMEN DECREASES
WITH EVERY STEP UP WAL-MART MANAGEMENT HIERARCHY**



17     Wal-Mart maintains a state-of-the-art information technology system, which permits the

18 Home Office to monitor the smallest details of daily operations in each of its retail stores. Fielek

19 Dep. at 8:10-13, 13:21-24, 14:10-22, Ex. 19; Annatone Dep. at 127:24-128:5, 132:19-133:9, Ex.

20 20. Remarkably, the Home Office controls the temperature in each store and selects the music

21 that customers will hear. Goodwin Dep. at 271:3-272:17, Ex. 21; Guthrie Dep. at 15:16-19, Ex.

22 22 (temperature control); D. Carter Dep. at 243:6-21, Ex. 23. Bentonville controls the

23 temperature in each store's freezer. Guthrie Dep. at 15:10-15, Ex. 22; D. Carter Dep. at 243:22-

24 244:12, Ex. 23; Goodwin Dep. at 270:20-272:16, Ex. 21.  Every store manager is connected at

25 all times to the Home Office through the Managers' Workbench, a real-time computer link.

26 Tang Dep. at 39:22-40:4, Ex. 24; R. Carter Dep. at 158:16-159:3, Ex. 78; Heilman Dep. at 196:7-

27 20, Ex. 25; Mireles Dep. at 24:1-9, Ex. 26.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ            PAGE 8

1    Wal-Mart's Home Office establishes all personnel policies, including compensation and
2    promotion guidelines. Hass Dep. at 15:21-16:3, Ex. 27. Personnel policies are virtually the
3    same for Wal-Mart Discount Stores, Supercenters, and Sam's Clubs. Coughlin Dep. at 42:21-
4    43:5, Ex. 15; Carpenter Dep at 63:19-64:9, Ex. 28; Reeves II Dep. at 147:23-148:7, Ex. 33 (99%
5    of the policies are the same); Hottinger Dep. at 33:9-18, 35:21-40:19, 49:5-9, Ex. 29. The People
6    Division is then responsible for disseminating employment policies to the "field." Hass Dep. at
7    33:24-34:20, Ex. 27.

8    District managers are charged with ensuring that store operations are consistent with
9    "company program," also known as "management by exception." Harper I Dep. at 178:18-
10   179:11, Ex. 1. The Home Office monitors each store's operations electronically and generates
11   reports for each district manager showing which stores are not meeting one of the many company
12   standards set and monitored by the Home Office. Harper II Dep. at 38:17-43:8, Ex. 11; Harper I
13   Dep. at 133:3-15, 163:18-164:21, Ex. 1; Hass Dep. at 102:20-25, 105:3-15, Ex. 27; Crawford
14   Dep. at 26:22-27:9, Ex. 30. District managers use these "exception" reports to identify the
15   problems on which to focus when they visit the stores. Harper I Dep. at 178:18-179:11, Ex. 1.
16   Notes from these store visits are forwarded to the RVPs. Butler Dep. at 106:16-21, 108:25-
17   109:10, Ex. 4. District Managers also conduct quarterly STAR audits in each store to track
18   individual store compliance more formally. Wigger Dep. at 110:17-24, Ex. 7; 2001 Company
19   Accountability Goals, Ex. 79. The district exception reports and STAR audits are also
20   consolidated (or "rolled up") into region and division level exception reports and are reviewed by
21   management at those levels. Arnold Dep. at 134:20-135:15, Ex. 31. There are a variety of
22   "exception" reports on store-related personnel matters, including pay. Arnold Dep. at 134:20-
23   135:15, Ex. 31; Crawford Dep. at 26:22-27:9, Ex. 30.

24   Accordingly, an elaborate organizational structure centered in Wal-Mart's Home Office,
25   coupled with common personnel policies and close monitoring for compliance, ensure that
26   common personnel policies and practices operate in its domestic stores.

27

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ          PAGE 9

1

**B.    Wal-Mart Has A Strong Corporate Culture and Has Been Permeated By
       Stereotypes**

2

3

     1.    Wal-Mart Has An Unusually Strong Corporate Culture, Which Reinforces
          Consistency in Practices and Attitudes

4      Wal-Mart has carefully constructed and actively fosters a strong and distinctive corporate

5   culture, which is centrally controlled.  This strong corporate culture promotes and sustains

6   uniformity of operational and personnel practices.  Bielby Decl. at ¶ 21.[6]  "Wal-Mart Culture" is

7   the same throughout the company; it does not vary by division or by region.  Muzingo Dep. at

8   159:25-160:17, Ex. 32; Swanson Dep. at 140:16-21, Ex. 14; Reeves I Dep. at 56:21-23; 103:17-

9   25; 156:10-17, Ex. 2.  Many elements of the Wal-Mart Culture – such as the emphasis on

10  "promotion from within" – bear directly on personnel practices within the stores.  Muzingo Dep.

11  at 93:20-94:11, Ex. 32.

12      The culture, also known as the "Wal-Mart Way," is a company-wide value system.  Wal-

13  Mart Culture Pocket Handbook, Ex. 80; Muzingo Dep. at 75:16-22, Ex. 32.  Every new

14  employee goes through the same orientation process and, as part of that process, is trained about

15  the culture.  Muzingo Dep. at 114:20-25, Ex. 32; Hass Dep. at 58:20-22; 62:19-21; 67:25-69:1,

16  Ex. 27; Goodwin Dep. at 126:1-6, 127:5-7, Ex. 21.  New employees watch a video about the

17  company history and are introduced to the company's philosophy ("The Three Basic Beliefs").

18  Muzingo Dep. at 115:1-6, Ex. 32.  The Associate Handbook, provided to all employees, also

19  describes the Wal-Mart Culture and personnel policies.  Muzingo Dep. at 115:10-16, Ex. 32;

20  Hass Dep. at 51:24 - 57:13, Ex. 27; Associate Handbook, Ex. 81; Van Allen Dep. at 74:7-20, Ex.

21  34; Reeves I Dep. at 103:8-12, Ex. 2; Hottinger Dep. at 66:2-7, Ex. 29.

22      Thereafter, employees receive weekly training on culture topics at mandatory store

23

24      [6] Plaintiffs' expert sociologist, Dr. William Bielby, analyzed Wal-Mart's personnel
25  practices and culture to determine whether barriers exist for female employees and, if so, whether
    Wal-Mart's efforts to address these barriers have been adequate.  Bielby Decl. at ¶¶ 6-10.  Dr.
26  Bielby's work has been widely accepted by federal courts in numerous Title VII class action
    cases. *See e.g. Butler v. Home Depot,* 984 F. Supp. 1257, 1265 (N.D. Cal. 1997); *Stender v.*
27  *Lucky Stores,* 803 F. Supp. 259, 300-304 (N.D. Cal. 1992).

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 10

1    meetings. Wal-Mart store managers are provided with a detailed schedule of corporate "culture"

2    lessons and accompanying training materials to present at these weekly meetings. Muzingo Dep.

3    at 125:1-4, Ex. 32; "Culture Topics Index," Ex. 82. The same Computer-Based Learning

4    Modules are used in all stores, including required training on culture topics. Poland Dep. at

5    49:25-50:10, 110:9-24, 113:4-114:11, Ex. 35; Muzingo Dep. at 129:4-131:14, Ex. 32. Wal-Mart

6    employs a wide variety of standardized communication tools which reinforce its culture,

7    including broadcasts of Wal-Mart TV from Home Office into all its stores; the broadcasts include

8    training on personnel and employment matters. Reeves I Dep. at 103:13-14, Ex. 2; Hass Dep. at

9    88:9-89:6, 92:8-13, 93:6-94:10, Ex. 27; Hottinger Dep. at 78:6-79:7, Ex. 29; Muzingo Dep. at

10    130:11-131:14, Ex. 32 (company intranet).

11         Culture is also an integral part of all management training programs. Muzingo Dep. at

12    143:2-145:2, Ex. 32. It is presented at company-wide Year Beginning and Holiday Meetings as

13    well as at the annual Shareholder meeting. Muzingo Dep. at 147:6-22, Ex. 32. At the

14    Bentonville headquarters, all Wal-Mart and Sam's Club senior managers attend a Saturday

15    morning meeting which, once a month, is dedicated to presenting one of the company's culture

16    lessons. Muzingo Dep. at 135:14-136:8, Ex. 32. Those senior managers, who travel frequently

17    to the stores, are then expected to communicate those culture lessons to the field. Muzingo Dep.

18    at 141:6-21, Ex. 32. Notes of the Culture Saturday meetings are put on the Pipeline and made

19    available to all store employees. Muzingo Dep. at 129:11-130:14, 138:24-139:1, Ex. 32; Culture

20    & History, Ex. 83, "Saturday Meeting Notes," Ex. 84 . Culture training is considered a

21    "continual process" for even the most senior Wal-Mart executives. Swanson Dep. at 141:13-15,

22    Ex. 14.

23         The corporate culture is further reinforced by a number of significant internal practices.

24    First, Wal-Mart evaluates managers on their understanding of the culture and rewards employees

25    who show a strong commitment to it. Management Performance Appraisal, Ex. 85; Muzingo

26    Dep. at 167:25-168:5, Ex. 32. Second, Wal-Mart has a strong policy favoring promotion from

27    within. Peterson Dep. at 72:2-6, Ex. 16; Associate Handbook, Ex. 81. Thus, before an employee

28    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION    Case No. C-01-2252 MJJ      PAGE 11

1  becomes part of the management team, he or she will have been thoroughly steeped in the Wal-

2  Mart Culture. Finally, the company regularly moves store level managers from one retail facility

3  to another, often from one state to another, and between Wal-Mart and Sam's Club division.

4  Ludwig Dep. at 71:17-72:15, Ex. 6; Drogin Decl. at ¶ 34, Table 16; ¶ 35, Table 17. This practice

5  ensures that the Wal-Mart Culture is widely disseminated and that the dominant cultural

6  messages are the official culture, rather than any disparate local mores.

7  Not surprisingly, Wal-Mart has been recognized by social scientists and management

8  scholars as an organization with a strong corporate culture. Bielby Decl. at ¶ 18. Typical of such

9  organizations, the Wal-Mart Culture is based in large part on the personal history and beliefs of

10  the company's founder, Sam Walton. Muzingo Dep. at 103:6-14, Ex. 32. Walton's

11  autobiography, "Made in America," is required reading for Wal-Mart management trainees.

12  Management Training Program Week 1 Trainee Guide, Ex. 86.

13  Many of "Mr. Sam's" traditions remain firmly entrenched in the culture. Following a

14  visit to a Korean factory in the 1980s, Walton instituted a Wal-Mart cheer, which is now

15  performed by employees every morning in each of the 3000 Wal-Mart stores. Walton & Huey,

16  MADE IN AMERICA at 200-202, Ex. 87; Muzingo Dep. at 85:18-86:21, Ex. 32. A similar

17  cheer is heard at every Sam's Club store. Oshier Dep. at 106:17-108:22, Ex. 37; Hottinger Dep.

18  at 85:14-22, Ex. 29. The cheer is also regularly done at Wal-Mart corporate meetings and events.

19  Muzingo Dep. at 86:23-87:3, Ex. 32.

20      2.    There Is Strong Evidence That Gender Stereotypes Permeate Wal-Mart
and Wal-Mart Has Resisted Changes to Make the Company More
21            Hospitable to Women

22  Wal-Mart has held tightly to many traditions, including those which have made women

23  uncomfortable at Wal-Mart. Mr. Walton was a passionate quail hunter and, from the early days

24  of the company, invited a small group of his top managers for an annual quail hunt at his hunting

25  ranch in Texas. Schwindt Dep. at 57:14-61:10, Ex. 38; R. Harper Dep. at 116:10-24, Ex. 36.

26  When women finally reached the lower executive ranks of the company and a few were invited

27  to the event, many suggested that an activity other than hunting would allow more people to feel

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ          PAGE 12

1   comfortable participating. Reza Dep. at 98:17-25 ("I don't really like to kill animals, but I

2   went"), 99:22-100:13 (female executives have suggested skiing or river rafting instead), Ex. 39;

3   Schwindt Dep. at 59:12-18, Ex. 38 (organizers are aware that "a lot of [women] don't like to

4   hunt"); R. Harper Dep. at 116:10-117:16, Ex. 36. Despite Wal-Mart's professed commitment to

5   diversity, the suggestion was soundly rejected as interfering with "tradition," and the annual

6   quail hunt remains today the corporate retreat for executives and senior management in the

7   company. Reeves II Dep. at 144:23-145:14, Ex. 33; Reza Dep. at 100:23-101:2, Ex. 39; R.

8   Harper Dep. at 116:21-24, Ex. 36.

9       Indeed, Wal-Mart's culture is so strong and conforming that new management hires often

10  encounter great difficulty becoming assimilated. Swanson Dep. at 26:5-10, Ex. 14; Reeves I

11  Dep. at 46:1-21, 56:15-20, Ex. 2 ("it takes about five years to be accepted in this organization.

12  The first year is tough for all external folks."); R. Harper Dep. at 120:14-18, 122:14-123:1, Ex.

13  36 (marketing executive considered himself an outsider for first eleven years with company).

14  One former female Vice President of Sam's Club Marketing, Rhonda Harper, an outside hire and

15  veteran of a number of large American corporations, described the Wal-Mart culture as a "very

16  tight, deep culture" and "very closed." R. Harper Dep. at 121:9-15, Ex. 36. When asked about

17  her efforts to assimilate into the Wal-Mart culture, Harper explained:

18      I didn't go hunting with them, I didn't go fishing with them, I wondered if I had been
        able to do some of those things if I might have assimilated more quickly into the
19      organization.

20  R. Harper Dep. at 125:21-126:3, Ex. 36. Plainly, Wal-Mart's culture exerts an enormous

21  influence on the company's associates, treating as family the favored employees and treating as

22  foreigners the newcomers and the employees who fail to fit the Wal-Mart mold.

23      Other features of Wal-Mart's environment are even more inhospitable to women. For

24  example, at regular Monday executive level Sam's Club meetings, senior management often

25  referred to the female associates in the stores as "little Janie Qs" and "girls." R. Harper Dep. at

26  103:21-105:11; 135:13-136:14, Ex. 36. One female executive, new to the company, raised an

27  objection to the use of these demeaning terms to the Sam's Club President as well as to the

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 13

1  Executive Vice President. R. Harper 135:13-136:14, Ex.36. Her criticism was not well received
2  and there was no change in the regular use of the demeaning label.[7]

3      Female managers have been required to go to Hooter's restaurants and strip clubs in the
4  course of business events. Howard Decl. ¶¶ 14, 17-19 (female store managers required to attend
5  lunch meetings at Hooter's; female store managers forced by district manager to go to strip clubs
6  while on business trip). Indeed, Executive Vice President for People Coleman Peterson defended
7  this conduct, testifying that it was appropriate for a Wal-Mart district meeting to be held at a
8  Hooter's restaurant, if it is considered to be the "restaurant du jour" and "one of the best places to
9  meet and eat. . ." in the town. Peterson Dep. at 264:11-16, Ex. 16. Numerous male Wal-Mart
10  managers testified that they regularly go to strip clubs while attending the annual sales meetings.
11  Riggs Dep. at 196:1-5, Ex. 40; J. Brown Dep. at 185:8-12, Ex. 41; Seaman Dep. at 321:1-3, Ex.
12  42; Sherman Dep. at 259:10-23, Ex. 43; Schaffner Dep. at 194:19-195:9, Ex. 12; Sims Dep. at
13  185:3-14, Ex. 44. *See also* Horton Decl. at ¶ 5 (stripper performed at store meeting to celebrate
14  store manager's birthday). Further, at a company event in May 2001, Jim Haworth, Executive
15  Vice President of Operations and Chief Operating Officer for Wal-Mart Stores, sat on a chair that
16  looked like a leopard-skin stiletto high heel shoe, while surrounded by women singing and
17  dancing. Haworth Dep, at 215:12-218:9; R. Harper Dep. at 105:12-106:18. A photograph of the
18  event was later included in the employee newsletter. Haworth Dep. at 217:7-18, Ex. 126.

19      Wal-Mart had reinforced the stereotype that women are less assertive than men in training
20  sessions given to store managers at the Walton Institute.[8] Participants were told the reason that
21  so few women had reached senior management at Wal-Mart was because "men have been more
22  aggressive in achieving those levels of responsibility. . ." Walton Institute Diversity Questions,

23

24      [7] Indeed, the female executive was criticized by her boss for her "attitude of superiority"
25  and was counseled "not to be judgmental." Swanson Dep. at 134:15-135:6, Ex. 14.

26      [8] The Walton Institute is a Bentonville-based management training center. All salaried
    management must attend uniform management training at the Institute. Hass Dep. at 80:3-7, Ex.
27  27; Bosler Dep. at 40:2-23, Ex. 57.

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ      PAGE 14

1  Ex. 89. In defending the half-hearted efforts undertaken by Wal-Mart in the past to address

2  under-representation of women, Divisional Vice President Larry Williams testified that Wal-

3  Mart did not do more because there was "no forcing the issue." In his view, this would lead to

4  promoting unqualified women. Williams Dep. at 108:18-109:13, Ex. 17. This same view – that

5  additional efforts to promote women would lead to "lowering standards" and that better qualified

6  white males would be passed over – has been echoed repeatedly by other managers at these

7  Walton Institute meetings. Ex. 89. Thus, from the senior executives down through store

8  managers, the view that promoting women requires "lowering standards" is a frequently

9  expressed belief at Wal-Mart.

10       Wal-Mart's own consultants and employee groups have highlighted for the company the

11  challenges to women that some of Wal-Mart's traditions and its managers' stereotypes have

12  erected. In 1998, Wal-Mart hired the consulting firm, Diversity Management Inc. (DMI), which

13  conducted surveys of attitudes among groups of Wal-Mart managers about diversity. In one

14  report of its results, it noted a wide range of "Diversity Challenges" which reflect the existence of

15  entrenched stereotyped beliefs:

16       Fact or perception that advancement is not sought by diverse associates: e.g. when
     women are unwilling to seek advancement because they see how a female store manager
17       or DM is treated.

18       The glass ceiling is perceived by many women and people of color at the assistant
     manager level. Many feel like they have to work harder than white men to advance. One
19       stated: "I knew I would never be promoted to store manager under my DM, because I was
     a women and everyone knew he didn't think women could manage stores well. So I was
20       aggressive about finding other opportunities."

21       Some DMs [District Managers] who don't have any or very few female store managers
     don't seem personally comfortable with women in leadership roles;
22

23  Diversity Management, Inc. Memo, Ex. 88 at WMHO 734095. Although DMI recommended a

   detailed course of action to address those attitudes, Wal-Mart declined to proceed. Bilgischer
24
   Dep. at 198:16-199:13, Ex. 45.
25
     DMI's observations about stereotypical attitudes towards women should not have been
26
   news to Wal-Mart. As early as 1992, a group of female Wal-Mart Home Office employees
27

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ     PAGE 15

1   formed the Women in Leadership Group, which identified a number of concerns for women

2   employees, some of which centered on the culture of Wal-Mart. Their concerns included:

3   "[s]tereotypes limit the opportunities offered to women," "[c]areer decisions are made for

4   associates based on gender," "aggressive women intimidate men," "men are interviewed as the

5   replacements, women are viewed as support," and "[m]en's informal network overlooks

6   women." Memo re: Women in Leadership, Ex. 90.[9] The Women in Leadership group was

7   inactive from 1996 until 2002, after this suit was filed. Bilgischer Dep. at 42:22-43:24, Ex. 45.

8   ## C. Under Wal-Mart's Compensation System, Women Are Consistently Paid Less than Men

9

10  Pay for all Wal-Mart hourly employees is set at hire and adjusted after annual

11  performance evaluations and in some cases for exceptional "merit." Shatz Dep. at 52:24-53:4,

12  66:6-19, 68:25-69:5. 82:7-13, Ex. 46; Crawford Dep. at 69:5-14, Ex. 30; Scantlin Dep. at 91:6-

13  22, Ex. 47; Raps Dep. at 244:7-16, Ex. 48; Harper II Dep. at 73:20-74:10, Ex. 1. Wal-Mart

    establishes general compensation guidelines, but the guidelines permit, and even encourage,

14

15

16  [9] Such stereotypes persist to this day. *See, e.g.,* Durfey Decl. at ¶ 10 (a female assistant

17  manager in Utah was told repeatedly by a store manager that retail is "tough" and not "appropriate" for women); Scott Decl. at ¶¶ 8, 9, 12 (male store manager told Scott that "[m]en

18  are here to make a career and women aren't. Retail is for housewives who just need to earn extra money"); Mathis Decl. at ¶ 12 (male store manager told female associate that women have to be

19  "bitches" to survive in Wal-Mart management); Kwapnoski Decl. at ¶ 16 (female receiving area manager told by store manager to "doll-up, " dress a little better and "blow the cobwebs off [her]

20  make-up"); Lovejoy Decl. at ¶ 6 (male area manager told female associate that she could not get promoted to the overnight supervisor position because she had children and because she would

21  be the only woman working overnight); Zumbrun Decl. at ¶ 5 (during interview for ICS team

22  leader, male assistant manager asked her, "[b]eing a female, what makes you more qualified for this job than a male employee?" She was also told that the ICS staff was mostly male and that

23  they might have a problem with a female boss; male was hired); Donovan Decl. at ¶ 6 (male manager told her "you aren't part of the boy's club, and you should raise a family and stay in the

24  kitchen" instead of seeking advancement); Martin Decl. at ¶ 13 (told by male co-manager, "you

25  need to grow some balls"); Rajas Decl. at ¶ 5 (male district manager told her to resign as an Assistant Manager and find a husband with whom she could settle down to relieve work-related

26  stress); Deno Dep. at 166:15-167:7, 234:2-236:6, Ex. 69 (male manager said women only made store manager to meet a quota, that women should be home barefoot and pregnant and women

27  weren't qualified to be managers because men had an extra rib).

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ          PAGE 16

Case3:01-cv-02252-VRW   Document99   Filed04/28/03   Page25 of 58
1  managers to make idiosyncratic and subjective compensation decisions. Bielby Decl. at ¶ 40.

2  The Home Office annually sets the minimum hourly wage rate for each store, based upon

3  the local labor market. Heinle Dep. at 19:10-17, Ex. 49, Field Associate Compensation

4  Guidelines, 1997, Ex. 93 at WMHO151976; Crawford Dep. at 74:9-20, Ex. 30. Jobs are grouped

5  into "classes" by the Home Office; every department manager or cashier at any retail store in the

6  country will be assigned the same class. Ex. 93; Harper II Dep. at 16:7-18:1, Ex. 11; Arnold

7  Dep. at 57:8-58:5, Ex. 31; Crawford Dep. at 69:15-20, Ex. 30. Home Office also establishes, for

8  each class, a minimum wage rate that is progressively higher than the minimum rate for the store.

9  *See, e.g.,* Ex. 93, FYE 2003 Field Non-Exempt Associate Pay Guidelines, Ex. 94; Crawford Dep.

10  at 72:14-21, 73:18-25, Ex. 30. For example, in 2002, all "Class 2" jobs had a minimum starting

11  rate of $0.25 above the minimum start rate for the store. *See, e.g.,* Ex. 94; Shatz Dep. at 62:12-

12  18, Ex. 46.

13  Store Managers set the pay for each hourly employee. Arnold Dep. at 109:12-110:5, Ex.

14  31; Shatz 52:16-53:4, 66:6-19, 68:25-69:5, Ex. 46; Hom Decl. at ¶ 12. The guidelines authorize

15  Store Managers to adjust starting pay by as much as $2.00 per hour, although district managers

16  receive exception reports whenever pay is set at 6% or more above the minimum set by

17  guideline. Ex. 93, 94; Shatz Dep. at 66:20-23, Ex. 46. But Wal-Mart provides no guidance on

18  what circumstances would justify such an adjustment. Ex. 94 at WMHO 366905; Shatz Dep. at

19  66:6-11, 70:9-18, Ex. 46. Without proper criteria, inappropriate gender-based factors therefore

20  can, and do, affect pay decisions.[10] Bielby Decl.¶ 37.

21

22  [10] Tallent Decl. at ¶ 10 (during department manager meeting, male store manager said,
"[m]en need to be paid more than women because they have families to support"); Young Decl.
23  at ¶ 10 (during store meeting, male assistant manager responded to question from female
associate about why men made more than women by stating that men were working as heads of
24  their households while women were just working for the sake of working); Scott Decl. at ¶ 8
(when single mother personnel manager asked why male associate was receiving a merit raise,
25  male assistant manager told her it was because he "has a family to support"); Kwapnoski Decl. at
26  ¶ 12 (store manager told plaintiff that he gave male associate larger raise because he had "a
family to support"); McDonald Decl. at ¶ 7 (female associate told by male Department Manager
27  that male employees will always make more than females because "God made Adam first, so

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 17

1    The process for setting starting pay is similar for Assistant Managers and Co-Managers,

2 except that compensation decisions are made by District Managers (for AMs) or RVPs (for Co-

3 Managers), in consultation with RPMs. Memo re: Management Wages, Ex. 91 ("the Home

4 Office is the one who determines hiring, firing, wages, transfers and promotions for the

5 management associates with input from the District Manager"). The Exempt Associate Pay

6 Guidelines establish a broad salary range ($29,500 to $47,000) for Assistant Managers. Simpson

7 Dep. at 95:15-19, Ex. 50; Assistant Manager and Fresh Managers Performance Matrix Salary

8 Structure, Ex. 92. District Managers are given almost no guidance as to where in the range an

9 Assistant Manager or Co-Manager should be paid, other than to consider store size. Simpson

10 Dep. at 92:8-17, 104:19-25, 105:7-106:14, Ex. 50, Ex. 92; FYE 2002 Field Exempt Associate

11 Pay Guidelines, Ex. 95 at WMHO 205239. *See, e.g.,* T. Hall Decl. at ¶ 18; Stumpf Decl. at ¶ 9.

12    Employees ordinarily receive pay increases after their first 90 days and annually

13 thereafter, based upon the employee's performance evaluation score. Shatz Dep. at 80:21-82:6,

14 102:15-21, Ex. 46; Ex. 93, Ex. 94, Ex. 95; Blackburn Dep. at 45:18-46:10, Ex. 51; McNair Dep.

15 at 76:11-17, Ex. 52. Wal-Mart's guidelines set a percentage range for the increase, tied to the

16 evaluation score, but endorse the exercise of management discretion in these decisions as well.[11]

17 Harper I Dep. at 45:17-21, Ex. 1; Scantlin Dep. at 91:6-14, Ex. 47; Simpson 125:24-126:9, Ex.

18

19

20 women would always be second to men"); Odle Decl. at ¶¶ 8, 10, 11 (when female assistant
manager requested raises for two female associates because they were making less than their

21 male counterparts, male general manager said, "[t]hose girls don't need any more money; they
make enough as it is." She later asked why a male assistant manager was making over $10,000

22 more than she was, male director of operations told him it was because he "supports his wife and
his two kids"); Brown Decl. at ¶ 5 (when she asked department manager about why her pay was

23 lower than a less qualified male, manager said, "[y]ou don't have the right equipment. . . you
aren't male, so you can't expect to be paid the same.").

24

25    [11] Performance increase decisions for hourly employees are made by Store Managers.
Shatz Dep. at 103:4-104:13-16, Ex. 46; Blackburn Dep. at 68:10-69:12, 82:19-83:5, Ex. 51.

26 Performance increases for Assistant and Co-Managers are made by District Managers in
consultation with Store Managers. Arnold Dep. at 203:6-9, Ex. 31; McNair Dep. at 118:23-

27 123:1, Ex. 52.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ          PAGE 18

1  50. For example, if an Assistant Manager receives an "outstanding" performance evaluation, the

2  guidelines call for a salary increase of between five and seven percent. Simpson Dep. at 126:5-9,

3  Ex. 50. As with the start rate, a manager may exceed Home Office guidelines in setting the

4  amount of an individual performance increase. Shatz Dep. at 81:22-82:1, Ex. 46.

5       Finally, managers are permitted to award merit increases for "exceptional performance."

6  Shatz Dep. at 82:11-13, Ex. 46. All employees, through Co-Managers, are eligible for merit

7  increases. Simpson Dep. at 85:24-87:15, 110:3-14, Ex. 50; Arnold Dep. at 212:13-214:8, Ex. 31;

8  Crawford Dep. at 86:4-8, 141:7-11, Ex. 30; McNair Dep. at 31:6-14, 79:9-15, 80:24-81:2, Ex.

9  52; Ex. 93; Ex. 94; Ex. 95. Wal-Mart has declined to provide criteria for identifying

10  "exceptional performance." Arnold Dep. at 149:11-150:10, Ex. 31; Shatz Dep. at 86:24-87:12,

11  Ex. 46. Instead, Wal-Mart has chosen to permit managers to decide for themselves what is

12  "exceptional." *Id.* The guidelines provide a suggested range of 5% to 6% and only allow one

13  merit increase each year. Ex. 92; Shatz Dep. at 87:13-88:17, Ex. 46; Blackburn Dep. at 76:15-19

14  (once a year), Ex. 51. Yet managers have discretion on how much, within the range, to award for

15  a merit increase, and may even award more than one per year. *See e.g.*, McNair Dep. at 91:17-

16  20, Ex. 52; Schatz Dep. at 106:4-15, Ex. 46.

17       In sum, Wal-Mart deliberately grants its managers broad discretion at critical junctures in

18  making compensation decisions for employees in the field. While Wal-Mart's policies provide

19  managers with broad discretion, (Shatz Dep. at 53:20-54:1, Ex. 46) store managers have

20  exceeded even these generous bounds. Such decisions to exceed corporate compensation

21  guidelines appear on the Payroll Exception report, thus alerting district managers. Blackburn

22  Dep. at 110:1-2, Ex. 51; Shatz Dep. at 66:6-72:2; 20:15-25, Ex. 46. Wal-Mart is, therefore,

23  aware of how its Store Managers are using their discretion, but it has done nothing to rein them

24  in or ensure this discretion is exercised fairly.[12]

25

26       [12] Proposed class representatives have experienced pay discrimination. Named Plaintiff
    Cleo Page, who worked in the Union City and Livermore, California stores after transferring
27  from Tulsa, Oklahoma, was paid a lower hourly rate than a male associate who held a similar

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ       PAGE 19

1    Finally, the major part of store manager's compensation is tied to store profitability.

2    Arnold Dep. at 204:18-205:5, Ex. 31; Crawford Dep. at 140:20-141:6, Ex. 30. Performance

3    evaluations are not a factor, nor is a manager's ability to execute policies fairly. Crawford Dep.

4    at 137:6-11, Ex. 30; Simpson Dep. at 117:7-16, Ex. 50. Because some stores are more profitable

5    than others (*e.g.* better location, fewer nearby competitors), store assignment is a critical

6    component in determining store manager salary. *See* Ex. 95 at WMHO 205238. Not

7    surprisingly, female class members have complained of being assigned to smaller or "problem"

8    stores that generate lower profits. *See* Servatius Decl. at ¶¶ 2, 13-16, 21; M. Howard at ¶¶ 10-13;

9    T. Hall Decl. at ¶¶ 27-28; N. Martin Decl. at ¶ 11; Stumpf Decl. at ¶¶ 17, 28. Their complaints

10   are reflected in the statistical results, which reveal that female store managers are paid less than

11   their male counterparts, as described more fully below.

12   **D.    Wal-Mart's Promotion Policies Rely on Excessive Subjectivity and Act To
           Exclude Women**

13

14        All Wal-Mart stores use the same policies for making promotions to all in-store positions.

     For promotions above department manager,[13] Wal-Mart has a very subjective process that has

15

16

17

_____

18   position although he had worked at Wal-Mart for a shorter time and had less supervisory

19   experience. Page Decl. at ¶ 11. Similarly, Named Plaintiff Patricia Surgeson, who worked in the
     Vacaville, CA store from 1997-2001, transferred from department manager of Lay-Away to the

20   Cash Office in the hope of being promoted to management, and the male employee who replaced
     her in Lay-Away was paid more than she had been paid for doing the same job. Surgeson Decl.

21   at ¶¶ 8, 9. Plaintiff Betty Dukes has worked at the Wal-Mart store in Pittsburg, California since

22   1994. She has been paid significantly less than male employees with less seniority performing
     similar work. Dukes Decl. at ¶ 19.

23

24        [13] At the very lowest level, promotion from hourly associate to hourly department
     manager, Wal-Mart has a policy that requires stores to post all such openings. Job

25   Announcements Company Policy, Ex. 96. For the most part, in these lower-paying positions
     ($20,000-$25,000 range), women have been able to express their interest through posting and

26   obtain these promotions. Wal-Mart's workforce data do not show any significant disparities in
     promotion to hourly department manager positions as a whole and, therefore, the plaintiffs do not

27   seek class certification of this particular claim.

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ        PAGE 20

1 systematically disadvantaged women.[14]

2 *Promotion to Hourly Support Manager* – Support manager, the highest level hourly

3 position, serves as an important feeder job for the Management Training Program. Harper I Dep.

4 at 108:16-109:10, Ex. 1. *See also* Wal-Mart Corporate Policy: Support Managers, Ex. 76 and

5 Drogin Decl. at ¶ 53. While the company job posting policy includes support manager among the

6 hourly positions that should be posted, Wal-Mart's internal data shows that most openings to

7 support manager (80%) were not, in fact, posted. Job Announcements Policy, Ex.96; Drogin

8 Decl. at ¶ 44. Wal-Mart also allows store managers to apply their own unwritten criteria when

9 selecting candidates.[15] Store Manager, Art Mireles, for example, testified that he relied on

10 factors such as teamwork, ethics, integrity and the ability to get along with others. Mireles Dep.

11 at 180:20-181:4, Ex. 26. Such unwritten, subjective criteria are particularly vulnerable to the

12 influence of stereotypes. Bielby Decl. at ¶ 39. Wal-Mart's workforce data, discussed more fully

13 below, reveal that women associates have indeed received far fewer of these promotions to

14 support manager than would be expected in a non-discriminatory system.[16]

15 *Corporate Guidelines for Promotions into In-Store Management Positions* – Wal-Mart

16 has company-wide promotion guidelines, which set forth the minimum requirements for

17

18 [14] There are no minimum education or prior experience requirements for any hourly or
field management position, with the exception of store pharmacists, who must have a degree and
19 a state license. Wal-Mart's Supplemental Response to Interrogatory No. 22, Ex. 97.
Historically, Wal-Mart preferred managers who did *not* have a college degree. Walton & Huey,
20 MADE IN AMERICA at 216-218, Ex. 87.

21 [15] In some cases, these criteria have clearly reflected gender bias. *See, e.g.,* Houchins-
22 Post Decl. at ¶ 5 (male Co-Manager said he would not hire a "squatter" or "someone who squats
to pee" for the Support Manager position.).
23

24 [16] For example, Named Plaintiff Edith Arana had more than ten years' retail experience
when she began her employment with Wal-Mart in Duarte, California where she worked from
25 1995 to 2001. She applied for, but was denied, a support manager position in August 1998 and
again in October 2000. Arana Decl. at ¶¶ 19, 31. Plaintiff Page was also denied a support
26 manager position offered to a less qualified male associate. Page Decl. at ¶ 7. Plaintiff Dukes,
was unable to apply for many support manager positions which were not posted, and were filled
27 by men. Dukes Decl. at ¶¶ 14, 15.

28

1  advancement into salaried positions within the retail stores. Promotional Guidelines, Ex. 98.

2  Individual regions or divisions are not allowed to have written management promotion

3  guidelines different from the company requirements. Harper II Dep. at 218:13-219:25, Ex. 11

4  (Divisional Vice President developed division specific promotion standards; upon learning of

5  them, the Home Office rescinded them). The basic requirements are that candidates have an

6  "above standard" evaluation, at least one year in their current position, be current on training, not

7  be in a "high shrink" department or store, and be on the Company's Rising Star list.[17]

8  Promotional Guidelines, Ex. 98. The promotion guidelines also require that management

9  candidates be willing to relocate, a requirement discussed further below. *Id.*

10  *Promotion to Assistant Manager Trainee* – The Management Training program is the

11  primary way hourly employees can enter salaried management. Kintzele Dep. at 44:6-18, Ex.

12  13. Any hourly employee, regardless of job position, is eligible for assistant manager training.

13  Weaver Dep. at 102:4-17, Ex. 9; Monfils Dep. at 161:22-162:7, Ex. 53; Ludwig Dep. at 151:6-

14  152:5, Ex. 6. Until January 2003, Wal-Mart did not post openings for the training program

15  (Harper II Dep. at 180:23-181:10, Ex. 11) nor did it have any system available for employees to

16  express an interest in the program. Kintzele Dep. at 42:3-8, Ex. 13. Wal-Mart did not provide

17  any written information to employees about what the management training program is or how to

18  apply. Harper II Dep. at 204:19-22, Ex. 11; June 27, 2002 Email from Jarrells-Porter re: Urgent

19  Project, Ex. 100.[18]

20

21  [17] The Rising Star designation is a company-wide program to identify employees who are

22  viewed as "potential leaders of tomorrow." To be designated a Rising Star, an employee had to be recommended by his/her supervisor based largely on subjective criteria. The names of "Rising Stars" were, until recently, posted on the "Rising Star Wall" in the "Winners Win" room

23  in the Bentonville Home Office. Training Resources: Rising Star, Ex. 99 at WMHO 217266. These pre-selected "Stars" were given priority for promotion.

24

25  [18] Earlier this year, Wal-Mart implemented a one-time-only opportunity to express an interest in the management training program. Employees were given only one week in which to

26  express general interest; no specific positions in specific stores or districts were identified. The program materials stressed the negative aspects of the trainee position, but none of its potential

27  upside. Bielby Dep. at 169:13-172:5, Ex. 56. When plaintiffs sought discovery of the documents

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ      PAGE 22

1       District managers, subject to the approval of Home Office-based Regional Vice

2 Presidents, select management trainees through a "tap on the shoulder." Kintzele Dep. at 86:20-

3 23, Ex. 13 (store managers nominate candidates); M. Miller Dep. at 65:2-13, Ex. 54; Martinez

4 Dep. at 147:16-148:6, Ex. 3; Butler Dep. at 134:25-135:11, Ex. 4; Schaffner Dep. at 103:22-

5 104:10, Ex. 12; Email from Jarrells-Porter re: Urgent Project (referenced in paragraph above),

6 Ex. 100; Harper II Dep. at 206:12-16, Ex. 11; Wesbescher Dep. at 204:7-21, Ex. 55. Since the

7 promotion guidelines only set forth the minimum requirements for advancement, district

8 managers inevitably apply unwritten criteria to decide which of the hundreds of employees under

9 their supervision they will select for management training.[19] Kintzele Dep at 79:21-80:20, 106:1-

10 9, 110:11-111:8, Ex. 13; Heilman Dep. at 108:13-20. Ex. 25; M. Miller Dep. at 65:2-13, Ex.54

11 (Sam's Club management trainees selected if general or assistant manager sees potential);

12 Guthrie Dep. at 77:11-22, 80:3-18, 82:11-83:3, Ex. 22 (criteria for promotion to TLE

13 management trainee are subjective); Goodwin Dep. at 183:15-23 (common sense relied on to

14 decide which employees were promotable), 236:10-14, Ex. 21. They are not required to review

15 recent performance appraisals. Kintzele Dep. at 90:13-2, Ex. 13. There is no oversight or other

16 monitoring of these unwritten criteria. *See* Bielby Decl. at ¶ 39; Schwindt Dep. at 134:15-18;

17 195:13-196:4 Ex. 38; Kintzele Dep. at 46:8- 47:4, Ex. 13. Thus, it is not surprising that women

18 have been discriminated against with respect to advancement into the Management Training

19

20 explaining the development of the new "program," Wal-Mart claimed attorney-client privilege.
Seligman Dec. at ¶ 14.

21

22 [19] There is evidence that these criteria reflect explicit gender bias. *See, e.g.,* Crawford
Decl. at ¶ 5 (when she asked male district manager why a male had gotten an assistant manager
23 position over her, he told her that it was because the male was "head of his household" and that
as a married woman, she did not "need" the position); Rojas Decl. at ¶¶ 2, 5 (upon meeting the
24 male store manager in store where she was to complete management training, he said, "I don't
like college graduates," (which she was) and "I don't like female managers"); T. Hall Decl. at ¶¶
25 5, 16 (male store manager told a male assistant manager that all women should be "at home with
26 a bun in the oven" and "barefoot and pregnant." Male assistant manager told room of associates
that the only reason that Wal-Mart needed female assistant managers was to ensure that women
27 associates had someone with whom they could discuss their periods).

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION Case No. C-01-2252 MJJ    PAGE 23

1 Program.[20]

2     *Promotion to Assistant Manager and Co-Manager* – In 1998, Wal-Mart implemented a

3 computerized Management Career Selection (MCS) system, which would make it possible to

4 post all management openings in the retail stores. Mitchell Dep. at 204:10-25, Ex. 58; Emails

5 Regarding MCS, Ex. 101. Wal-Mart has, however, deliberately chosen not to post Assistant

6 Manager or Co-Manager openings as a matter of policy. Harper II Dep. at 160:3-9, 161:3-5, Ex.

7 11; Kintzele Dep. at 41:17-42:2, 42:19-21, 129:15-18, Ex. 13). *See also* MCS RPM Training,

8 Ex. 102 at WMHO 378025; Spragg Dep. at 256:11-2; 258:19-20, Ex. 68. Wal-Mart decided not

9 to post these jobs, even though Wal-Mart's executives concede that job posting would allow the

10 company to identify and attract talented candidates and would assist with diversity. Peterson

11 Dep. at 162:15-23, 166:24-167:3, Ex. 16; Coughlin Dep. at 95:22-96:21, Ex. 15. As with

12 management trainee openings, district managers, in conjunction with store managers and RPMs,

13 use their own subjective assessment to select the "best" candidate for Assistant Manager and Co-

14 Manager vacancies, subject only to the minimum corporate guidelines explained above. Kintzele

15 Dep. at 129:25-130:22, 131:17-135:16, 144:23-145:5, Ex. 13.

16     *Promotion to Store Manager* – Wal-Mart does post openings for most store manager

17 positions on MCS. Kintzele Dep. at 152:9-22, Ex. 13; Lippert Dep. at 182:8-11, Ex. 59 (less

18 ───────────

19   [20] Plaintiff Page repeatedly expressed interest in the assistant manager trainee program, for which she was fully qualified, but was never promoted. Page Decl. at ¶ 9. Plaintiff Christine

20 Kwapnoski has worked at Sam's Club since 1986 and at the Sam's Club in Concord, California since 1994. Kwapnoski Decl. at ¶¶ 1, 4. Although her outstanding performance was recognized

21 with several merit raises and excellent evaluations, Ms. Kwapnoski was repeatedly denied

22 promotion into a managerial position. Finally, two weeks after this lawsuit was filed, and with fifteen years experience at Sam's Club, Ms. Kwapnoski was promoted to an area manager

23 position, the lowest level salaried job at Sam's Club. In March 2003, Ms. Kwapnoski began the Management Training Program to become an assistant manager. *Id.* at ¶ 21. Plaintiff Surgeson

24 asked an assistant manager how she could join the Management Training Program, as she saw no information about the program at the store. Ms. Surgeson received no information or

25 encouragement about receiving management training. Surgeson Decl. at ¶ 10. *See also*

26 Connaker Decl. at ¶¶ 8-9; Crom Decl. at ¶¶ 6-9; Dobbs Decl. at ¶¶ 45-46; Earwood Decl. at ¶¶ 9-11; T. Hall Decl. at ¶¶ 7-8; K. Johnson Decl. ¶¶ 10-16; Lehman Decl. at ¶¶ 6, 12, 14; Scott Decl.

27 at ¶¶ 10-17.

28

1 | than 30% of club manager openings at Sam's Clubs not posted on Sam's Club posting system).

2 | However, it is not an open posting system.[21] Candidates are first required to obtain permission

3 | from their district manager before they are allowed to post. Kintzele Dep at 157:19-158:15, Ex.

4 | 13. District managers may withhold permission for any reason. *Id. See* Stumpf Decl. at ¶ 20;

5 | Martin Decl. at ¶ 11. For those candidates who are given permission to post, they must take and

6 | pass an on-line assessment. Kintzele Dep. at 155:1-156:19, Ex. 13. Regional Vice Presidents,

7 | with input from District Managers and RPMs, select the candidate based upon whatever

8 | subjective criteria they choose to apply beyond the corporate minimum guidelines.[22] Kintzele

9 | Dep. at 165:22-167:1, 168:19-169:16, Ex. 13; Spragg 223:6-224:19, Ex. 68; Grimm Dep. at

10 | 177:13-178:19, Ex. 60.

11 | **E.   Wal-Mart's Workforce Data Reveals that Discretionary Compensation and Promotion Decisions Have Consistently Disadvantaged Female Employees**

12

13 | 1.   Female Employees Are Consistently Paid Less Than Their Male Employees in the Same Position Even Though They Have Higher Average Performance Evaluation Scores, More Seniority and Lower Turnover Rates

14

15 | Dr. Richard Drogin, a statistician, analyzed Wal-Mart payroll and personnel data. He

16 | found that women at Wal-Mart earn less than men holding the same job, for nearly all jobs, in

17 | every year since 1996. Among hourly workers, women earned about $1100 less than did men in

18 | 2001. For management employees, the gender pay gap was $14,500. Drogin Decl. at ¶ 20. The

19 | average total earnings for men and women in field management jobs and the three largest hourly

20

21 | [21] Sam's Club only notifies current general managers of the general manager vacancies, and general managers must nominate assistant managers for promotion to store manager/general

22 | manager positions. Eldridge Dep. at 222:8-23, 258:8-18, Ex. 10.

23 | [22] These criteria may include gender stereotypes. *See, e.g.,* Howard Decl. at ¶ 23 ( male district manager told a female store manager in Indiana that a single mother should not run a

24 | store and that she should instead be at home with her child). Moreover, several declarants

25 | explain how they applied over and over for different Store Manager positions on the MCS system. Often they heard nothing about who was given the position. Just as often, they learned

26 | that the positions had gone to men. *See* Kellems Decl. at ¶ 26 (posted for eighteen positions);

27 | Stumpf Decl. at ¶¶ 19-30 (numerous unsuccessful store manager postings); Hittle Decl. at ¶ 9 (posted for ten positions); McCarthy Decl. at ¶ 15 (posted for sixteen positions).

28 | PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ       PAGE 25

1  jobs in 2001 were:

| Average Earnings by Gender for 2001 | | | |
|---|---|---|---|
| Job | Men | Women | Difference |
| Regional Vice Pres. | $419, 435 | $279,772 | $139,663 |
| District Manager | $239,519 | $177,149 | $62,370 |
| Store Manager | $105,682 | $89,280 | $16,402 |
| Co-Manager | $59,535 | $56,317 | $3,218 |
| Asst. Manager | $39,790 | $37,322 | $2,468 |
| Mgmt. Trainee | $23,175 | $22,371 | $804 |
| Dept Head | $23,518 | $21,709 | $1,809 |
| Sales Associate | $16,526 | $15,067 | $1,459 |
| Cashier | $14,525 | $13,831 | $694 |

Drogin Decl. at ¶ 25, Table 9; ¶ 26, Table 10. These pay differences were found consistently across regions. Drogin Decl. at ¶ 76. The differences in pay between men and women could not be explained by *seniority or turnover*. Drogin Decl. at ¶ 28, Table 12. Women have longer average tenure (4.47 years) than do men (3.13 years) and lower turnover. *Id.* The differences could not be explained by *performance*. Women in hourly positions on average have higher performance ratings (3.91) than do men (3.84).[23] Drogin Decl. at ¶ 30, Table 13. The disparity in pay between comparably-employed women and men has increased every year since 1997. Drogin Decl. at ¶ 67.

Dr. Drogin also looked at the pay gap, over a five-year time period, for men and women hired in the *same* year into the *same* position. For employees hired into hourly positions in 1996, the average pay for men was $0.35 per hour more than for women. For those 1996 hires who stayed at Wal-Mart through 2001, the gap in pay for men and women increased to $1.16 per hour on average. In other words, with each additional compensation decision after hire, the average

---

[23] Wal-Mart did not produce complete data on performance ratings for salaried employees until after the discovery cut-off. Drogin Decl. at ¶ 30, n.10.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION Case No. C-01-2252 MJJ      PAGE 26

1    pay gap increased.

2    Dr. Drogin conducted numerous multiple regression analyses to determine whether other
3    factors might explain these disparities in pay. Results, known as "t-values," larger than 2.0 are
4    considered statistically significant.[24] Drogin Decl. at ¶ 66. His initial regression of total annual
5    earnings controlled for seniority, weeks worked, part time status, and store location. The results
6    showed that women are paid at least 9.3% less than similarly situated men in every year. The
7    initial regression resulted in a t-value of - 120.5 in every year, which is *highly* statistically
8    significant and many times greater than the legal threshold of *two* standard deviations. *Id*. at ¶
9    67.

10   Dr. Drogin then ran a second set of analyses using hourly pay rate, in lieu of annual
11   earnings, to take into account any possible effect from regular and overtime hours worked. The
12   analysis controlled for seniority, whether hired within the year, part-time/full-time status, store,
13   job position, whether the employee was ever hired into a retail store, management and gender.
14   Again, women made less than men and the disparities were statistically significant (t-value -
15   62.3). The disparities steadily widened from $.18 per hour to $.34 per hour from 1997 to 2001.
16   Drogin Decl. at ¶ 74. Dr. Drogin then added performance rating as a control factor in the
17   regression analysis, but only for 2001 when data was reasonably complete. Women were paid
18   $.37 less than comparable men in 2001 and the results were highly significant with a t-value of -
19   102.65. Not surprisingly, the disparity increased because Dr. Drogin's earlier analysis found
20   that women have higher average performance ratings scores than do men. Drogin Decl. at ¶ 30,
21   Table 13; ¶ 75, Table 28.

22

23

24   [24] Under both social science and judicial standards, roughly two or more standard
     deviations (a .05 level of statistical significance) are considered statistically and legally
25   significant. *See, e.g, Hazelwood School Dist. v. United States,* 433 U.S. 299, 309-311 & n.14, 17
     (1977); *Segar v. Smith,* 738 F.2d 1249, 1283 (D.C. Cir. 1984); *Contreras v. City of Los Angeles*,
26   656 F.2d 1267, 1273 n.3 (9th Cir. 1981). Two to three standard deviations may be sufficient to
     establish a *prima facie* case of discrimination. *Hazelwood*, 433 U.S. at 312 n.17. In his
27   declaration, Dr. Drogin refers to standard deviations either as "t-values" or "Z-values."

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 27

1     The bottom line is that Dr. Drogin found that women employees at Wal-Mart are paid

2   less than men in every year, in virtually every job, even when relevant non-discriminatory factors

3   were considered. This pattern was found in every one of the 41 Wal-Mart regions. Drogin Decl.

4   at ¶ 76.

5           2.      Female Employees in Wal-Mart Stores Are Far Less Likely to Be
                    Promoted Than Their Male Counterparts and, When They Are Promoted,
6                   Women Take Longer Than Do Men

7     Wal-Mart boasts of a strong "promote from within" policy, with 72% of its salaried

8   managers starting as hourly associates. Wal-Mart Stores Career Opportunities, Ex. 103. Yet,

9   women are disproportionately employed in lower-paying jobs. They hold about 65% of the

10  hourly jobs, but only 33% of the management positions – a pattern that is consistent in all 41

11  regions across the country. Drogin Decl. at ¶ 18, Table 3; ¶ 76. Dr. Drogin conducted a

12  promotion analysis to determine how many women one would expect would be promoted in a

13  non-discriminatory system. He analyzed the available pools for promotion, using the proportion

14  of incumbents in each of the historical feeder jobs for the particular promotion.[25] The results

15  showed a consistent pattern of under-promotion of women into each of the higher-level jobs in

16  the stores. The pattern was found in nearly every region of Wal-Mart for each job. In no region

17  was there a statistical disparity that favored women. Drogin Decl. at ¶ 63, Table 26.

18    *Support Manager* – Dr. Drogin's analysis of promotions into support manager found that,

19  between 1997 and early 2002, women received 2891 fewer promotions than would be expected

20  from their representation in the feeder jobs. This result had a high degree of statistical

21

22          [25] Dr. Drogin analyzed Wal-Mart's available job posting data but found that it was not a
23  reliable source of information about who is interested in promotion. Drogin Decl. at ¶ 45-48.
    The data for the hourly job posting system showed that only 20% of the actual moves into
24  support manager were captured by the job posting system. The vast majority of jobs were filled
    outside the posting system. Similarly, the MCS system for managerial jobs included virtually no
25  data on assistant manager or co-manager promotions. While there was data on posting and
    promotion into store manager positions, the system does not permit open bidding and is thus not
26  a valid measure of availability. Applicants must be pre-approved before they post, and the
27  system allows for individual exceptions to eligibility criteria. Drogin Decl. at ¶ 47.

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ       PAGE 28

1    significance (Z-value = -54.38). Drogin Decl. at ¶ 54, Table 22.

2    *Management Trainee* – Dr. Drogin found that, for the same time period, women received

3    2952 fewer promotions into management training than would be expected, controlling for feeder

4    job, district and year of move. Again, the results showed a statistically significant shortfall (Z-

5    value = -60.81) that is "virtually impossible to occur by chance, if promotions were selected at

6    random from the availability pool." Drogin Decl. at ¶ 57, Table 23. This pattern was found in

7    every region of Wal-Mart.

8    *Co-Manager* – Women received 346 fewer promotions than expected based on their

9    representation in the feeder pool. The result was statistically significant (Z-value = -13.81).

10   Drogin Decl. at ¶ 59, Table 24.

11   *Store Manager* – The store manager positions are filled by co-managers and assistant

12   managers. Obviously, as women have been under-promoted to the first-level management

13   positions, their representation in the feeder pools for store manager is commensurately

14   diminished. Despite their lower representation in the feeder pools, women still received 155

15   fewer promotions than would be expected from their availability, a statistically significant

16   disparity (Z-value = -7.72). Drogin Decl. at ¶ 61, Table 25.

17   Dr. Drogin also studied the time that it took employees to reach management positions.

18   He found that, for the select group of women who do move up the ladder, it consistently takes

19   them longer than comparable men. On average, it took women 4.38 years from date of hire to be

20   promoted to assistant manager, while men took only 2.86 years. To reach Store Manager,

21   women on average took 10.12 years from hire date, compared with 8.64 years from hire for male

22   employees. Drogin Decl. at ¶ 29.

23   These promotion analyses provide strong support for the conclusion that Wal-Mart

24   promotion practices adversely affect women and do so in a consistent way across the entire

25   country.

26

27

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ        PAGE 29

1

2

3. The Representation of Women in Management at Wal-Mart is Far Lower Than That of Comparable Employers Operating in the Same Labor Markets

3    The under-representation of women in management at Wal-Mart is markedly different

4   from the employment patterns of other major retailers. While Wal-Mart employs an in-store

5   management workforce with 34.5% women, comparable retailers employ 56.5% female

6   management, a staggering 22 percent difference. Bendick Decl. at ¶ 31.

7         Labor economist Marc Bendick compared, or benchmarked, Wal-Mart against 20

8   comparable general merchandise retailers, much as Wal-Mart itself benchmarks it workforce

9   with other retailers. His analysis relied on workforce data from EEO-1 reports provided by the

10  companies to the EEOC. Rather than simply comparing the percentage of female management

11  in each company overall, Dr. Bendick broke down the company-to-company comparisons into

12  375 local labor markets, comparing Wal-Mart only to the other firms that compete for labor in

13  the same local labor area.[26] For each local labor market, Dr. Bendick calculated the average

14  proportion of women among managers in all firms in the specific market, including Wal-Mart.

15  He then calculated the "shortfall" – the number of additional female managers that Wal-Mart

16  would have if it utilized women in management at the same rate as these market averages.

17       Dr. Bendick found that, in 1999, Wal-Mart had a cumulative shortfall of 4,004 female in-

18  store managers, compared to the expected number based on the representation of women in the

19  large chain retail industry, a 22% difference. Bendick Decl. at ¶¶ 30, 31. Put differently, "for

20  every *seven* women managers Wal-Mart actually employed, *three* additional women managers

21  were "missing." Bendick Decl. at ¶ 30 (emphasis in original). Dr. Bendick determined that this

22  result was highly statistically significant. The shortfall corresponds to 47 standard deviations,

23  meaning that the probability that the result was due to chance alone was "less than one chance in

24  many billions." Bendick Decl. at ¶ 32. The shortfall was consistent throughout the country,

25

26

27  [26] This analysis ensured that differences in employment patterns among the firms are not a function of differing markets.

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ        PAGE 30

1 found in four out of every five Wal-Mart stores, in 49 out of 50 states (including California), and

2 in both urban and non-urban communities. Bendick Decl. at ¶¶ 44, 45.

3 Dr. Bendick then conducted the bench-marking analysis for the period 1975 – 2002 and

4 found that Wal-Mart had a consistent shortfall in female managerial representation in every year

5 examined. He found that by 1999, Wal-Mart had not yet achieved the level of representation for

6 women managers that comparable firms had 25 years ago. Dr. Bendick concluded that:

7     [t]he scale, pervasiveness, and consistency of under-representation of women among
    Wal-Mart's managers suggests that such under-representation is deeply rooted in the
8     organization's corporate culture and the company-wide employment attitudes, policies
    and practices that reflect and maintain that culture.
9
Bendick Decl. at ¶ 67.
10
Notably, Dr. Bendick's results are consistent with the results of Wal-Mart's own internal
11
bench-marking studies, which also concluded that Wal-Mart falls significantly behind other
12
comparable firms. *See* discussion *infra* at Section II.F. Wal-Mart also conducted its own "gap"
13
analysis to determine the number of females in management it would need to match their
14
representation in the community. It concluded that Wal-Mart had a "gap" of 3324 women
15
managers. Gap Analysis, Ex. 104; Division 1 Operations Gap Analysis/Action Plan, Ex. 105 at
16
WMHO665709; Haworth Dep. at 170:1-24, Ex. 18.
17
    **F.    Wal-Mart Senior Management Has Been Aware of the Adverse Effects of Its
18         Personnel Policies on Female Employees for Many Years But Has Failed to
        Take Effective Steps to Redress These Problems**
19
        1.    Wal-Mart Management Has Long Known of the Adverse
20                 Consequences of Its Policies on Female Employees

21 Wal-Mart's People Division has annually prepared reports showing the percentage of

22 women in management positions company-wide since at least 1993. Fourth Quarter Diversity

23 Representation: Total Management, Ex. 106: Diversity Report FY00 1st Quarter YTD, Ex. 107;

24 7/15/99 Email and Attachments Re: Diversity Presentation, Ex. 108; 10/02/01 Email and

25 Attachments Re: Cole's Board Presentation, Ex. 109; Coleman Peterson, the Executive Vice

26 President of the People Division, annually presents these incumbency reports company-wide and

27 by division, to the Wal-Mart Board of Directors as well as to senior management. Peterson Dep.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ    PAGE 31

1  at 72:18-73:1, Ex. 16. The reports demonstrate that, since 1998, the percentage of women in
2  management has shown little improvement. *Compare* Ex. 108 at WMHO 733389 with Ex. 109
3  at WMHO 733164.

4  Wal-Mart has also conducted studies comparing the percentage of women in management
5  at Wal-Mart to that of other retailers. Retail Benchmarks on Diversity, Ex. 110. As Coleman
6  Peterson candidly put it four years ago, "we are behind the rest of the world."[27] Bentonville '99
7  People Strategic Planning Session, Ex. 111 at WMHO363415. Minutes from the Compensation
8  and Nominating Committee of the Board of Directors for March 1999 state that "Wal-Mart's
9  women in field management percent of 32.4% is significantly behind several of the other
10 retailers reporting between 43.2% and 65.3%. . . . The Wal-Mart percent of women (32.4%) trails
11 both the retail industry of 38.6% and workforce averages of 33.9%." 3/4/99 Minutes of Meeting
12 of the Compensation and Nominating Committee of the Board of Directors, Ex. 112; *see also*,
13 6/1/00 Minutes of Meeting of the Compensation and Nominating Committee of the Board of
14 Directors, Ex. 113 at WMHO 502683. In a February 2001 memo to the Executive Committee,
15 Peterson compared data from the "Catalyst Census of Women Corporate Officers" to Wal-Mart's
16 senior corporate ranks. He noted that: "Wal-Mart is behind both the Fortune 500 and General
17 Merchandisers in the development of women into Corporate Officers" and "Wal-Mart reported
18 no women in the 'clout title.'" Memo Re: Catalyst Census of Women Corporate Officers and
19 Top Earners, Ex. 114.

20 Wal-Mart management has long been aware that its relocation requirement had an
21 adverse impact on female employees seeking management promotions, and that the requirement
22 led some managers to avoid considering women for management. Wal-Mart has a requirement
23 that, to qualify for management positions, an employee had to be willing to move his or her

24 _____

25 [27] Coleman Peterson repeatedly and forcefully alerted the Board and Senior executives to
   the problem of diversity in management, in these and other memos. In a remarkable effort to
26 avoid the consequences of these early alerts to the Board, Mr. Peterson disavowed one of these
   memos at his deposition, calling it "a lie" intended solely to get the attention of management.
27 Peterson Dep. at 243:6-244:5, Ex. 16.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ          PAGE 32

1   residence at any time. "Traditionally, we've had this attitude that if you wanted to be a manager

2   at Wal-Mart, you basically had to be willing to move on a moment's notice. . . . You just pack

3   and go, then sometime later you worry about selling your house and moving your family." Ex.

4   87 at 217. By at least 1992, Sam Walton had recognized that the relocation requirement was no

5   longer justified by business needs and was creating a barrier to the advancement of women.

6       Maybe that was necessary back in the old days, and maybe it was more rigid than it
         needed to be. . . . the old way really put good smart women at a disadvantage in our
7        company because at that time they weren't as free to pick up and move as many men
         were. Now I've seen the light on the opportunities that we missed out on with women.
8
    *Id.* at 217-218.[28] Many other internal Wal-Mart documents recognize that relocation is a barrier
9
    for the advancement of women into management positions. Email re: Women in Leadership, Ex.
10
    115; Diversity Ideas, Ex. 116. Many class members have been deterred from seeking promotion
11
    by the relocation requirement. *See, e.g.,* Crawford Decl. at ¶ 4; Ervine Decl. at ¶ 18, 19; Gordon
12
    Decl. at ¶ 10; Renati Decl. at ¶ 2; Williams, L. Decl. at ¶ 13; Tallent Decl. at ¶ 8.
13
        Notwithstanding the clear evidence of an adverse impact, Wal-Mart still requires that
14
    assistant management candidates be willing to relocate as a prerequisite to promotion. Coughlin
15
    Dep. at 159:23-160:25, Ex. 15 ; Promotional Guidelines, Ex. 98; Relocation Agreement, Ex. 117;
16
    Grimm Dep. at 142:8-143:6, Ex. 60 (same requirement at Sam's Club). As Sam's Club's former
17
    president put it, relocation is necessary "in order to keep a very viral [sic], vital company
18
    growing." *Id.* Many class members have stated under oath that they were told by management
19

20

21

22      [28] At Walton's direction, the company established the Resident Assistant Manager
23   (RAM) Program, which allowed employees (both male and female) to be promoted to the
     management ranks without moving their residence. Schwindt Dep. at 148:13-149:12, Ex. 38.
24   There has been no publicity or posting of the policy to the hourly associates since at least 1996.
25   Curran Dep. at 55:14-20, Ex. 61. Wal-Mart has taken no steps to encourage individuals to avail
     themselves of the RAM program. Curran Dep. at 82:25-83:10, Ex. 61. There are fewer people
26   in the program today than in the mid-90's. Harper II Dep. at 246:11-17, Ex. 1. Even today, Wal-
     Mart leadership regard the RAM position as a dead end job. Coughlin Dep. at 157:22-158:6, Ex.
27   15.

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ        PAGE 33

1   that relocation was required for promotion to management.[29]

2       Turning to compensation, Wal-Mart claims it has not prepared any regular analyses of

3   compensation by gender, a surprising position since the company uses its information technology

4   system to track every other aspect of its business. Arnold Dep. at 174:2-12; 229:17-230:6, Ex.

5   31; Coughlin Dep. at 122:21-123:5, Ex. 15; Harris Dep. at 176:20-177:8, Ex. 62. The few

6   isolated reports that have been produced by Wal-Mart consistently show that women on average

7   are paid less than men holding the same positions. Peterson Dep. at 141:5-20, Ex. 16. For

8   example, a study of retail store management positions conducted in 2000 concluded that

9   "[g]enerally, average salaries for female and minority males are below the overall average pay

10  for most jobs" and "[a]verage pay increases for minority males and females are generally below

11  overall average income ratio across most jobs." Wal-Mart Stores/Supercenter Minority/Gender

12  Pay Analysis FYE 2000, Ex. 120; Sam's Club Minority/Gender Pay Analysis FYE 2000, Ex.

13  121. Another study of the average salaries of new district managers by gender showed that in

14  every year since 1987, new male district managers were paid more than new female district

15  managers – with the difference ranging from $3,000 to $15,000. District Manager Average

16  Salary Chart, Ex. 122; *see also* District Manager Average Salary by Time in Position Chart, Ex.

17  123.

18

19  [29] *See e.g.,* Stumpf Decl. at ¶ 4; Calimee Decl. at ¶ 2; Connaker Decl. at ¶ 8; Crom Decl.
20  at ¶ 6, 8; Collier Decl. at ¶ 5, 7, 8, 11, 14; Dobbs Decl. at ¶ 4; Ervine Decl. at ¶ 18, 19; Gordon
    Decl. at ¶ 10; Hall, T. Decl. at ¶ 6, 8, 9, 27; Johnson, J. Decl. at ¶ 8; Kellems Decl. at ¶ 6, 21;
21  Lehman Decl. at ¶ 6, 12, 14; Martin Decl. at ¶ 3, 4; Ramirez Decl. at ¶ 13, 27; Pidich Decl. at ¶
22  15, 19; Renati Decl. at ¶ 2; Rojas Decl. at ¶ 9; Bell Decl. at ¶ 4, 9; Crawford Decl. at ¶ 2, 4, 8;
    DeWall Decl. at ¶ 6; Durfey Decl. at ¶ 3; Durfey Decl. at ¶ 8; Farmer Decl. at ¶ 9, 10; Johnson,
23  K. Decl. at ¶ 19; Jones, L. Decl. at ¶ 5b; Marshall Decl. at ¶ 4; Rojas Decl. at ¶ 9; Williams, L.
    Decl. at ¶ 13; Zumbrum Decl. at ¶ 17; Tallent Decl. at ¶ 8; Mott Decl. at 12. Since the filing of
24  this lawsuit, Wal-Mart's official policy has shifted to treating relocatability as a "preferred" but
25  not required criteria. Emails re: Management Relocatability, Ex. 118. The change in "official"
    policy appears to be a response to the lawsuit. Email re: Response to the Retreat Notes, Ex. 119.
26  However, senior management is apparently unaware of this post-litigation change in policy.
    Coughlin Dep. at 159:23-160:11, Ex. 15. Wal-Mart's change in policy, in the face of litigation,
27  demonstrates that the "requirement" was not necessary to meet business needs.

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ          PAGE 34

1    If these reports were not enough to alert Wal-Mart management to these problems, many

2    individual Wal-Mart and Sam's Club female employees have tried to raise the alarm by calling

3    and sending letters and e-mails to Wal-Mart executives. Farmer Decl. at ¶ 21 and Exs. 1 and 2

4    (declarant sent e-mails to Wal-Mart CEO Lee Scott in 2000 and 2001 chronicling the ways in

5    which she had observed a gender gap in pay within her store: "[F]emale department managers

6    [who] have been with Wal-Mart for seven years... don't make as much as some male associates

7    [who] have only been with Wal-Mart a few years... Talk about discrimination..."); Ratliff Decl. at

8    ¶ 13 and Ex. A (declarant wrote letter to Wal-Mart CEO Lee Scott in 2002 describing concerns

9    about the gender differences in pay and treatment at her Wal-Mart Neighborhood Market);

10   Collier Decl. at ¶ 15 (declarant wrote letter to Wal-Mart CEO Lee Scott in August 2000

11   complaining about gender and racial discrimination). *See also* Hom Decl. at ¶¶ 12, 13 (female

12   assistant manager received copies of three letters in 1992 and 1993 to top executives of Wal-Mart

13   describing concerns about a pattern of discrimination and retaliation against women employees at

14   Sam's Club).

15   Outside groups have also tried to direct Wal-Mart management's attention to the

16   problems of discrimination against female workers. For several years, a group of nuns has

17   attended Wal-Mart's annual shareholder meeting and asked the company to conduct a glass

18   ceiling review. Reeves II Dep. at 118:9-13, Ex. 33. Each year, the company has successfully

19   urged shareholders to reject the proposal. Notice of Annual Meeting of Shareholders, Ex. 124.

20   Notwithstanding the clear evidence that female employees have been disadvantaged by

21   pay and promotion practices, Wal-Mart has not undertaken any analysis or study of the causes of

22   these problems. Coughlin Dep. at 122:6-123:5, Ex. 15; Harris Dep. at 176:20-177:8, Ex. 62;

23   Indeed, even after this lawsuit was filed, the company took no steps to investigate the problems

24   further. Harper I. Dep. at 36:3 - 37:14, Ex. 1; Swanson Dep. at 127:15-128:13, Ex. 14.

25   Nor can Wal-Mart attribute the plight of its female employees to innocent causes. Wal-

26   Mart concedes that women are not less qualified as a group than men for management positions

27   nor does it contend that women are more frequently disciplined. WM Supplemental Response to

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ          PAGE 35

1 | Interrogatories No. 11, 17, Ex. 97. Moreover, many senior managers testified that they had no
2 | reason to believe that women are less interested in management than are men. Harris Dep at
3 | 85:7-86:5, Ex. 62; Carpenter Dep. at 141:16-19, Ex. 28. Indeed, they were at a loss to explain
4 | why so few women held management positions. Kocharian Dep. at 7:18-22, Ex. 64; M.
5 | Anderson Dep. at 10:25-11:2, Ex. 63; Sherman Dep. at 12:15-13:3, Ex. 43; Bishop Dep. at
6 | 21:18-20, Ex. 65; Harper II Dep. at 304:3-22, Ex. 11; Schwindt Dep. at 211:16-212:25, Ex. 38.
7 | This willful ignorance cannot be reconciled with Wal-Mart's claim to be committed to diversity
8 | and respect for the individual.

9 |
2. The Numerical Goals for Women in Management Are Arbitrarily Set and Lack Any Mechanism for Holding Managers Accountable

10 |
11 | Wal-Mart sets numerical goals for the overall percentage of women in management.

Harper II Dep. at 292:25-293:4, Ex. 11. The goals are set at the district level and then aggregated
12 |
into regional and divisional goals. *Id* at 294:7-14. Store managers are largely unaware of the
13 |
diversity goals. Mireles Dep. at 219:20-23, Ex. 26; Raps Dep. at 222:9-223:15, Ex. 48; Bosler
14 |
Dep. at 85:6-13, Ex. 57; Oshier Dep. at 69:16-24, Ex. District managers are not given any
15 |
direction about how to set goals for their district and they can do so however they wish. Harper
16 |
II Dep. at 297:22-298:5, Ex. 11; Butler Dep. at 203:11-21, Ex. 4. The goals are not tied to any
17 |
analysis of the number of women who are available and qualified for promotion to the next
18 |
level. Harper II Dep. at 302:7-21, Ex. 11. Typically, managers set modest goals that only
19 |
slightly exceed the levels of women currently holding management positions. Bielby Decl. at ¶
20 |
55. As District Manager Danny Carter put it, he did not want to set a goal that was "unrealistic
21 |
or I knew wouldn't happen immediately." D. Carter Dep. at 220:3-24, Ex. 23. RPM Sandy
22 |
Ellison testified that she reviewed the district manager goals simply to see if they "weren't worse
23 |
than the year before." Ellison Dep. at 187:12-23, Ex. 66.
24 |

Failure to meet even these modest goals has no real consequence on the district manager.
25 |
Jarrells Porter Dep. at 149:17-150:1, Ex. 67. Meeting diversity goals is just one of four elements
26 |
of a performance dimension that makes up 5% of a district manager's evaluation. Reeves II Dep.
27 |

28 | PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ          PAGE 36

1 at 44:5-7, Ex. 33. Even worse, it is not necessary to actually meet the goal to get a positive

2 diversity score. A manager only needs to "show progress" in meeting these goals. In fact, where

3 a senior manager's figures showed that the percentage has actually declined, he still received a

4 positive score. Haworth Dep. at 153:3-20, Ex. 18. Not surprisingly, the goals have had little

5 impact on the percentage of women in field management. Drogin Decl. at ¶¶ 21, 77.

6     It is well understood that, unless there is meaningful accountability for meeting diversity

7 goals, they will not accomplish their purpose. Bielby Decl. at ¶¶ 56-57. When asked how the

8 female representation in field management could be increased, former Sam's Club Vice President

9 of Human Resources, Jeffrey Reeves, explained:

10     I think what you do is to get people's attention you tie expectations and the number to
    people's incentive, whether it's their base or it's their bonus, but I think that's the first and
11     foremost and most important piece. Until you do that, it will continue to be lip service.

12 Reeves II Dep. at 281:19-282:4, Ex. 33. *See also* Bilgischer Dep. at 184:25-185:19, Ex. 45.

13     Accordingly, the record assembled in this action readily demonstrates that Wal-Mart has

14 pursued a common set of compensation and promotion policies and practices which have

15 disadvantaged female employees and which, notwithstanding knowledge of the shortcomings of

16 these practices and policies by senior management, have been left unremedied for the entire

17 period covered by the proposed class. The claims of the Named Plaintiffs and of the thousands

18 of women associates who are similarly situated are susceptible of class treatment.

19 **III. ARGUMENT**

20     Plaintiffs ask this Court to certify a class consisting of:

21     All women employed at any Wal-Mart domestic retail store at any time since December
    26, 1998 who have been or may be subjected to Wal-Mart's challenged pay and
22     management track promotions policies and practices.[30]

23     A motion for class certification is not an occasion for examination of the merits of the

24 case. *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2nd Cir. 1999); *see also*

25

26     [30] The class definition excludes decisions on promotions into, or compensation for, store
pharmacists, who are subject to specialized educational and state licensing requirements. *See*
27 n.14.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ     PAGE 37

1   *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 745, 480 (9th Cir. 1983). "There is nothing in

2   either the language or history of Rule 23 that gives a court any authority to conduct a preliminary

3   inquiry into the merits of a suit in order to determine whether it may be maintained as a class

4   action. . ." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). Instead, the Court must

5   determine if the plaintiffs have proffered evidence to meet each of the requirements of Rule 23.

6   No weighing of competing evidence is appropriate at this stage of the litigation. *Caridad*, 191

7   F.3d at 293.

8       Plaintiffs state claims under both the disparate treatment and disparate impact analyses of

9   Title VII. As discussed below, this class meets all the requirements of Rule 23(a): numerosity,

10   commonality, typicality and adequacy of representation. In addition, this class meets the

11   requirements of Rule 23(b)(2) in that final injunctive relief is appropriate.

12   **A.**   **All Requirements of Rule 23(a) Are Met**

13     1.   <u>The Proposed Class is Sufficiently Numerous</u>

14       The class proposed here is plainly so numerous that "joinder of all members is

15   impracticable." Fed. R. Civ. P. 23(a)(1). Classes of fewer than 100 persons are sufficiently

16   numerous to render joinder impracticable. *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319

17   n.10 (9th Cir. 1982) *judgment vacated on other grounds* at 459 U.S. 810 (1982). Wal-Mart

18   employs over 930,770 hourly employees, Drogin Decl. at ¶ 31, Table 14 and almost two-thirds

19   are women. *Id*. There should be no dispute that this satisfies the numerosity requirement.

20     2.   The Claims of the Named Plaintiffs Are Typical of the Class They Seek to <u>Represent</u>

21

22       Typicality is satisfied where the named plaintiffs have suffered from defendant's general

23   policy of discrimination in compensation and promotions. *Gen. Tel. Co. of Southwest v. Falcon*,

24   457 U.S. 147, 159 n.15 (1982); *Piva v. Xerox Corp.*, 70 F.R.D. 378, 387-88 (N.D. Cal. 1975).[31]

25     [31] Moreover, the "commonality and typicality requirements of Rule 23(a) tend to merge."

26   *Falcon*, 457 U.S. at 157 n.13. A finding of commonality will ordinarily satisfy the requirement of typicality as well. *Barefield v. Chevron U.S.A., Inc.*, No. C-86-2427 TEH, 1987 WL 65054, at

27   *5 (N.D. Cal. 1987); *Piva v. Xerox Corp.*, 70 F.R.D. 378, 385 (N.D. Cal. 1975). Thus, the

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ     PAGE 38

1  Under the rule's "permissive standards," representative claims are "(typical) if they are
2  reasonably co-extensive with those of absent class members; they need not be substantially
3  identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Here, named
4  plaintiffs Betty Dukes, Cleo Page and Patricia Surgeson have each suffered from Wal-Mart's
5  general policy of discrimination in compensation, and each of the plaintiffs – Betty Dukes,
6  Patricia Surgeson, Cleo Page, Debra Gunter, Edith Arana and Christine Kwapnoski – have
7  suffered from Wal-Mart's general policy of denying women promotions to management
8  positions. *See* nn.12 and 16. It is not necessary for every named plaintiff to have been affected
9  by every type of discrimination challenged in plaintiffs' class claims. It is sufficient that, taken
10  as a whole, the named plaintiffs have been subject to each of the challenged practices. *Staton v.*
11  *Boeing* 313 F.3d 447, 466 (9th Cir. 2002). Plaintiffs need not have a class representative for
12  each job category and for each type of claim alleged. *Taylor v. Union Carbide Corp.,* 93 F.R.D.
13  1, 6 (S.D. W. Va. 1980) [32]

14  Any minor factual variations arising from the individual details of each plaintiff's
15  employment are irrelevant since all proceed under the same legal theory: that Wal-Mart's
16  centrally controlled personnel system systemically disadvantages women employees in
17  compensation and promotion decisions. *Wofford v. Safeway Stores Inc.*, 78 F.R.D. 460, 488
18  (N.D. Cal. 1978); *Adams v. Pinole Point Steel Co.*, 1994 WL 515347, 65 F.E.P. 774 (N.D. Cal.
19  1994). Thus, the named plaintiffs may properly represent a nationwide class, although they all

20

21  typicality requirement is also satisfied for the reasons set forth in the discussion of commonality,
22  in subsection 3 below.

23  [32] Further, it does not matter that some women have been denied promotion to assistant
24  manager positions and others have been denied promotion to store manager positions. As a court
   in this district found in certifying an employment discrimination class action, "the Court
25  perceives no significant difference in interest . . . among those employees denied opportunity for
   advancement, at whatever level that denial occurred." *Wofford v. Safeway Stores, Inc.*, 78 F.R.D.
26  460, 491 (N.D. Cal. 1978). *See Stender v. Lucky Stores, Inc.*, 1990 U.S. Dist. Lexis 19985 (N.D.
   Cal. June 8, 1990) (named plaintiffs allowed to represent claims of initial assignment, although
27  they only had claims for lack of promotion).

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ       PAGE 39

1   reside in California.  The class representatives have been subjected to the same policies and

2   practices that have adversely affected members of the class that they seek to represent.  The same

3   compensation and promotion practices in effect in the California stores apply throughout Wal-

4   Mart's other domestic facilities.  *See* Sections II C, D *supra*.  Accordingly, the claims of the

5   named plaintiffs are typical of the claims advanced by members of the class they seek to

6   represent.

7        Plaintiffs have submitted the declarations of over 110 current and former female

8   employees who explain how they each have been subjected to the discriminatory pay and

9   promotion practices at issue in this case.  The Supreme Court has recognized that such anecdotal

10  evidence is particularly valuable to "bring the cold numbers convincingly to light."  *Teamsters v.*

11  *United States*, 431 U.S. 324, 339 (1977).  These declarants have worked in Wal-Mart and Sam's

12  Club stores all over the country.  Ex. 125 (map of locations of discriminatory events described by

13  declarations).   What is striking about their stories is that, even though they worked in different

14  stores, in different states and in different divisions, they experienced the same discriminatory

15  policies and suffered the same adverse consequences.

16                    3.    There Are Questions of Law and Fact Common to the Class

17       Rule 23(a)(2) requires that there be questions of law or fact common to the class.  It does

18  not require that all questions of law or fact be common to every single member of the class;

19  rather, at least one issue must be common to the claims of all the class members.  *Hanlon,* 150

20  F.3d at 1019; 5 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §3.10 at 154 (3d

21  ed. 1992); 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d*, §1763, at 198

22  (1986).  Courts have not considered commonality a difficult hurdle; the requirement should be

23  "construed permissively."  *Hanlon,* 150 F.3d at 1019.

24       For example, there is sufficient commonality where "the named plaintiffs' claims . . .

25  charge discrimination based on patterns and practices not special or unique to themselves, and

26  the members of the putative class . . . have been similarly victimized by the same patterns or

27  practices."  *Wofford*, 78 F.R.D. at  478; *see also Bouman v. Block*, 940 F.2d 1211, 1232 (9th Cir.

28

1    1991). Plaintiffs here have alleged the existence of common discriminatory practices in
2    compensation and promotion which affect putative class members in a like manner as the named
3    plaintiffs.

4         Moreover, differences in the ways in which these practices affected individual members
5    of the class do not undermine the finding of commonality. *Staton*, 313 F.3d at 447, 464 (where
6    plaintiffs have alleged a "complex of discriminatory practices," individual class members need
7    not have been affected by every practice); *Wofford*, 78 F.R.D. at 473 ("a class action may be
8    maintainable to challenge a general course of discrimination, even though different members of
9    the class may have been affected in different ways and at different times.") For example,
10   different class members may have been under-compensated in different amounts; some
11   employees may have been denied promotion to Assistant Manager while others may have been
12   denied promotion to Store Manager. Nonetheless, all harm for which relief is sought is the result
13   of the same general course of conduct.

14        The class is challenging discrete policies and practices that have adversely affected the
15   female employees within Wal-Mart's domestic retail facilities. The challenged policies have as a
16   common feature that they have entrusted to managers very broad discretion to make promotion
17   and compensation decisions with little or no oversight.[33] As the Supreme Court recognized, the
18   "problem of subconscious stereotypes and prejudices" when combined with an "undisciplined
19   system of subjective decisionmaking has precisely the same effect as a system pervaded by
20   impermissible intentional discrimination." *Watson v. Fort Worth Bank of Trust Co.*, 487 U.S.
21   977, 990-91 (1988). The common policies and practices that the class challenges include:

22        (a) Wal-Mart's decision not to issue criteria for making promotion selections from
23   among minimally qualified candidates, thereby permitting the managers to use subjective and

24   _____

25   [33] An employer's decision to permit subjective decision making has been recognized as
     presenting common questions appropriate for class certification. *Wofford*, 78 F.R.D. at 479;
26   *Caridad*, 191 F.3d at 286; *Wagner v. The NutraSweet Co.*, 170 F.R.D. 448, 450-51 (N.D. Ill.
     1997); *Morgan v. UPS,* 169 F.R.D. at 349; *Shores v. Publix Super Mkts., Inc.*, No. 95-1162-
27   CIV-T-25(E), 1996 U.S. Dist. LEXIS 3381 (M.D. Fla. March 12, 1996).

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ        PAGE 41

1    idiosyncratic factors in making such selections that may be based on stereotypes, rather than job-

2    related factors. Bielby Decl. at ¶¶ 38-39; *supra* at Section II D;

3        (b) Wal-Mart's decision to entrust managers with the discretion to forego posting job

4    vacancies, its refusal, until January 2003, to post vacancies for its Management Training

5    Program, thereby denying many women the chance to even apply for promotions, and its refusal

6    generally to post assistant manager and co-manager positions. Bielby Decl. at ¶ 44, *supra* at

7    Section II D;

8        (c) Wal-Mart's decision not to exercise oversight or conduct any systematic review of

9    the grounds on which candidates are selected for promotion, ensuring that whatever bias may

10    infect promotion decisions goes undetected and unremedied; Bielby Decl. at ¶¶ 21- 44; *supra* at

11    Section II D ;

12        (d) Wal-Mart's decision to authorize managers to depart from the starting pay rates for

13    hourly employees without offering any guidance or training on the particular factors that may be

14    considered or limits on the pay rates that may be offered, permitting managers to make decisions

15    based on gender rather than merit; Bielby Decl. at ¶ 40; *supra* at Section II C;

16        (e) Wal-Mart's decision to authorize managers to award pay raises for "exceptional

17    performance," without offering any guidance as to the factors that may be considered, allowing

18    bias to infect decisions on pay; Bielby Decl. at ¶¶ 21- 41; *supra* at Section II C;

19        (f) Wal-Mart's decision not to conduct any systematic review of compensation decisions

20    by gender, thereby allowing bias that has entered compensation decisions to go undetected and

21    unremedied. Bielby Decl. at ¶ 37; *supra* at Section II F;

22        (g) Wal-Mart's decision to require that candidates for management promotions be

23    willing and able to relocate, despite the concession that such a requirement lacks any business

24    justification and its operation has disadvantaged female employees. Bielby Decl. at ¶¶ 21- 45;

25    *supra* at 32-33.

26        Common questions of law and fact are presented with respect to each of Wal-Mart's

27    policies and practices set forth above. Specifically, two factual questions arise (i) are these

28    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION    Case No. C-01-2252 MJJ      PAGE 42

1    practices common throughout Wal-Mart?; and (ii) do these practices cause women at Wal-Mart
2    to be paid less and promoted less often than similarly situated male employees? There are also
3    three common legal questions: (i) does Wal-Mart's conduct violate Title VII, 42 U.S.C. § 2000e-
4    5, by causing a pattern or practice of discrimination against women employees?; (ii) does Wal-
5    Mart's conduct violate Title VII because it has a disparate impact on women employees that is
6    not justified by business necessity?; and (iii) did Wal-Mart act with reckless indifference to the
7    federally-protected rights of its female employees, making it liable for punitive damages?

8    4.    The Named Plaintiffs and Their Counsel Are Adequate Representatives

9    Rule 23(a)(4) requires that the named representatives "will fairly and adequately protect
10   the interests of the class." The rule is satisfied where, as here: (1) the representatives' claims are
11   sufficiently interrelated to and not antagonistic with the class' claims; and (2) counsel for the
12   representatives are qualified, experienced and generally able to conduct the litigation. *Hanlon*,
13   150 F.3d at 1020; *Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24, 42 (N.D. Cal.
14   1977); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). Here, the
15   interests of the class and the interests of the named plaintiffs are the same. Both seek to prove
16   the existence of Wal-Mart's general practice of gender discrimination in compensation and
17   promotion. There is no antagonism between the named plaintiffs' claims and those of the class
18   they seek to represent.

19   The named plaintiffs have retained counsel who have the resources and expertise to
20   prosecute this action vigorously on behalf of the class. Plaintiffs retained a coalition of three not-
21   for-profit organizations and three private law firms each of which, standing on its own, possesses
22   substantial experience in litigating employment discrimination cases; collectively they are more
23   than qualified to serve as class counsel. *See* Declaration of Brad Seligman, *passim*. Plaintiffs
24   have retained counsel who are among the most experienced in the country in representing
25   plaintiffs in employment discrimination class actions. *Id.*

26   **B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2)**

27   Certification under Rule 23(b)(2) is appropriate when the defendant "has acted or refused

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ        PAGE 43

1  to act on grounds generally applicable to the class," thereby making appropriate final injunctive

2  relief or corresponding declaratory relief with respect to the class as a whole. Fed. R. Civ. P.

3  23(b)(2). "Civil rights cases against parties charged with unlawful, class-based discrimination

4  are prime examples" of Rule 23(b)(2) classes. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

5  117 S. Ct. 2231, 2245 (1997). Indeed, it is "often acknowledged, (b)(2) was deliberately drafted

6  to facilitate the vindication of civil rights through the class action device." *Barefield v. Chevron*

7  *U.S.A., Inc.*, 48 F.E.P. Cases 907, 910 1988 WL 188433 (N.D. Cal. 1988).

8

        1.    The Court Should Certify a Class for Liability, Injunctive and Equitable
            Relief Under Rule 23(b)(2)

9

10  Certification of a class under Rule 23(b)(2) is appropriate here because Wal-Mart has

11  acted and refused to act on grounds generally applicable to the entire class. *See* section III A.3,

12  *supra*. Here, plaintiffs have alleged that Wal-Mart has acted in a discriminatory manner

13  generally applicable to the class, and plaintiffs have sought declaratory and injunctive relief with

14  respect to the class as a whole. Third Amended Complaint at ¶¶ 19, 114, Prayer for Relief.

15  Moreover, plaintiffs have presented evidence that these general practices have adversely affected

    many members of the class. *See* Drogin Decl., *passim*.

16

17  In addition to substantial injunctive relief, plaintiffs seek back pay for the class as a

18  whole. Back pay awarded under Title VII, while monetary in nature, is a form of equitable relief.

19  *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1152-55 (9th Cir. 1999). Plaintiffs

20  seeking back pay have long secured certification under Rule 23(b)(2). *See, e.g., Probe v. State*

21  *Teachers' Ret. Sys.,* 780 F.2d 776 (9th Cir. 1986); *Salinas v. Roadway Express*, 735 F.2d 1574,

22  1576 (5th Cir. 1984); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998); *see*

    *also*, 42 U.S.C. § 2000e-5(g) (1994).

23

24

        2.    The Court Should Certify Plaintiffs' Claims for Punitive Damages Under
            Rule 23(b)(2) With Notice and Right to Opt Out

25  Plaintiffs also seek a class-wide award of punitive damages to punish Wal-Mart for its

26  reckless disregard of the rights of its women employees to equal employment opportunity, and to

27  deter similar misconduct by Wal-Mart and other large retailers in the future. *See* Third Amended

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 44

1   Complaint , Prayer for Relief. An award of punitive damages to the class as a whole is

2   appropriate here because the misconduct warranting punitive damages was perpetrated by senior

3   Wal-Mart management and has adversely affected women employees in a similar fashion.

4   *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1991); *Barefield,* 1988 WL 188433, at *3;

5   *Beck v. The Boeing Co.*, 203 F.R.D. 459 (W.D. Wa. 2001), *modified by slip op*. Dec. 27, 2001,

6   *affirmed in part, vacated in part by unpublished decision*, 2003 WL 683797, 83 Empl. Prac. Dec.

7   ¶ 41, 313 (9th Cir. Feb. 25, 2003); *EEOC v. Dial Corp.*, Civ. Action No. 99-C-3356, *slip op*

8   (N.D. Ill. Feb. 14, 2003), *See* Declaration of Julie Goldsmith, hereinafter referred to as

9   "Goldsmith Decl."

10      Claims for punitive damages, awarded to the class as a whole, may properly be certified

11  under Rule 23(b)(2).[34] Out of an abundance of caution, however, plaintiffs ask that the Court

12  direct that class members be provided notice and an opportunity to opt out, akin to that provided

13  by Rule 23(b)(3). The Court may do so pursuant to Rule 23(d), which permits it to issue such

14  orders as are necessary. *See Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003). In *Molski,* the

15  Ninth Circuit adopted an *ad hoc* approach similar to the Second Circuit in *Robinson v. Metro-*

16  *North Commuter R.R. Co.,* 267 F.3d 147 (2d Cir. 2001) to determine whether certification under

17  Rule 23(b)(2) was appropriate in cases seeking monetary in addition to injunctive relief, and

18  encouraged the use of notice under Rule 23(d) to address concerns about the interests of absent

19

20

21  [34] It has long been recognized in this circuit that classes could be certified under Rule 23(b)(2) even when such actions involve damages. *Probe*, 780 F.2d at 780 ("Class actions

22  certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages." affirming Rule 23(b)(2) class

23  certification of claims under the Equal Pay Act seeking monetary damages); *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003). Courts have specifically included punitive damages in classes

24  certified under Rule 23(b)(2); *Barefield*, 1988 WL 188433, at *3; *Butler v. Home Depot*, No. C-94-4335 SI, 1996 WL 421436 (N.D. Cal. Jan. 25, 1996). *See also Arnold v. United Artists*

25  *Theatre Circuit, Inc.*, 158 F.R.D. 439, 450, 461 (N.D. Cal. 1994) (certifying entire case under

26  Rule 23(b)(2) because the statutory damages available in that case were more akin to back pay claims in the ease of their calculation); *Rodriguez v. Carlson*, 943 F. Supp. 1263, 1275-77 (E.D.

27  Wash. 1996) (same).

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ      PAGE 45

1  class members. *Molski*, 318 F.3d at 947, 949-50.

2        This hybrid approach has also been endorsed by other circuits called upon to address

3  precisely employment discrimination classes seeking punitive damages. *Robinson v. Metro-*

4  *North Commuter R.R. Co.*, 267 F.3d 147, 166-67 (2d Cir. 2001) ("any due process risk posed by

5  (b) (2) class certification of a claim for non-incidental damages can be eliminated by the district

6  court simply affording notice and opt out rights to absent class members for those portions of the

7  proceedings where the presumption of class cohesion falters – *i.e.*, the damages phase of the

8  proceedings."); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898-99 (7th Cir. 1999) (endorsing

9  certification under Rule 23(b)(2) with notice and opt-out provided for damage claims); *see also*

10  *Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997) (finding Rule 23(d)(5) "broad enough to

11  permit the court to allow individual class members to opt out of a (b) (1) or (b) (2) class when

12  necessary to facilitate the fair and efficient conduct of the litigation.") (citation omitted).

13        In awarding punitive damages, defendant's conduct, not the individual circumstances of

14  class members, is at issue. *Kolstad*, 527 U.S. at 536; *see also, Cooper Indus. v. Leatherman Tool*

15  *Group*, 532 U.S. 424, 432 (2001). The circumstances of individual class members, therefore, do

16  not preclude the class from seeking a collective award of punitive damages. In *Barefield*, Judge

17  Henderson applied this same analysis in an employment discrimination class action:

18      A class claim for punitive damages does not detract from the homogeneity or
    cohesiveness of the class. Rather, it is consistent with the notion that the focus of a [Rule

19      23](b)(2) action is the defendant's conduct towards persons sharing a common
    characteristic. Because the purpose of punitive damages is not to compensate the victim,

20      but to punish and deter the defendant, any claim for such damages hinges, not on facts
    unique to each class member, but on the defendants' conduct toward the class as a whole.

21  *Barefield*, 1988 WL 188433 at *3. Thus, the court held punitive damages could be determined

22  on an aggregate basis. *Id.* at *4-5.[35]

23

24

25     [35] *See also, Hilao v. Estate of Marcos*, 103 F.3d 767, 780-81 (9th Cir. 1996) (human
rights abuses); *Butler v. Home Depot*, No. C-94-4335 SI, 1996 WL 421436 (N.D. Cal. Jan. 25,

26  1996) (employment discrimination); *In re Exxon Valdez*, 229 F.3d 790 (9th Cir. 2000), and 270
F.3d 1215 (9th Cir. 2001) (oil spill); *EEOC v. Dial Corp.*, Civ. Action No. 99-C-3356 *slip op*

27  (N.D. Ill. Feb. 14, 2003) (pattern and practice sexual harassment case), *see* Goldsmith Decl.; *Day*

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ    PAGE 46

1          3.     The Court Could Also Certify the Case Pursuant to Rule 23(b)(3)

2          In the alternative, Plaintiffs' claims are also suitable for certification under Rule 23(b)(3).

3   In order to obtain certification under Rule 23(b)(3), plaintiffs must show that they meet the

4   requirements of Rule 23(a), and that "questions of law or fact common to the class members of

5   the predominate," and "a class action is superior to other available methods."

6          There are numerous common issues in this case, as discussed above. The common

7   questions relate to whether Wal-Mart is liable for a pattern or practice of discrimination against

8   female employees and whether its policies and practices have had a disparate effect on female

9   employees. Here, resolving the common question of Wal-Mart's liability for a pattern or practice

10  of discrimination is the dominant issue in the case. Moreover, the issue of whether Wal-Mart is

11  liable for punitive damages, and the amount of punitive damages to which the class is entitled,

12  are also significant issues which can be resolved on a class-wide basis. Thus, the most

13  substantial questions would be decided at the class-wide liability trial, leaving only discrete

14  questions relating to allocation of damages to be determined on an individual basis.

15         Class treatment is, moreover, superior to other available methods of litigation. It would

16  be far more costly for each individual female employee of Wal-Mart separately to seek discovery

17  of Wal-Mart's policies, obtain data concerning personnel decisions, and have a multitude of

18  different experts analyze such data for each individual case. Moreover, separate lawsuits would

19  require analysis of the same evidence by a multitude of courts and juries. Finally, the disparity in

20  resources between individual women employed by Wal-Mart, most of them making less than

21  $25,000, and the world's largest private employer, could easily intimidate potential plaintiffs

22  from proceeding individually.

23         **C.     Proposed Trial Plan**

24         Plaintiffs propose the following trial plan.

25  **STAGE 1**: The jury decides:

26

27  *v. NLO*, 851 F. Supp. 869, 884-85, 887 (S.D. Ohio 1994) (radiation exposure).

28  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ          PAGE 47

1      1)   Whether Wal-Mart has engaged in a pattern and practice of discrimination (liability

2      for class-wide disparate treatment);

3      2)   Whether Wal-Mart's conduct meets the standard for an award of punitive damages;

4      3)   If liable, the aggregate amount of lost earnings owed to the class and a measurement

5      of front pay;

6      4)   If liable for punitive damages, the aggregate amount of punitive damages owed to the

7      class;

8      5)   Whether Wal-Mart is liable to the named plaintiffs for gender discrimination, and if

9      so, in what amount.[36]

10 The Court decides:

11      1)   Whether Wal-Mart's employment practices have had an adverse impact on women

12      (liability for disparate impact claim), subject to jury findings.

13 **STAGE 2**: The Court would decide:

14      1)   Whether Wal-Mart's employment practice was justified by business necessity

15      (defense to the disparate impact claim), and if so, whether there was a less discriminatory

16      alternative;

17      2)   Appropriate injunctive relief; and

18      3)   The process for allocating damages and other individualized relief based upon the

19      issues.[37]

20 *See, e.g., EEOC v. Dial Corp.*, Civ. Action No. 99-C-3356, *slip op* (N.D. Ill. Feb. 14, 2003), *see*

21 Goldsmith Decl.; *Beck v. The Boeing Co.*, 203 F.R.D. 459 (W.D. Wa. 2001), *modified by slip op.*

22 Dec. 27 2001, *affirmed in part, vacated in part by unpublished decision*; *Barefield*, 1988 WL

23 188433 at *3.

24      A finding of liability to the class *mandates* an award of lost wages to the class, with no

25

26      [36] Plaintiffs propose to sever the race claims of Plaintiffs Page and Dukes.

27      [37] A special master can be appointed to handle these individualized issues.

28 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION   Case No. C-01-2252 MJJ     PAGE 48

1    separate individual liability determinations required. The Fifth Circuit, for example, has stated:

2        Once a court has determined that a plaintiff or a complaining class has sustained
         economic loss from a discriminatory employment practice, back pay should normally be
3        awarded . . . Under Title VII *the plaintiff class is entitled to compensation* for that loss. . .

4
     *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 252-53 (5th Cir. 1974) (emphasis added).
5
         The lost wages due to the class can be determined by formula; the correct formula
6
     presents another class-wide issue for determination. Such formulaic distributions of back pay
7
     have been found particularly useful where, as here, defendant's lack of objective standards or
8
     adequate records would make any attempt at reconstructing the career paths of affected
9
     employees in order to quantify lost earnings individually a "quagmire of hypothetical
10
     judgments." *Pettway*, 494 F.2d at 261; *see also, Domingo v. New England Fish Co.*, 727 F.2d
11
     1429, 1444-45 (9th Cir. 1984); *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452-53 (7th Cir.
12
     1976); *Segar v. Smith*, 738 F.2d 1249, 1289-91 (D.C. Cir. 1984); *EEOC v. O & G Spring & Wire
13
     Forms Spec. Co.*, 38 F.3d 872, 876 (7th Cir. 1994). Such an approach is similar to that accepted
14
     by the Ninth Circuit in *Hilao v. Estate of Marcos*, 103 F.3d 767, 782-87 (9th Cir. 1996).
15
         Punitive damages may be allocated to individual members of the class proportionate to
16
     the amount of lost earnings each woman would receive or by any other rationale means that the
17
     Court or jury determines. *EEOC v. Dial Corp.*, Civ. Action No. 99-C-3356 *slip op* (N.D. Ill.
18
     Feb. 14, 2003) *see* Goldsmith Decl.; *Hilao*, 103 F.3d at 782-87.
19
                                           **CONCLUSION**
20
         Plaintiffs have established all the requirements for certification of this case as a class
21
     action. The proposed trial plan provides an efficient and effective means for bringing justice to
22
     thousands of women who daily suffer the indignities of pervasive gender discrimination. This
23
     Court should, therefore, order certification of this case under Rule 23(b)(2).
24
     Dated: April 28, 2003
25
                                           Respectfully submitted,
26

27                                         By: _____

28   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ          PAGE 49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jocelyn Larkin (SBN 110817)
THE IMPACT FUND
125 University Avenue
Berkeley, CA 94710
Telephone:    (510) 845-3473
Facsimile:    (510) 845-3654

By: _____
Christine E. Webber, *pro hac vice*
COHEN, MILSTEIN, HAUSFELD &
   TOLL, PLLC
West Tower - Suite 500
1100 New York Avenue
Washington, DC 20005-3964
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699

Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  Case No. C-01-2252 MJJ          PAGE 50