1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

BETTY DUKES, et al.,

                Plaintiffs,

    v.

WAL-MART STORES, INC.,

                Defendant.

Case No.: 01-cv-2252 CRB (JSC)

**ORDER RE: THE AKIN GUMP
MEMORANDUM (Dkt. Nos. 840, 846)**

Now pending before the Court is Plaintiffs' Motion for Declaratory Relief Concerning the Akin Gump Memo and Defendant's Cross-Motion to Compel Delivery of the Memo. (Dkt. Nos. 840 & 846.) The motions arise out of a 2010 *New York Times* article discussing a leaked confidential memorandum from the law firm of Akin Gump to its client Wal-Mart Stores, Inc. ("Wal-Mart"). The memorandum addressed the central issue in this lawsuit: alleged gender disparities in pay and promotion at Wal-Mart. The Court must decide whether the unauthorized disclosure of the memorandum, or at least Wal-Mart's public comments about the memorandum, waived the attorney-client privilege. After carefully considering the papers submitted by the parties, including their supplemental filings, and having had the benefit of oral argument on February 14, 2013, the Court finds that Wal-Mart has not waived its attorney-client privilege as to the memorandum and therefore DENIES Plaintiffs' Motion and GRANTS Defendant's Cross-Motion.

United States District Court
Northern District of California

**BACKGROUND**

**A.      The *New York Times* Article**

On June 3 and 4, 2010, the *New York Times* published an article (the "Article") in its online and print editions concerning "a memorandum issued by Wal-Mart's counsel in 1995 that found widespread gender disparities in pay and promotion at Wal-Mart and Sam's Club stores" (the "Memo").  (Dkt. No. 840-1, Ex. 1.)  According to the Article, <u>Lawyers Warned Wal-Mart of Risks Before Bias Suit</u>, the Memo "was made available to The New York Times by someone not involved in the lawsuit who said that Wal-Mart had not done enough to address the issues it raised."  *Id.*  The Article purported to describe a January 1995 memorandum on employment practices written by Wal-Mart's outside counsel, Akin Gump Strauss Hauer & Feld ("Akin Gump"), at the direction of Wal-Mart's in-house counsel.  (*Id.*)

While the *New York Times* did not publish the Memo, the newspaper did report several findings contained in the Memo, including that "women employed by Wal-Mart earned less than men in numerous job categories, with men in salaried jobs earning 19 percent more than women."  (Dkt. No. 840-1, Ex. 1.)  "By one measure . . . men were five and a half times as likely as women to be promoted into salaried, management positions."  (*Id.*)  Further, in 1993, men employed by Wal-Mart as department managers were paid an hourly rate 5.8 percent higher than women in those positions.  (*Id.*)  Because the company "would find it difficult to fashion a persuasive explanation for disproportionate employment patterns," the Memo estimated that Wal-Mart's potential legal exposure in a class-action sex discrimination suit was $185 million to $740 million for 1993 alone.  (*Id.*)  The Memo also indicated that the overall disparities in job assignments were "statistically significant and sufficient to warrant a finding of discrimination unless the company can demonstrate at trial that the statistical disparities are caused by legitimate, nondiscriminatory factors."  (*Id.*)

Prior to the Article's publication, the *New York Times* contacted Wal-Mart asking for comment.  David Tovar, a Wal-Mart spokesperson, was quoted in the Article as having responded that the company considered the Memo "confidential and privileged,"  "stale,"

United States District Court
Northern District of California

1    and "deeply flawed." [1]   (Dkt. No. 840-1, Ex. 1.)   "This memo is 15 years old and has no

2    bearing or relevance to the [present case] or our strong employment practices and diversity

3    programs," he said, adding, "We are proud of our work to promote diversity at Wal-Mart

4    and are continually recognized for our efforts."   (*Id.*)   According to the Article, "Wal-Mart

5    criticized Akin Gump's methodology, saying it had deliberately mimicked the type of

6    statistical analysis done by plaintiffs' lawyers in class-action cases.   Even using that

7    methodology, the retailer said, Akin Gump did not find significant disparities between the

8    hourly wages of men and women."   (*Id.*)   The Article paraphrases Wal-Mart as stating:

9

10        in the last five years, Wal-Mart has told its 50,000 managers to promote
          more women and minorities, with 15 percent of managers' bonuses tied to
11        achieving diversity goals.   Women now hold 45.8 percent of assistant store
          manager positions – a pipeline to higher-level jobs – up from 39.7 percent
12        five years ago.

13

14    (*Id.*)   Wal-Mart also claimed to have received repeated recognition for its performance on

15    diversity in recent years from groups representing women and minorities.   (*Id.*)   "We use

16    state-of-the-art hiring and promotional systems," Tovar was quoted as saying, "to make sure

17    that every applicant has the opportunity to apply and be considered for any position they're

18    qualified for and interested in."   (*Id.*)

19        After learning about the Article, Defendant informed Plaintiffs' counsel that the *New*

20    *York Times* planned to "publish a story based on a 1995 Memo" Akin-Gump had prepared

21    for Defendant.   (Dkt. No. 840-1, Ex. 2.)   Defendant explained that "Wal-Mart has always

22    maintained the privileged and confidential nature of the Memo and did not authorize its

23    disclosure" and had informed the newspaper "of the privileged and confidential nature of the

24    Memo and requested that it be returned to Wal-Mart."   (*Id.*)   Wal-Mart's counsel also

25    inquired whether Plaintiffs' counsel had ever received the Memo or provided the Memo to

26    the newspaper.   (*Id.*)   The following day, Plaintiffs' counsel confirmed that they had never

27    possessed the Memo and did not provide it to the newspaper.   (Dkt. No. 840-1, Ex. 3.)

28

---

[1] The Article appears to use Tovar and Wal-Mart interchangeably.

3

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      Disclosure of the Memo to Plaintiffs**

Eight months later, Plaintiffs' counsel Joseph Sellers ("Sellers") returned to his office after several days of travel and discovered on his desk a "brown envelope addressed to him with no return address." (Dkt. No. 840-1, Ex. 4 at ¶2.)  Upon removing the document from the envelope, Sellers "noticed on the cover page of the document inside that it bore the letterhead of 'Akin Gump Strauss Hauer & Feld,' that it was addressed to various people at Wal-Mart Stores, and that it was marked Privileged and Confidential/ Attorney Client Privilege." (Dkt. No. 840-1, Ex. 4 at ¶ 3.)  Suspecting that it might be the "Akin Gump Memo," Sellers refrained from reading any more of the document. (Dkt. No. 840-1, Ex. 4 at ¶ 4.)  Instead, Sellers gave the envelope containing the document to his firm's HR Director/Assistant Administrator, Bonnie Kelley ("Kelley"). (Dkt. No. 840-1, Ex. 4 at ¶ 5.) He directed Kelley to "sequester it in her office, which is locked nightly and whenever Ms. Kelley is away from her desk, where the firm's other confidential records are maintained." (*Id.*)  According to Kelley, "[t]he envelope and its contents have been locked" in her office ever since. (Dkt. No. 840-1, Ex. 5 at ¶ 7.)

Two days after receiving the document Sellers notified Defendant's counsel of his receipt of the anonymous package and the procedures taken to secure the document. (Dkt. No. 840-1, Ex. 6.)  After several email attempts to negotiate a course of action, counsel for both parties agreed to postpone further discussion of the document. (*Id.*)

**C.      Wal-Mart's Efforts to Maintain the Memo's Confidentiality**

The Memo was conspicuously marked as privileged and confidential:

The cover of the document bears the Akin Gump firm name and contains the words "PRIVILEGED & CONFIDENTIAL...DO NOT REPRODUCE WITHOUT THE EXPRESS CONSENT OF LESTER C. NAIL" in large block letters. The first page (inside the cover) is marked in bold letters "Privileged & Confidential – Do Not Reproduce," and each subsequent page of the 42-page document repeats in bold type, at the bottom of the page, "Privileged & Confidential," and "Do not reproduce without the express consent of Lester C. Nail."

United States District Court
Northern District of California

1   (Dkt. No. 846-1, Declaration of Marshall S. Ney ("Decl. Ney") at ¶ 2.)  Sellers likewise

2   attests that the Memo he received was clearly marked "Privileged and Confidential/ Attorney

3   Client Privilege."  (Dkt. No. 840-1, Ex. 4 at ¶ 3.)

4          Marshall Ney ("Ney"), the Associate General Counsel for the Litigation Division of

5   Wal-Mart from 2002-2005 and the in-house attorney directly responsible for maintaining the

6   Memo's confidentiality during that time, declares that Wal-Mart "tightly controlled

7   distribution of and access to the Privileged Memorandum."  (Dkt. No. 846-1, Decl. Ney at ¶¶

8   3-4.)  There were five original copies of the Memo, and each was "individually numbered on

9   the cover as 'COPY 1 of 5,' '2 of 5,' etc."  (Dkt. No. 846-1, Decl. Ney at ¶ 3.)  Upon taking

10  responsibility for the Memo in 2002, Ney was given the "express directive of continuing

11  very tight control over the Memo."  (*Id.*)  Distribution was accordingly limited:

12

13      Wal-Mart provided copies only to a very limited set of outside counsel,
        select in-house attorneys, and certain executive-level Wal-Mart employees.
14      To the extent that the Privileged Memorandum was distributed to Wal-Mart
        executives, or its in-house or outside legal team, recipients were
15      specifically instructed that the document was privileged and highly
        confidential, and told that it should not be forwarded.
16

17  (*Id.*)

18         Kurt Krafsky, current Associate General Counsel for the Litigation Division of Wal-

19  Mart, attests that from August 2006 through approximately January 2012, he served first as a

20  case manager in the class action group within Wal-Mart's legal department and then as

21  Discovery Co-Manager on this case.  (Dkt. No. 857-1, Declaration of Kurt Krafsky ("Decl.

22  Krafsky") at ¶ 2.)  During that period, "sensitive documents associated with the [current

23  case] that Wal-Mart considered to be privileged and/or confidential were maintained in a

24  locked storage area within the Wal-Mart Legal Department accessible only to authorized

25  personnel.  Such materials included, without limitation, hard copies of [the Memo]."  (Dkt.

26  No. 857-1, Decl. Krafsky at ¶ 4.)  Electronic copies of the Memo "were protected by the

27  Legal Department's separate firewall."  (Dkt. No. 857-1, Decl. Krafsky at ¶ 5.)  He and his

28  colleagues "took reasonable precautions to safeguard the attorney-client privilege and other

United States District Court
Northern District of California

1  protections afforded" the Memo." (Dkt. No. 857-1, Decl. Krafsky at ¶ 6.)  Wal-Mart

2  maintains that it did not authorize the Memo's disclosure to the *New York Times*.  (Dkt. Nos.

3  857-1, Decl. Krafsky at ¶ 5; 846-2, Declaration of Catherine Conway ("Decl. Conway") at ¶

4  2).

5  ### D.      The Pending Motions

6  Plaintiffs seek Declaratory Relief concerning the Memo.  (*See* Dkt. No. 840.)  While

7  both parties agree that the Memo is protected by attorney-client privilege, Plaintiffs argue

8  that the "public disclosure of the Memo's contents [in the *New York Times*] has resulted in

9  the loss of any privileged status that the document previously had" and accordingly ask the

10  Court to allow Plaintiffs "to view and use the document." (Dkt. No 840 at 7.)  Defendant

11  argues that the Memo "was and remains protected by the attorney-client privilege and it may

12  not be retained by plaintiffs' counsel." (Dkt. No. 846 at 6.)

13  ### DISCUSSION

14  Federal common law governs a claim of privilege in federal question cases.  *See*

15  Fed.R.Evid. 501; *see also Weil v. Inv./Indicators, Research and Mgmt., Inc.*, 647 F.2d 18, 24

16  (9th Cir. 1981).  The attorney-client privilege protects confidential communications between

17  attorney and client for the purpose of legal advice.  *Upjohn Co. v. U.S.*, 449 U.S. 383, 389

18  (1981).  The privilege exists "to encourage the full and frank communication between

19  attorneys and their clients and thereby promote broader public interests in the observance of

20  law and the administration of justice." *Id.*

21  "To prevent abuse and assure the availability of relevant evidence . . . the privilege is

22  limited to only those disclosures necessary to obtain informed legal advice which might not

23  have been made absent the privilege*." In re Grand Jury Investigation*, 974 F.2d 1068, 1070

24  (9th Cir. 1992).  The party asserting privilege bears the burden of proof as to the privileged

25  nature of the documents or communications in question.  *Id.*; *see also Weil*, 647 F.2d at 25

26  ("As with all evidentiary privileges, the burden of proving that the attorney-client privilege

27  applies rests not with the party contesting the privilege, but with the party asserting it.")  The

28  attorney-client privilege is strictly construed because it may impede "full and free discovery

United States District Court
Northern District of California

1    of the truth."  *Weil*, 647 F.2d at 24.  The questions presented by the parties' motions are

2    whether the disclosure of the Memo to the *New York Times* and Plaintiffs waived the

3    privilege and, if not, whether Wal-Mart's public comments on the Memo in the Article

4    waived the privilege and, if so, to what extent.

5    **1.  The Disclosures to the *New York Times* and Plaintiffs**

6

7    Plaintiffs argue that the disclosure of the Memo to the *New York Times* and Plaintiffs,

8    even if not authorized, "destroyed the Memo's privileged status."  (Dkt. No. 847 at 1.)

9    Defendants respond that because the disclosure was involuntary and unauthorized, no waiver

10   occurred.

11   "[V]oluntarily disclosing privileged documents to third parties will generally destroy

12   the privilege."  *In re Pac Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012); *see also*

13   *Clady v. County of Los Angeles*, 770 F.2d 1421, 1433 (9th Cir. 1985) (the voluntary

14   disclosure of a privileged attorney-client communication constitutes waiver); *Weil*, 647 F.2d

15   at 24 (the voluntary disclosure of a privileged attorney-client communication constitutes

16   waiver). On the other hand, "[i]nvoluntary disclosures do not automatically waive the

17   attorney-client privilege."  *In re Pac. Pictures Corp.,* 679 F.3d at 1130; *see also United*

18   *States v. de la Jara*, 973 F.2d 746, 749-50 (9th Cir. 1992) (the privilege is not waived by the

19   government's discovery of a document "in the course of executing a search warrant").

20   Involuntary disclosures include "[c]ommunications which were intended to be confidential

21   but are intercepted despite reasonable precautions."  J. Weinstein & M. Berger, Weinstein's

22   Evidence, ¶ 503(a)(4)[01] at 503–31 (1982 ed.) (hereinafter Weinstein & Berger); *see also*

23   *Resolution Trust Corp. v. Dean*, 813 F. Supp. 1426, 1429 (D. Ariz. 1993) (holding that

24   unauthorized disclosure of internal memo subject to strict confidentiality restrictions did not

25   waive attorney-client privilege) ; *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468,

26   470 (S.D. Ohio 1984) (holding that privilege was not waived for unauthorized disclosure of

27   employee's diary maintained at direction of outside counsel where employer limited access

28   to the diary to senior executives, counsel and accountants); *Smith v. Armour Pharm. Co.*,

1   838 F. Supp. 1573, 1577 (S.D. Fla. 1993) (stating that "if a confidential memorandum is

2   stolen from an attorney's office and subsequently published in newspapers across the

3   country" the privilege is not waived).

4        The Court finds that the disclosures to the *New York Times* and Plaintiffs were

5   unauthorized and involuntary and thus did not waive Wal-Mart's attorney-client privilege in

6   the Memo.  In *Dayco*, a case factually similar to this case, the plaintiffs moved for the

7   production of a defendant's diary compiled at the direction of outside counsel for his former

8   employer.  102 F.R.D. at 469.  The majority of the information plaintiffs had concerning the

9   diary "appear[d] to come from a newspaper account of some aspects of the litigation." *Id*.

10  The newspaper had obtained the diary through an unidentified source and had quoted

11  extensively from the diary.  *Id.*  The former employer's general counsel averred that the

12  employer had authorized only a select group of its senior employees, officers, counsel and

13  accountants to access the diary and that the disclosure of the diary to the newspaper was

14  unauthorized.  *Id.* at 470.  The court held that "[a]bsent any indication that [defendant] or

15  Dayco officials voluntarily gave the diary to the *Dayton Daily News,* publication of excerpts

16  of same should not be considered a waiver of the privilege." *Id.*  The record supports the

17  same finding here: Wal-Mart did not voluntarily disclose the Memo to the *New York Times*

18  or Plaintiffs.

19       Plaintiffs nonetheless argue that the Wal-Mart has not met its burden of showing that

20  it took sufficient precautions to maintain the Memo's confidentiality.  They contend that the

21  Court should infer from the disclosures themselves that Wal-Mart "has not safeguarded its

22  attorney-client communication like 'crown jewels.'"  (Dkt. No. 840 at 7, quoting *In re*

23  *Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989)).[2]  The Court disagrees.  In *Resolution*

24  *Trust Corp.*, for example, *The Washington Post* published an article purporting to describe

25  and quote from an internal "Authority to Sue Memorandum" ("ATS") written by a senior

26

27  _____

[2] Federal Rule of Evidence 502(a) rejected the result in *In re Sealed Case*, dictating instead
that "an inadvertent disclosure of protected information can never result in a subject matter
28  waiver."  Fed. R. Evid. 502(a), Adv. Comm. Notes (2011 Amd.).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    attorney for the plaintiff.  813 F.Supp. at 1427.  Despite evidence of the Resolution Trust

2    Corporation's ("RTC") precautions to secure the memorandum's confidentiality, including

3    that each page of the memorandum was marked confidential and that the memorandum was

4    shared with only a few high-ranking officials and attorneys, the defendant argued that the

5    disclosure itself supported an inference that the RTC had knowingly and deliberately waived

6    the memorandum's confidentiality.  *Id.* at 1429.  The court refused to draw such an

7    inference; instead,  the court explained that the "RTC has come forward and presented

8    testimony, under penalty of perjury, affirmatively demonstrating that they took precautions

9    to secure the confidentiality of the ATS memo and that the memo's leak remains

10   inexplicable." *Id.* at 1429-30.  Accordingly, the court found that the plaintiff "did not

11   voluntarily waive any attorney-client privilege it would have possessed, but for the

12   disclosure." *Id.* at 1430.

13          The same reasoning applies here.  Wal-Mart has submitted evidence under penalty of

14   perjury establishing its extensive efforts to maintain the Memo's confidentiality.  Indeed,

15   when Sellers found the Memo on his desk, he did not read past the top of the first page

16   because the Memo was so distinctively marked as confidential and attorney-client

17   privileged.  (Dkt. No. 840-1, Ex. 4 at ¶¶3-4.)

18          Plaintiffs' reliance on *Fed. Election Comm'n v. Christian Coal* is misplaced.  178

19   F.R.D. 61, *order aff'd in part, modified in part*, 178 F.R.D. 456 (E.D. Va. 1998).  There the

20   court concluded that "[i]f the information ends up in the hands of a third party, courts don't

21   want to hear how it got there.  Once in the hands of a third party, the privilege, if it ever

22   existed, is lost." *Id.* at 71-72.  This holding, Plaintiffs contend, represents the "longstanding

23   line of authority" that "documents lose their privileged status upon disclosure to a third

24   party." (Dkt. No. 840 at 6.)  The court, however, was discussing those situations "where the

25   attorney or client communicates the privileged information to a third party after the privilege

26   has come into existence," and not, as is the case here, situations involving the unauthorized

27   disclosure by an unknown party.  *Fed. Election Comm'n*, 178 F.R.D. at 71.  The court itself

28   observed that unauthorized disclosures to a third party do not automatically waive privilege.

United States District Court
Northern District of California

1   *Id.* at 72, n.9.  Citing *Dayco*, the court noted that "when a company carefully protects its

2   privileged documents but they are stolen or otherwise misappropriated and then revealed,

3   some courts have held that this does not constitute a waiver of the attorney-client privilege."

4   *Id.*

5          The Court finds that Wal-Mart took reasonable steps to clearly mark the Memo as

6   privileged and to maintain it in a secure location and limit its dissemination.  Despite such

7   efforts, the Memo still made its way to the *New York Times* and Plaintiffs.  Because Wal-

8   Mart did not authorize these disclosures, the disclosures did not waive Wal-Mart's attorney-

9   client privilege in the Memo.

10         **2.  Wal-Mart's Public Comments Regarding the Memo**

11         Plaintiffs next argue that Wal-Mart's voluntary decision to comment on "the

12  substance and merits of the Memo in *The New York Times*," waived the privilege as to the

13  entire Memo.  (Dkt. No. 840 at 9.)

14         There are two primary ways in which a party can waive the attorney-client privilege.

15  First, a party may implicitly waive the privilege by asserting a claim or defense that relies on

16  privileged materials as its basis.  *Weil*, 647 F.2d at 24; *see also Chevron Corp. v. Pennzoil

17  Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("Where a party raises a claim [or defense] which

18  in fairness requires disclosure of the protected communication, the privilege may be

19  implicitly waived.").  Such waiver indisputably does not apply here because Defendants do

20  not rely on the Memo or any privileged attorney-client communication for their claims or

21  defenses.

22         Second, and more relevant here, a party may expressly waive the attorney-client

23  privilege.  *See Weil*, 647 F.2d at 24.

24         An express waiver occurs when a party discloses privileged information to
25         a third party who is not bound by the privilege, or otherwise shows
           disregard for the privilege by making the information public.  Disclosures
26         that effect an express waiver are typically within the full control of the
           party holding the privilege; courts have no role in encouraging or forcing
27         the disclosure-they merely recognize the waiver after it has occurred.

28

10

*Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) (en banc) (internal citations omitted); *see also United States v. Reyes*, 239 F.R.D. 591, 602 (N.D. Cal. 2006) ("[T]he attorney-client privilege is waived upon the voluntary disclosure of protected information by a client, or by an attorney at the behest of a client."). Once the proverbial cat is out of the bag, the client has defeated the underlying purpose of maintaining confidentiality and therefore the communications are no longer worthy of protection.

A party need not have intended to waive privilege when it made the disclosure. *See Weil*, 647 F.2d at 24. "Despite the somewhat misleading nomenclature, an 'express' waiver need not be effectuated by words or accompanied by the litigant's subjective intent [to have waived privilege]. Rather, the privilege may be waived by the client's . . . actions even if the disclosure that gave rise to the waiver was inadvertent." *Bittaker*, 331 F.3d at 720, n.4; *see also United States v. Mendelsohn,* 896 F.2d 1183, 1189 (9th Cir. 1990) ("intent or lack of intent to waive the attorney-client privilege is not dispositive"); *Underwater Storage, Inc. v. U.S. Rubber Co.*, 314 F. Supp. 546, 548 (D. D.C. 1970) (defendant waived privilege over a letter when he inadvertently included it among other documents he delivered to plaintiff).

A review of the comments attributed to Wal-Mart in the Article reveals that Wal-Mart disclosed some of the confidential Memo's protected content.

First, the Article quotes Wal-Mart as calling the Memo "confidential and privileged," "stale," and "deeply flawed." (Dkt. No. 840-1, Ex. 1.) Those comments do not reveal any privileged communication.

Second, Wal-Mart stated that "[t]his memo is15 years old and has no bearing or relevance to the [present case] or our strong employment practices and diversity programs…We are proud of our work to promote diversity at Wal-Mart and are continually recognized for our efforts." (*Id.*) This quote provides no information about the actual content of the Memo and is in fact a generalization.

Third, the Article quotes Wal-Mart as saying: "We use state-of-the-art hiring and promotional systems to make sure that every applicant has the opportunity to apply and be considered for any position they're qualified for and interested in." (Dkt. No. 840-1, Ex. 1.)

11

United States District Court
Northern District of California

1   Here, Wal-Mart appears to be speaking about present employment practices, providing no

2   insight into the specific contents of the privileged 1995 Memo.

3          Fourth, the Article also paraphrases what Wal-Mart reportedly said about more recent

4   hiring patterns: "[I]n the last five years, Wal-Mart has told its 50,000 managers to promote

5   more women and minorities, with 15 percent of managers' bonuses tied to achieving

6   diversity goals. Women now hold 45.8 percent of assistant store manager positions…up

7   from 39.7 percent five years ago." (*Id.*) According to the Article, "[Wal-Mart] said groups

8   representing women and minorities had repeatedly recognized the company's performance

9   on diversity in recent years." (*Id.*) Even if any of this information had been presented in the

10  form of direct quotes, it does not pertain to the Memo's contents but instead pertains to

11  recent developments.

12          In only one paragraph does Wal-Mart disclose the actual contents of the Memo.

13  According to the Article, "Wal-Mart criticized Akin Gump's methodology, saying it had

14  deliberately mimicked the type of statistical analysis done by plaintiffs' lawyers in class-

15  action cases. Even using that methodology, the retailer said, Akin Gump did not find

16  significant disparities between the hourly wages of men and women." (Dkt. No. 840-1, Ex.

17  1.)[3] With this statement Wal-Mart intentionally disclosed privileged information; namely,

18  Akin Gump's methodology and the fact that the law firm did not find hourly wage

19  disparities by gender.

20          **3. Wal-Mart's Disclosure did not Waive the Privilege as to the Memo**

21          "It is well-established that when a client discloses to another person the content of a

22  privileged attorney communication, the resulting privilege waiver may extend beyond the

23  communication itself to other related matters." *WI-LAN, Inc. v. Kilpatrick Townsend &*

24  *Stockton LLP*, 684 F.3d 1364, 1369 (Fed. Cir. 2012). Plaintiffs insist that Wal-Mart's

25  disclosure to the *New York Times* waived the attorney-client privilege as to the entire Memo;

26  Plaintiffs should be allowed to keep the Memo and use it however they see fit. In other

27

28

---

[3] Wal-Mart does not contest the accuracy with which the Article paraphrased its comments.

United States District Court
Northern District of California

1    words, Wal-Mart's limited disclosure of the Memo's contents waived the privilege as to the

2    undisclosed (at least by Wal-Mart) contents.

3            Under the Federal Rules of Evidence, when a disclosure is made in a federal

4    proceeding or to a federal agency or office and "waives the attorney-client privilege or work-

5    product protection, the waiver extends to an undisclosed communication or information in a

6    federal or state proceeding only if:

7            (1)     the waiver is intentional;

8            (2)     the disclosed and undisclosed communications or information concern the

9    same subject matter; and

10           (3)     they ought in fairness to be considered together."

11   Fed. R. Evid. 502(a); *see also Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010)

12   (stating that courts apply a fairness balancing test to determine the scope of a waiver of

13   privilege).  The last requirement—fairness—aims "to prevent prejudice to a party and

14   distortion of the judicial process that may be caused by the privilege-holder's selective

15   disclosure during litigation of otherwise privileged information. Under the doctrine the client

16   alone controls the privilege and may or may not choose to divulge his own secrets." *In re

17   von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987).

18           Rule 502, however, only applies to disclosures made in a federal proceeding.  Wal-

19   Mart's disclosure here was extrajudicial; it was made to a newspaper rather than as part of

20   this litigation.  The Ninth Circuit has not directly addressed whether fairness should be

21   considered in determining the scope of an express waiver made outside of litigation.  In *WI-

22   LAN, Inc.*, however, the Federal Circuit recently held that the Ninth Circuit would conclude

23   that fairness balancing is required in determining the scope of privilege waivers arising from

24   extra-judicial express disclosures.  684 F.3d at 1369.  The court also concluded: "we find

25   nothing in the Ninth Circuit's law to demonstrate that it has adopted a rule simultaneously

26   requiring district courts to apply fairness balancing to privilege waivers made during

27   litigation, but blocking them from applying it to extrajudicial waivers." *Id.* at 1370.  The

28   Federal Circuit reached this decision after engaging in a comprehensive review of the Ninth

United States District Court
Northern District of California

1   Circuit caselaw.  The court emphasized the Ninth Circuit's repeated reliance on *In re von*

2   *Bulow*.  There the Second Circuit held that "where...disclosures of privileged information are

3   made extrajudicially and without prejudice to the opposing party, there exists no reason in

4   logic or equity to broaden the waiver beyond those matters actually revealed."  *In re von*

5   *Bulow*, 828 F.2d at 103.

6       This Court agrees with the Federal Circuit that fairness must be the touchstone in

7   determining whether Wal-Mart's disclosure of certain findings in the Memo compels the

8   disclosure of the entire Memo.  Plaintiffs argue that "[i]t would be manifestly unfair" to

9   allow Wal-Mart to "selectively disclose portions of the Memo it believed were beneficial to

10  its position–in one of the largest publications in the country–while refusing to disclose the

11  full scope of these facts to Plaintiffs."  (Dkt. No. 847 at 5.)  The Court finds no unfairness to

12  Plaintiffs here.  Wal-Mart has not attempted to use any portions of the Memo in this

13  litigation.  As long as the initial disclosures of privileged communications "are and remain

14  extrajudicial, there is no legal prejudice that warrants a broad court-imposed subject matter

15  waiver."  *In re von Bulow*, 828 F.2d at 103.  "[D]isclosures made in public rather than in

16  court—even if selective—create no risk of legal prejudice until put at issue in the litigation

17  by the privilege holder."  *Id.*;  *see also WI-LAN, Inc. v. LG Electronics, Inc.*, 2013 WL

18  685339 * 4 (N.D. Cal. Feb. 25, 2013) (finding no subject matter waiver from the plaintiff's

19  extrajudicial disclosure of a privileged communication because the plaintiff never used and

20  disclaimed any intent to use the disclosed information in the litigation).

21                              **CONCLUSION**

22      Neither the unauthorized disclosures of the Memo to the *New York Times* and

23  Plaintiffs' attorneys, nor Wal-Mart's subsequent comments to the *New York Times*, waived

24  Wal-Mart's privilege over the Memo.  Accordingly, the Court DENIES Plaintiffs' Motion

25  for Declaratory Relief (Dkt. No. 840) and GRANTS Defendant's Motion to Compel

26  Delivery of the Memo (Dkt. No. 846).  Plaintiffs shall deliver their copy of the Memo to

27  Defendant within 10 days of the date of this Order.

28

14

1        **IT IS SO ORDERED.**

2     Dated:  March 26, 2013

3                                                                    _____
                                                                     JACQUELINE SCOTT CORLEY
4                                                                    UNITED STATES MAGISTRATE JUDGE

United States District Court

Northern District of California

15