Randy Renick [SBN 179652]
Anne Richardson [SBN 151541]
Cornelia Dai [SBN 207435]
HADSELL STORMER RICHARDSON
 & RENICK, LLP
128 N. Fair Oaks Avenue
Pasadena, CA  91103
Telephone:  (626) 585-9600
Facsimile:  (626) 577-7079
rrr@hadsellstormer.com
arichardson@hadsellstormer.com
cdai@hadsellstormer.com

Joseph M. Sellers (*pro hac vice*)
Christine E. Webber (*pro hac vice*)
Jenny R. Yang (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
jyang@cohenmilstein.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature
Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETTY DUKES, PATRICIA SURGESON, EDITH ARANA, DEBORAH GUNTER AND CHRISTINE KWAPNOSKI, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>WAL-MART STORES, INC.,<br><br>    Defendant | Case No:  3:01-cv-2252-CRB<br><br>**PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION**<br><br>Date: July 9, 2013<br><br>Time: 10 am<br><br>Location:  Courtroom 6 – 17th Floor<br>            450 Golden Gate Avenue<br>            San Francisco, CA  94102 |

1722749.1

## TABLE OF CONTENTS

Page

NOTICE OF MOTION ........................................................................................................ VI

RELIEF SOUGHT ............................................................................................................. VI

SUMMARY OF ARGUMENT ........................................................................................... VI

I.    INTRODUCTION ...................................................................................................... 1

II.   FACTS ....................................................................................................................... 1

    A.    The California Regions Operated with a Uniform Job, Store, and
Management Structure in Which Men Held the Vast Majority of
Management Positions ...................................................................................... 2

    B.    Within the California Regions, District and Regional Management Closely
Monitored Store Operations and Met and Communicated Frequently about
People Issues ..................................................................................................... 6

    C.    California Region Managers Received Uniform Management Training and
Immersion in the "Wal-Mart Way" ................................................................. 8

    D.    Many California Region Managers Shared Stereotypes about the Interests
and Abilities of Women Employees ............................................................... 10

    E.    District and Regional Management Staff Used Common Policies to Make
Promotion Decisions, Which Disadvantaged Women ................................... 14

    F.    California Region Managers Used Uniform Compensation Policies that
Consistently Paid Women Less than Men ...................................................... 20

        1.    Pay for Hourly Employees ................................................................... 20

        2.    Pay for Management Employees ........................................................... 23

        3.    Statistical Pattern of Unequal Pay for Women .................................... 25

III.  ARGUMENT ........................................................................................................... 26

    A.    The Proposed Class Is Sufficiently Numerous .............................................. 27

    B.    Plaintiffs Have Identified Common Questions of Law and Fact ................... 27

i

1722749.1

## TABLE OF CONTENTS

Page

1. Employment Policies that Incorporate Elements of Discretionary Decision-Making May Still Meet the Commonality Standard After *Dukes*........................................................................................................ 27

2. Plaintiffs Have Identified Common Questions for the Promotion Claims ..................................................................................................... 29

3. Plaintiffs Have Identified Common Questions for the Pay Claims .......... 31

C. Plaintiffs Have Met Their Burden of Demonstrating that They Are Typical of the Class and Are Adequate Class Representatives........................................... 32

D. The Case Can Properly Be Certified Under Rule 23(b) and Plaintiffs Have Proposed a Manageable Trial Plan ...................................................................... 33

IV. CONCLUSION.............................................................................................................. 35

1722749.1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds,*
    133 S. Ct. 1184 (2013).................................................................................................27

*Chen-Oster v. Goldman Sachs & Co.,*
    No. 10 Civ. 6950, 2012 WL 205875 (S.D.N.Y. Jan. 19, 2012)............................29, 30

*Chin v. Port Auth. of New York & New Jersey,*
    685 F.3d 135 (2d Cir. 2012)......................................................................................34

*Chin v. Runnels,*
    343 F. Supp. 2d 891 (N.D. Cal. 2004), *aff'd sub nom. Chin v. Carey,* 160 F. App'x
    633 (9th Cir. 2005)....................................................................................................28

*Domingo v. New England Fish Co.,*
    727 F.2d 1429 (9th Cir. 1984), *modified,* 742 F.2d 520 (9th Cir. 1984) ..................28

*Dukes v. Wal-Mart Stores Inc.,*
    222 F.R.D. 137 (N.D. Cal. 2004)..........................................................................1, 32

*Dukes v. Wal-Mart Stores Inc.,*
    603 F.3d 571 (9th Cir. 2010) ....................................................................................32

*Ellis v. Costco Wholesale Corp.,*
    285 F.R.D. 492 (N.D. Cal. 2012).........................................................29, 30, 34, 35

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) ...............................................................................10, 31

*Emig v. Am. Tobacco Co., Inc.,*
    184 F.R.D. 379 (D. Kan. 1998).................................................................................32

*Gen. Tel. of the Sw. v. Falcon,*
    457 U.S. 147 (1982)...................................................................................................27

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ..................................................................................32

*Hazelwood School Dist. v. United States,*
    433 U.S. 299 (1977)...................................................................................................20

iii

1722749.1

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324, 361 (1977)............................................................................33

*Kimble v. Wisconsin Dep't of Workforce Dev.,*
    690 F. Supp. 2d 765 (E.D. Wis. 2010)......................................................28

*Lust v. Sealy,*
    383 F.3d 580 (7th Cir. 2004) ....................................................................12

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    672 F.3d 482 (7th Cir. 2012) .................................................28, 29, 30, 34

*Myers v. Hertz Corp.,*
    624 F.3d 537 (2d Cir. 2010)......................................................................34

*Pitre v. W. Elec. Co., Inc.,*
    843 F.2d 1262 (10th Cir. 1988) ................................................................28

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)..................................................................................10

*Segar v. Smith,*
    738 F.2d 1249 (D.C. Cir. 1984)................................................................20

*United States v. City of New York,*
    276 F.R.D. 22 (E.D.N.Y. 2011)....................................................33, 34, 35

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 1227 (9th Cir. 1996) ....................................................................34

*In re Vivendi Universal, S.A. Sec. Litig.,*
    284 F.R.D. 144 (S.D.N.Y. 2012) ........................................................33, 35

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011)......................................................................*passim*

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977 (1988)..................................................................................28

**STATUTES AND RULES**

42 U.S.C. § 2000e-2(k)(1)(B)(i) ........................................................................30

Fed. R. Civ. P. 23...................................................................................... 14, 27

Fed. R. Civ. P. 23(a)(1)......................................................................................27

iv

1722749.1

Fed. R. Civ. P. 23(a)(2) ................................................................................................27, 28

Fed. R. Civ. P. 23(a)(3) ......................................................................................................32

Fed. R. Civ. P. 23(a)(4) ......................................................................................................32

Fed. R. Civ. P. 23(b) .......................................................................................................... 27

Fed. R. Civ. P. 23(b)(3) ................................................................................................ 33, 34

Fed. R. Civ. P. 23(c)(4) ......................................................................................................34

Fed. R. Civ. P. 23(g) ..........................................................................................................33

**OTHER AUTHORITIES**

2 EEOC Compl. Man. (BNA) Section 615 (May 23, 2007) ...............................................12

v

1722749.1

## NOTICE OF MOTION

Please take notice that Plaintiffs will seek an order certifying this case as a class action under Fed. R. Civ. P. 23 on July 9, 2013 at 10:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Judge Charles R. Breyer, United States District Court, 450 Golden Gate Ave., San Francisco, CA, based upon this notice and motion, the memorandum of points and authorities, the accompanying declarations and exhibits, the pleadings and papers on file in this action, and further briefing and arguments of counsel.

## RELIEF SOUGHT

Plaintiffs request that this Court: 1) certify three regional classes for all issues under Fed. R. Civ. P. 23 (b)(3), or for liability only under 23(c)(4); 2) appoint named Plaintiffs Dukes, Surgeson, Arana, Gunter and Kwapnoski as class representatives; 3) appoint Plaintiffs' counsel to serve as counsel for the classes; and 4) authorize notice to the classes of the action and of their right to opt-out. The proposed class definition, varying only by the region number, is:

> All women employed at any retail store in [Wal-Mart Region 16 or Wal-Mart Region 19 or Sam's Club Region 18E] at any time from December 26, 1998, to December 31, 2002, who were subject to: a) the compensation system for hourly retail sales positions; b) the compensation system for salaried management positions up to and including Co-Manager; and c) the promotion system into Management Trainee/Assistant Manager and Support Manager/Area Manager. The class does not include Store Managers or Pharmacists.

## SUMMARY OF ARGUMENT

This gender discrimination action is now limited to three of Wal-Mart's 41 regions ("the California Regions"). This motion seeks certification for three regional classes, for the period of December 1998 to 2002 only. The size of the classes, the scope of the claims, and the evidence in support of the motion, are all markedly different from the case considered by the U.S. Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). Plaintiffs challenge specific employment practices in the California Regions, which they allege had the intent and effect of discriminating against female retail store employees. Addressing the unmistakable message from the Supreme Court, the evidence places the focus squarely on the group of

1722749.1

managers at the regional level whose decisions have caused these adverse outcomes for women.

Plaintiffs challenge promotions into two management track positions in each Region: Management Trainee positions in all three regions, Support Manager positions in Regions 16 and 19, and Area Manager positions in Region 18E. The decisions were made in the context of four common employment policies: 1) a "promotion from within" policy; 2) a policy not to post openings; 3) corporate minimum requirements (including mandatory relocation for management trainees); and 4) common subjective criteria to select among minimally eligible candidates. Through close and regular communication, shared culture and training, and active oversight, these regional managers guided the discretion exercised by store and district managers. They also perpetuated gender stereotypes about what jobs were appropriate for women employees at Wal-Mart, including the gender characteristics of "future leaders."

Plaintiffs also challenge compensation decisions for hourly and management employees within the Regions. The decisions for hourly employees were made within a common company-established framework, "Field Compensation Guidelines," which allowed for discretion in setting starting pay and awarding merit increases for "exceptional" performance, subject again to the guidance and oversight of district and regional managers. For management employees within each region, a single decision-maker—the Regional Personnel Manager—made all compensation decisions.

The statistical patterns confirm that, for both pay and promotion, women fared far worse than their male counterparts in the California Regions, and the results are statistically significant.

The women who brought this case have waited over 12 years to have their claims heard. Without a class action, their rights cannot be vindicated. Because they satisfy each requirement of Rule 23(a) and (b), the Court should certify the classes as proposed.

vii

1722749.1

## I.    INTRODUCTION

In rejecting certification of a national class, the Supreme Court found that Plaintiffs could not bridge the distance between decisions made in Wal-Mart's Arkansas headquarters and the adverse outcomes experienced by female class members across the country. Plaintiffs have now met this concern by drastically reducing the geographic scope of the class as well as the claims they assert. This narrowed certification motion expressly links specific employment policies, the group of managers who collectively implemented those policies, and the women who suffered discrimination as a result. Plaintiffs offer evidence of these managers' biases and statistically significant proof of the discriminatory consequences. In doing so, Plaintiffs have:

- reduced the overall size of the case by nearly 93% (from 3,400 stores to 250);
- defined the classes by region, rather than nationally;
- removed Store Managers from the classes;
- eliminated claims for promotion into Co-Manager and Store Manager, leaving only three promotions at issue;
- identified the specific employment practices that resulted in discrimination against female employees;
- identified the specific decision-makers and offered evidence of biases held by these managers;
- explained the common mode in which these managers exercised discretion;
- proffered a new statistical analysis that tracks the specific employment decisions and demonstrates significant adverse impact against women;
- offered a manageable trial plan consistent with the Supreme Court's ruling; and ensured notice and opt-out rights for class members.

Accordingly, Plaintiffs ask that their claims be certified so they may have their day in court.

## II.    FACTS

Plaintiffs provide here the essential facts necessary to determine this motion. In addition to the large factual record previously submitted and summarized in the district court's prior decision, *Dukes v. Wal-Mart Stores Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004), Plaintiffs offer substantial new evidence including:

- a new statistical analysis that studies the challenged pay and promotion decisions at the store, district and region level for the California Regions;
- 61 new class member declarations to supplement the previous 25 declarations from women

1

who worked in stores within the three California regions;

- new testimony and documents specific to the California Regions concerning pay and promotion policies and practices; and

- statements from a meeting of District Managers presided over by Wal-Mart's CEO, explaining the characteristics of men that would make them appropriate choices as "future leaders," as well as evidence of gender bias among California Region managers.

The record includes evidence through 2004, with one important exception. The statistical data available for use by Plaintiffs' expert was limited to the time period through December 2002.[1] Plaintiffs have, accordingly, limited the class definitions to December 2002, until the data is available for analysis and Plaintiffs can supplement their certification request.

A.    The California Regions Operated with a Uniform Job, Store, and Management Structure in Which Men Held the Vast Majority of Management Positions

Plaintiffs' evidence demonstrates that Wal-Mart ran the stores within the California Regions in a highly uniform way, particularly for the conduct at issue in this motion.

During the time period relevant to this motion, Defendant operated Wal-Mart stores selling general merchandise and Sam's Clubs selling bulk items.[2] The field operations were divided geographically into six Wal-Mart divisions and one Sam's Club division, each headed by a Divisional or Senior Vice President.[3] Each division contained approximately six regions.[4]

---

[1]   Plaintiffs did not receive electronic personnel data for 2003 and 2004 for the relevant stores with the requested fields until March 14, 2013, which did not provide sufficient time for the parties and the magistrate to resolve numerous disputes and then to analyze it. While Wal-Mart produced some data for this time period in early January, it omitted a large number of stores, omitted key fields including names, addresses and all other identifying information, and failed to explain changed formatting and coding. *See* Renick Decl. in Support of Plaintiffs' Motion for Enlargement of Time to File Class Cert Motion at ¶¶28, 38, Dkt 870. While Magistrate Corley was supervising the resolution of a number of data disputes, Plaintiffs filed their motion for additional time to file the class certification motion in light of the data issues. *Id.* at ¶69. Wal-Mart provided additional data on March 14, 2013 as ordered by the Magistrate. Many questions about the changed coding and formatting remained, however. *Id.* at ¶64. Further information was provided by Wal-Mart on March 19 and 20, but important questions were still left unanswered, and the responses to earlier questions generated new issues. Drogin Decl. ¶¶6-7. As explained by Plaintiffs' statistician, it will take approximately 8-10 weeks from the time he receives the relevant information—including answers to his questions about how to decode the new data—to analyze it. Drogin Decl. ¶9, Dkt 868.

[2]   All references to exhibit numbers throughout the brief refer to exhibits to the Declaration of Christine Webber. References to deposition or declaration testimony are abbreviated as [Witness' Last Name] Dep. or Decl. There is only one deposition for each witness with the exception of John Butler, Janice Van Allen, Michael Miller, Kevin Harper, and Jeffrey Reeves.

[3]   Harper I Dep. 215:3-4, Ex. 3; Ex. 4 at 157785.

2

At issue are three regions: two Wal-Mart regions (Regions 16 and 19) and one Sam's Club region (Region 18E).[5] Geographically, these regions covered California and a small number of stores in neighboring or additional states. Ex. 1, Ex. 2 (showing regions, districts and stores). Each region was supervised by a Regional Vice President (RVP).[6] From 1999 to 2002, there were only four individuals who served as RVPs for the Regions: John Butler in Region 19; Jon Sims and, before him, Larry Tompkins in Region 16; and Michael Miller in Region 18E.[7] Each region also had one Regional Personnel Manager (RPM), who was responsible for the "people side of the region."[8] The RPM is a key figure in the decisions at issue.[9]

Each region, in turn, contained approximately eleven districts; each district contained between six and eight stores.[10] In other words, this case concerns 250 (or 7%) of the 3,400 stores that Wal-Mart operated in the U.S. at that time. Each district was run by a District Manager (or Director of Operations at Sam's Club).[11] On a wide range of pay and personnel matters, District Managers worked closely with their region's RPM.[12]

Each store had the same job categories, job descriptions and management hierarchy.[13] At the bottom of the ladder, the primary entry-level hourly positions were cashier, sales associate,

---

[4] Harper I Dep. 215:18-216:1, Ex. 3.

[5] This region is referred to as Sam's Club Region 5 in Plaintiffs' statistical report, as that is the code used in Wal-Mart's database. However, Wal-Mart commonly referred to it as Region E of Sam's Club, within Division 18, and we refer to it as 18E. Miller II Dep. 8:13-9:5, Ex. 39.

[6] Kendall Schwindt was the Divisional Vice President over the Wal-Mart regions in this case, which were within Division 1A. Tompkins Dep. 143:16-21, Ex. 7.

[7] Butler I Dep. 37:23-38:16, Ex. 5; Sims Dep. 92:1-4, Ex. 6; Tompkins Dep. 131:9-24, Ex. 7; Miller I Dep. 22:1-3, Ex. 23 (became RVP May 1999).

[8] Ellison Dep. 74:21-75:5, Ex. 50.

[9] Harper I Dep. 190:17-191:7, Ex. 3; Ex. 10.

[10] Harper I Dep. 141:20-21, Ex. 3; Butler I Dep. 39:14-17, Ex. 5.

[11] Harper I Dep. 162:12-22, Ex. 3; Burner Dep. 145:17-24, Ex. 8.

[12] RPM Responsibilities, Ex. 10; Van Allen II Dep. 112:25-114:7, Ex. 38; Winkler Dep. 197:19-204:1, Ex. 12; Butler II Dep. 179:15-24, Ex. 37; Miller II Dep. 168:7-22, Ex. 39; see also nn. 50, 86, 125, 131, 136, infra.

[13] Harper I Dep. 32:14-40:12, 58:18-59:9, Ex. 3; Burner Dep. 144:16-145:12, 148:24-149:13, Ex. 8; Reeves I Dep. 72:1-16, Ex. 11; Winkler Dep. 172:7-15, Ex. 12; Ruiz Dep. 130:22-131:3, Ex. 13; Job Descriptions, Ex. 14.

3

and stocker.[14] While there were numerous hourly job titles, the majority of hourly employees in the California Regions were in only four positions.[15] And, importantly, Wal-Mart grouped all the hourly jobs into just five job classes (four for Sam's Clubs), regardless of department. It treated all jobs within a job class identically for purposes of hourly pay. *See infra* at n.113.

The first step above an entry-level job was an hourly supervisor position, including Department Manager,[16] Customer Service Manager (CSM), and Check-Out Supervisor (COS) at Sam's Club.[17] At issue here is the highest level hourly manager at Wal-Mart, Support Manager.[18] At Sam's Club, the level above hourly Department Manager was the Area Manager, who would be assigned as either the Front End Manager or Receiving Manager.[19] The Area Manager reported to an Assistant Manager and was salaried.[20]

The next step up was management trainee, a four-to-five month program that prepared employees to be Assistant Managers, a salaried position.[21] Each store had several Assistant Managers.[22] The next level was Co-Manager, a position used only in larger stores.[23] The top store position was Store Manager, called General Manager in Sam's Club.[24]

In 2001, women comprised 65% of all hourly workers in the Wal-Mart California Regions (54% at Sam's), and 73% of hourly Department Managers.[25] In contrast, women made

---

[14]  Harper I Dep. 42:15-43:10, Ex. 3; Ex. 15.

[15]  These positions were Sales Associate, Cashier, Overnight Stocker, and Team Lead for the two Wal-Mart regions, and Cashier, Stocker, Demo Partner and Shoe Management for Sam's. Drogin Decl. App. 4a-c.

[16]  Weaver Dep. 37:19-20, 45:3-9, Ex. 16; Keeley Dep. 83:13-85:14, Ex. 112.

[17]  Eldridge Dep. 40:7-12, Ex. 17.

[18]  Harper I Dep. 108:16-109:10, Ex. 3; Butler I Dep. 128:1-5, Ex. 5; *see also* Ex. 18.

[19]  Reeves I Dep. 95:22-24, Ex. 11

[20]  Reeves I Dep. 73:23-74:4, 165:20-166:9, Ex. 11.

[21]  Harper II Dep. 195:7-15, Ex. 19; Ex. 20; Schaffner Dep. 79:17-80:10, Ex. 21; Kintzele Dep. 44:6-11, 56:20-57:1, Ex. 22; Harper I Dep. 35:24-36:11, Ex. 3.

[22]  Harper I Dep. 35:24-36:11, Ex. 3.

[23]  Harper I Dep. 150:25-152:17, Ex. 3.

[24]  Harper I Dep. 35:24-36:11, 159:18-25, Ex. 3; Reeves I Dep. 72:9-16; 165:20-166:9, Ex. 11.

[25]  Drogin Decl. ¶20, Table 3-4, App. 4a-c.

4

up only 22.8% to 41.9% of Assistant Managers, 27.3% to 42.4 % of Co-Managers, and 8.3% to 17.4% of Store Managers.[26]  As RVP Butler admitted, it was "easily visible" when walking through stores, that women were the majority of hourly workers, but not of management.[27]

Women were not only concentrated at the bottom, but in certain departments within the stores.  The stores each contained many departments, some of which were highly gender segregated.[28]  In 2001, women made up over 96% of workers in the Infant/Toddlers, Health and Beauty Aids, Hosiery, and Ladies Sportswear Departments.[29]  In contrast, the Hardware, Home Furnishings, and Automotive Departments were between 11% and 28% female.  *Id.*  Within the California Regions, the departments with the higher concentration of women were referred to as "softlines," while those that were predominantly male were called "hardlines."[30]

Above the store level, 42 out of 49 District Managers (or Directors of Operations) in the California Regions were male during the class period.  All the California Regional Vice Presidents, the Divisional Vice President and 6 of 7 RPMs were male.[31]

[26]  Drogin App. 5a-c.

[27]  Butler I Dep. 195:23-196:7, Ex. 5. *See also* Sims Dep. 191:10-192:17, Ex. 6 (aware that number of women in management in his region far fewer than in hourly ranks); Miller I Dep. 73:20-77:8, Ex. 23 (regularly reviewed diversity report, showed women only 28% management)

[28]  Drogin Decl. ¶28, Table 11a-c; Stout Decl. ¶9; Crutcher Decl. ¶6; Alulquoy Decl. ¶5; Walker Decl. ¶8; Mitchell Decl. ¶4; Lee-Williams Decl. ¶5; Salvato Decl. ¶9; Stinson Decl. ¶7; Harper Decl. ¶2; Burt Decl. ¶4; Hardin Decl. ¶6; Reese Decl. ¶¶9, 10; Aguilera Decl. ¶6; Dougherty Decl. ¶3; Flores Decl. ¶4; McClelan Decl. ¶6; McElwain Decl. ¶3; Strausz Decl. ¶3; Wolsleger Decl. ¶4.

[29]  Drogin Decl. Table 11a-b.

[30]  *See, e.g.*, Ex. 115 at 128517 (explaining hardlines and softlines skills).

[31]  Ex. 2, 67, 93, 123.  Wal-Mart's Executive Committee, the top 14 or 15 executives, was all male until December 2000. Swanson Dep. 61:9-14; 62:21-63:1, Ex. 24.

5



**Women's Decreasing Share of Management Positions**

B.    Within the California Regions, District and Regional Management Closely Monitored Store Operations and Met and Communicated Frequently about People Issues

Consistent with Wal-Mart's management model, District Managers, Regional Personnel Managers and Regional Vice Presidents provided significant guidance, communication, and oversight of "people" issues in the California stores.

District Managers were charged to ensure that store operations conformed to the company program and "manage by exception."[32] The company had a system for monitoring each store's operations electronically. That system generated reports for each District Manager, detailing which stores were not meeting one of the many company standards.[33] There were a variety of such "exception" reports on personnel matters, including pay.[34]

---

[32]  Harper I Dep. 178:11-179:11, Ex. 3.

[33]  Harper II Dep. 38:17-43:8, Ex. 19; Harper I Dep. 133:3-15, 163:25-164:21, Ex. 3; Hass Dep. 102:20-25, 105:3-15, Ex. 25; Crawford Dep. 26:22-27:9, Ex. 26, Bishop Dep. 182:18-184:16, Ex. 27; Ex. 28 (one report identified pay changes outside the guidelines, DM was responsible to find out reason for exception).

[34]  Arnold Dep. 133:19-135:24, Ex. 29; Crawford Dep. 26:22-27:9, Ex. 26.; Dolan Dep. 213:10-215:1, Ex. 30; Wills Dep. 27:11-28:13, Ex. 31; Howard Dep. 44:11-46:20, Ex. 32;

6

District Managers visited each store in their district approximately twice a month,[35] and used these "exception" reports to identify the problems on which to focus in their visits.[36] District Managers forwarded their notes from those store visits to the RVPs.[37]

Regional Personnel Managers also visited stores within their regions each week.[38] The purpose of these visits was to "measure results, take care of people issues, validate that the open door is working, [to be an] auditor, listener, helper, remove roadblocks for the operators to do their jobs more efficiently."[39] During the visits, the RPMs conducted audits of the personnel files to ensure compliance with Wal-Mart's policies and "reviewed the People P&L information with . . . management teams."[40] The RPMs used Store Visit Forms to facilitate review, which included inquiries into diversity, turnover, exit interviews, attendance, wages, job postings, and current staffing.[41] After visits, RPMs would follow up with District or Store Managers to further ensure compliance with company standards.[42] Through these visits, "an RPM had the ability to give guidance to management associates, general managers, director of operations . . . ."[43] The RPMs also received and reviewed the exception reports for the region.[44]

In addition to this close monitoring of store operations through store visits, exception reporting and audits, California Region Managers regularly met and communicated regarding store operations within their respective regions, including pay and personnel matters:

Martinez Dep. 223:6-14, Ex. 33.

[35] Carter Dep. 132:14-134:25, Ex. 34.

[36] Harper I Dep. 178:18-179:11, Ex. 3.

[37] Butler I Dep. 106:16-21, 108:25-109:10, Ex.5.

[38] Ludwig Dep. 128:19-129:15, 136:22-137:15, Ex. 9; Wigger Dep. 67:12-69:25, Ex. 35; Winkler Dep. 271:2-11; 276:8-282:11, Ex. 12 (spends 50% of his time visiting stores); Ellison Dep. 102:8-12, Ex. 50 (visited stores typically four weeks out of five).

[39] Ludwig Dep. 128:19-129:8, Ex. 9.

[40] Winkler Dep. 276:8-277:3, 282:18-283:19, Ex. 12; Dolan Dep. 114:13-21, Ex. 30.

[41] Wigger Dep. 67:9-68:16, Ex. 35; Ellison Dep. 144:10-22, Ex. 50; Dolan Dep. 82:5-83:23, Ex. 30; Ex.116.

[42] Ellison Dep. 81:15-24, Ex. 50.

[43] Dolan Dep. 88:10-16, Ex. 30.

[44] Butler II Dep. 119:23-121:18, Ex. 37; Van Allen II Dep. 200:7-201:15, Ex. 38.

7

- The RVP held weekly conference calls with their District Managers and the RPM.[45]
- District Managers had regular monthly meetings with their Store Managers. At those meetings, they discussed people issues, including upcoming promotions.[46]
- District Managers and Store Managers watched weekly live video feeds from the home office, which included people issues.[47] At Sam's Club, the Director of Operations and all of the store level managers watched the weekly broadcast.[48]
- The RVPs emailed to their RPMs, District Managers, and Store Managers notes about company and executive meetings they attended, "so we would have the same information as our district managers and through the RPM, RVP, through the division, everything."[49]
- District Managers were in regular contact with RVPs and RPMs.[50]
- California Region Managers as a group attended the company-wide Year Beginning and Holiday Meetings together,[51] at which people issues were discussed.[52]
- At the Year Beginning meeting, managers held regional break-out meetings.[53]

This active and regular communication and oversight facilitated unusually close collaboration, which ensured the California Regions operated according to a common set of standards.

    C.    California Region Managers Received Uniform Management Training and Immersion in the "Wal-Mart Way"

Another means by which Wal-Mart ensured consistent decision-making among its

---

[45] Butler II Dep. 288:9-289:22, Ex. 37; Van Allen II Dep. 213:17-21, Ex. 38; Miller II Dep. 116:15-20, Ex. 39 (monthly group calls); Bishop Dep. 181:19-182:12, Ex. 27; Wills Dep. 294:23-295:14, Ex. 31; Carter Dep. 200:14-24, Ex. 34; Martinez Dep. 248:3-17, Ex. 33.

[46] Evans Dep. 135:23-136:21, Ex. 40.

[47] Schwindt Dep. 83:9-22, Ex. 41; Martinez Dep. 248:18-249:16, Ex. 33; Carter Dep. 205:14-206:21, Ex. 34 .

[48] Oshier Dep. 225:12-227:19, Ex. 42; Goodwin Dep. 268:20-269:4, Ex. 43.

[49] Bishop Dep. 161:19-162:3, Ex. 27.

[50] Van Allen II Dep. 213:17-21, Ex. 38; Butler II Dep. 288:9-289:22, Ex. 37; Bishop Dep. 161:14-162:3, Ex. 27; *see also* material cited *supra* n.12.

[51] Butler II Dep. 290:14-291:5, Ex. 37; Miller II Dep. 115:15-116:10, 116:25-117:2, Ex. 39; Mireles Dep. 122:11-19; 129:6-25, Ex. 45; Bishop Dep. 237:20-238:12, Ex. 27; Kocharian Dep. 67:1-68:1, Ex. 46; Oshier Dep. 42:1-43:24, Ex. 42; Ex. 47. Store Managers, District Managers, Regional Vice Presidents, and one Assistant Manager or Co-Manager per store attended. Miller II Dep. 115:15-116:10, Ex. 39; Winkler Dep. 117:1-7, Ex. 12; Bishop Dep. 237:20-238:12, Ex. 27.

[52] Miller II Dep. 117:11-14, Ex. 39; Mireles Dep. 123:10-14, Ex. 45; Winkler Dep. 117:13-22, Ex. 12. Those company meetings also offered opportunities for managers from the region to go to strip clubs together. Brown Dep. 185:1-186:24, Ex. 48 (all the assistant managers, co-manager and store manager went to a strip club); Sims Dep. 185:3-25, Ex. 6; Riggs Dep. 195:1-24, Ex. 49.

[53] Butler II Dep. 290:14-291:5, Ex. 37; Winkler Dep. 274:1-12, Ex. 12; Kocharian Dep. 68:17-69:2, Ex. 46; Ellison Dep. 134:17-135:1, Ex. 50.

8

California Region Managers was to instill in them a shared company philosophy and culture, fostered through uniform management training. From their first day of employment, California Region Managers were immersed in the "Wal-Mart Way"—the phrase that the company used to describe its culture. The Wal-Mart Way, a company-wide value system, did not vary by region.[54] As they progressed up the ladder, California Region Managers attended weekly sessions on the culture and in turn taught those lessons to hourly employees. Many elements of the Wal-Mart culture bear directly on personnel practices within the stores.[55]

Every new employee went through the same orientation process and, as part of that process, was trained about the culture and company philosophy.[56] The Associate Handbook, provided to all employees, described the Wal-Mart culture and personnel policies.[57] Employees received weekly training on culture topics at mandatory store meetings.

Upon their promotion, managers from the California Regions attended training at the Walton Institute, the company's training center in Bentonville, Arkansas.[58] As RVP Sims explained, attendance at the Institute was mandatory because new store managers needed to be "aligned" to "a company cultural viewpoint on . . . the company's beliefs and values."[59]

In some cases, the Walton Institute curriculum taught or reinforced stereotypes about women employees. For example, participants were told that the reason that so few women had reached senior management at Wal-Mart was because "men have been more aggressive in

---

[54] Wal-Mart Culture Handbook, Ex. 51; Muzingo Dep. 75:16-22, 159:25-160:17, Ex. 52; Swanson Dep. 140:16-21, Ex. 24; Reeves I Dep. 56:21-23; 103:17-25; 156:10-17, Ex. 11.

[55] Muzingo Dep. 93:20-94:11, Ex. 52.

[56] Muzingo Dep. 114:20-115:9, Ex. 52; Hass Dep. 58:20-59:11; 62:19-21; 67:25-69:1, Ex. 25; Goodwin Dep. 126:1-6: 127:5-7, Ex. 43.

[57] Muzingo Dep. 115:10-16, Ex. 52; Hass Dep. 51:24-57:12, Ex. 25; Associate Handbook, Ex. 53; Van Allen I Dep. 74:7-20, Ex. 44; Reeves I Dep. 103:8-12, Ex. 11; Hottinger Dep. 66:2-10, Ex. 54; Wills Dep. 262:4 -11, Ex. 31.

[58] Schwindt Dep. 56:18-57:6, Ex. 41; Butler I Dep. 42:1-45:11, Ex. 5; Martinez Dep. 127:9-128:5, Ex. 33; Mireles Dep. 91:17-92:9, Ex. 45; Brown Dep. 209:15-24, Ex. 48; Kocharian Dep. 148:3-17, Ex. 46.

[59] Sims Dep. 115:12–20, Ex. 6.

achieving those levels of responsibility . . . ."[60] Managers at the Walton Institute also expressed the view that promoting women in order to address past underrepresentation would require "lowering standards," a view also expressed by one of the Divisional Vice Presidents.[61]

As further described below, many California Region Managers held similar beliefs about the interests and abilities of women employees.

D.     Many California Region Managers Shared Stereotypes about the Interests and Abilities of Women Employees

It is quite unusual in modern employment litigation to have evidence of overtly expressed bias against members of a protected group. Such direct evidence is, of course, not legally required to prove claims of discrimination, much less class certification.[62] Here, biased views of women's abilities and interests among California Region managers were commonplace.

A 1998 survey of Wal-Mart managers revealed that there was a "good ol' boy philosophy" at Wal-Mart, that many managers were "close minded" about diversity in the workplace, and that some District Managers "don't seem personally comfortable with women in leadership roles."[63] Indeed, at Sam's Club executive meetings, management often referred to female associates in the stores as "little Janie Qs" and "girls."[64]

The findings of the 1998 survey echoed an earlier 1992 report by a group of female Wal-Mart management employees, who identified a number of concerns for women employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men

---

[60] Walton Inst. Diversity Questions, Ex. 55 at 715288.

[61] Ex. 55 at 715287; *see also* Williams Dep. 108:18-109:13, Ex. 56.

[62] *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000) (direct evidence of discrimination, such as derogatory comments, is not necessary for proof of intentional discrimination); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (district court need not resolve whether women were in fact discriminated against to determine class certification).

[63] Diversity Management, Inc. Memo, Ex. 57 at 734095.

[64] R. Harper Dep. 103:21-105:11; 135:13-136:14, Ex. 58. When a female executive, new to the company, objected to the use of these demeaning terms, her criticism was not well-received and she was counseled "not to be judgmental." *Id.*; Swanson Dep. 134:15-135:6, Ex. 24.

10

are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."[65]

The most common stereotype expressed by California Region managers was that women employees were not interested in management, particularly for family reasons. In some cases, the stereotype was based on nothing more than an outdated anecdote or two. As there was no system for collecting or surveying the actual interest of women employees in management, California Region managers were left to form and rely on their own impressions.[66]

Beginning at the top, California Divisional Vice President Schwindt testified that women were less interested in management jobs than men, echoing the Walton Institute's explanation that women were not aggressive in seeking management opportunities.

> I do believe that – to be honest with you, it's like many professions, women got into that – into the flow, if you will, a little later than a lot of the men. . . . I just don't think women were out looking early on for – to take those kind of responsible positions. . . . I can take you way back to when I was in the '60s and '70s, not too many women were actually wanting to work. They wanted to stay home. They wanted to raise their family. That was the perceived role of the woman.

Schwindt Dep. 241:20-242:19, Ex. 41.[67]

RVP John Butler's "general opinion" was that women did not seek management positions because of their family commitments.[68] DM Riggs testified that store managers told him that no women were interested in management training, and a woman told him she was not interested because she wanted "family time."[69] DM John Scantlin concluded that women were uninterested in management, based on the experience of one woman—his mother, who had worked at Wal-

---

[65] Memo re: Women in Leadership, Ex. 59.

[66] *See* Butler I Dep. 197:14-22, Ex. 5.

[67] Schwindt coordinated the annual corporate hunting trip for senior executives. Schwindt Dep. 57:14-59:18, Ex. 41. Once a few women reached the executive ranks, they were invited on the trip although organizers knew "a lot of [women] don't like to hunt." *Id.* When the women suggested a different activity (golf or river rafting) the proposal was rejected as interfering with "tradition." Reza Dep. 99:15-101:2, Ex. 61; Reeves II Dep. 144:23-145:14, Ex. 60.

[68] Butler I Dep. 196:12-197:22, Ex. 5 (Region 19).

[69] Riggs Dep. 219:13-222:3, 4:22-5:4, Ex. 49 (DM of District 333 in Region 16).

11

Mart decades earlier and had not been interested in advancement.[70] In contrast, one of the only female RPMs, Sandy Ellison, testified that women in her region were *not* less interested in being promoted than men and that female diversity was "going in the wrong direction."[71]

RPM Ludwig testified that women were less interested in management positions because of "raising their children," their spouses, they "don't like the hours" or were unwilling to move.[72] Nonetheless he explained women were "probably more qualified" for management because "they're cleaner, neater and nicer . . . [and] understand detailing."[73] He explained that certain stores had absolutely no women managers because those stores were "tough" and had a "very rough clientele," revealing that he believed women were not tough enough to manage stores in places like Victorville ("the high desert ... [with] a lot of transients") or Panorama City ("a very multi-ethnically diverse area").[74] Store Manager Larry Goulick stated, in front of a female Assistant Manager, that women generally were too weak to be Store Managers and those who were, were "bitches."[75]

When some class members expressed interest in promotion, they were asked about or discouraged from pursuing management positions because of their children. Marsh Decl. ¶2 (in

---

[70] Scantlin Dep. 278:6-13, 234:24-236:18, 57:4-58:6, Ex. 62 (explaining he thought his mother did not go into management because she was "nice" and a "mild-mannered caring person.") (88:14-19, 125:15-18, he had been DM in California, including Milpitas store). *See also* Miller I Dep. 12:16-13:6, 252:11-255:1, Ex. 23 (discrepancy between men and women in store management resulting from individuals deciding for themselves whether they want to be managers); *id.* 259:1-21 (women decide whether they want to pursue the opportunities).

[71] Ellison Dep. 67:21-68:20, 66:14-68:6, 68:21-70:5, 204:17-205:3, Ex. 50; Ex. 117. There may certainly have been women (and men) at Wal-Mart who were not interested in management for family reasons. In the absence of an application or other system that collected up-to-date information about individual employee preferences, assumptions and stereotypes about what women want will often fill the void. *See, e.g., Lust v. Sealy*, 383 F.3d 580, 583 (7th Cir. 2004) (employer denied a motion a promotion on the assumption that she would be unable to move her family to a new city); Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving Responsibilities, 2 EEOC Compl. Man. (BNA) Section 615 (May 23, 2007) (explaining the gender-based assumptions and stereotypes associated with caregiving).

[72] Ludwig Dep. 236:2-19; 29:18-21, 192:1-3, 10:10-11:3, Ex. 9 (RPM for Region 16 May 2000-July 2002).

[73] Ludwig Dep. 236:23-237:12, Ex. 9.

[74] Ludwig Dep. 205:15-207:7, Ex. 9.

[75] Clark Decl. ¶12.

12

response to her inquiry about promotion, her manager asked "aren't you a single mother?"); *see also* Reese Decl. ¶17 (Reese overheard a District Manager tell a group of Assistant Managers that women were not as reliable because they had children to take care of).

Another common gender bias was that men needed higher pay or promotions to support their families. Sam's Club Director of Operations Phil Goodwin justified paying less to a female manager than a male on the ground that the man "supports his wife and two kids." Odle Decl. ¶11. Store Manager Alan Oshier also justified giving a large raise to a male employee because he had a family to support. Kwapnoski Decl. ¶12. He later suggested to Kwapnoski that she "doll up" and "blow the cobwebs off [her] make-up" to make herself more promotable. Kwapnoski Decl. ¶17; *see also* Stout Decl. ¶7 (Assistant Manager justified paying male associate more because he had family to support); Perez Decl. ¶3, 7 (Store Manager Owens told Perez he did not know why women worked when they should be home getting pregnant and justified paying a man with less experience more because "you have a husband to take care of you, and he is just starting out and has a family to support"); Hardin Decl. ¶3 (Store Manager Taylor said a male assistant manager would make more than Hardin because he had a family to support).[76]

Such biases were so deeply ingrained and openly acknowledged that at a 2004 District Managers meeting presided over by Wal-Mart CEO, Thomas Coughlin, District Managers were

---

[76] Williamson Decl. ¶5 (Assistant Manager justified a promotion for a man because he had a new baby and needed the money); Adams Decl. ¶¶18, 24 (District Manager Chuck Salby stated, "Gretchen, I just want to tell you how refreshing it is to finally have a female with your intelligence and knowledge in my district"; he later called her a "worthless broad" after she used the Open Door); Adair Decl. ¶8 (Schwindt chastised Adair and another female Assistant Manager in front of male Manager Trainees telling them they were poor examples of managers for the "fine young men"); Jaso Decl. ¶10 (Store Manager Cuevas told Jaso that the Electronics Department Manager position had to go to two men because the position was a man's job and required heavy lifting); Odle Decl. ¶8 (when she tried to get raises for two women in the claims department so their pay would equal men's pay in same department, General Manager Chris Udderman stated, "Those girls don't need any more money; they make enough as it is."); Page Decl. ¶10 (When Page questioned why she was denied a promotion to Sporting Goods Manager, her manager told her he needed a man in the job); Salvato Decl. ¶9 (a manager told Salvato that women should not be working in the Hardware Department, but should work in Softlines instead); Campbell Decl. ¶4 (her co-manager told her she would never make it in management because she was too aggressive); Zumbrum Decl. ¶5, 6 (During interview for team lead, Assistant Manager asked her, "Being a female, what makes you more qualified for this job than a male employee?;" Co-Manager called female employees " Babe," "Baby Doll" and "Baby").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

instructed about the selection of future leaders through the use of gender stereotypes. Meeting notes taken by a District Manager at the meeting state that Coughlin "gave the best speech on execution."[77] The notes further report that the key to success was "single focus to get the job done" going on to explain that *"women tend to be better at information processing. Men are better at focus[;] single objective. Results driven."*[78] District Managers were directed to select "[f]uture leaders" and create a "culture of execution" and a "culture of results." *Id.* District Managers were reminded that they were the key to running the stores: "you are the culture." *Id.* By matching so-called male attributes ("results driven," single "focus") with the desired outcomes (a culture of "results" and "execution"), the session encouraged District Managers to select men as leaders. It offered a rationale for the concentration of women in lower level hourly jobs and, invoking the company's powerful culture, enlisted managers to perpetuate it.

> E. District and Regional Management Staff Used Common Policies to Make
> Promotion Decisions, Which Disadvantaged Women

At issue in this motion are three management track promotions for stores within the California Regions for the period 1998 to 2002: Management Trainee, Support Manager, and Area Manager (for Sam's Club). Selections for these positions were made by district and regional managers or with their active involvement. They worked closely together, were in frequent communication about personnel matters, and relied on uniform promotion policies for these positions.[79] The statistical evidence establishes that the promotion decisions made by this group had a common outcome: women were adversely affected to a statistically significant degree, which cannot be explained by any non-discriminatory reason.

***Management Trainee/Assistant Manager*** – The Management Training program (also known as MTP, Manager-in-Training, or MIT) was the primary way that hourly employees

---

[77] Coughlin Dep. 320:8-321:6, 322:2-9, Ex. 113; Ex. 63.

[78] Coughlin Dep. 320:8-322:22, Ex. 113; Ex. 63 (emphasis added).

[79] The relevant policies used in the three Regions are largely the same, with a few minor variations, primarily for Sam's Club. *See* Ex. 81. Those small variations among regions are not consequential to the Rule 23 analysis as plaintiffs seek certification of a separate class for each region.

14

became Assistant Managers in the California Regions.[80] The Regions relied on a strong promotion-from-within system.[81]

While the Training Program was intended to move current hourly employees up, the doors were not open. Entry was restricted to those who were tapped for one of the coveted slots. The company did not provide any written information to hourly employees about what the requirements or qualifications were for entering management, or how to apply.[82]

Openings for management trainee and Assistant Manager were not posted in the California Regions.[83] The company had a computerized system (used for posting Store Manager vacancies) that *would have* accommodated posting these openings but regional staff were directed *not* to post Assistant Manager positions.[84] The company had no other formal means to advise employees of the Program or allow them to express interest or apply until January 2003, when it first piloted a registration of interest system.[85]

District Managers selected management trainee candidates, with significant oversight from the RPMs in the California Regions.[86] Store Managers could recommend hourly

---

[80] Kintzele Dep. 44:6-24, 98:17-100:4, Ex. 22; Ex. 118.

[81] Martinez Dep. 156:12-23, Ex. 33; Annatone Dep. 222:22-223:4, Ex. 84; Wilson Dep. 80:5-8, Ex. 85; Miller II Dep. 151:14-153:12, Ex. 39.

[82] Harper II Dep. 204:19-22, 181:15-182:25, Ex. 19; Ex. 119; Ex. 64; Miller I Dep. 64:23-66:2, Ex. 23. Ervine Decl. ¶17; Kwapnoski Decl. ¶13; Surgeson Decl. ¶10; Williamson Decl. ¶3; Abaya Decl. ¶2; Alulquoy Decl. ¶3; Perez Decl. ¶8; Dukes Decl. ¶6; Harper Decl. ¶16; Stout Decl. ¶4; Walker Decl. ¶4; D. Valdez Decl. ¶3; Davis Decl. ¶2; Dougherty Decl. ¶2; L.M. Long Decl. ¶3; Marsh Decl. ¶2; McClelan Decl. ¶4, 5; Milse Decl. ¶2; Noone Decl. ¶3-5; Russell Decl. ¶2; Stout Decl. ¶3-4.

[83] Butler I Dep. 173:23-174:5, Ex. 5 (Region 19); Van Allen II Dep. 39:3-8, Ex. 38 (Region 16); Miller I Dep. 218:4-220:8, Ex. 23; Miller II Dep. 158:18-160:5, Ex. 39 (Sam's Club Region 18E) (succession planning identified candidates for MIT); Schwindt Dep. 172:4-173:11, Ex. 41; *see also* Harper II Dep. 160:3-9, 161:3-16, 180:23-181:10, Ex. 19; Kintzele Dep. 41:17-42:8, 42:16-21, 129:15-18, Ex. 22.

[84] RPM Training on MCS, Ex. 65 at 378008 ("AM position should not be posted on MCS unless the People Director has given his/her approval.").

[85] Butler II Dep. 249:25-250:14, Ex. 37 (no process for tracking those who expressed interest before 2003); Clark Dep. 278:1-5, Ex. 114; Evans Dep. 78:17-24, Ex. 40; Scantlin Dep. 24:5-25:13, Ex. 62; Schwindt Dep. 134:19-135:12, 174:2-19, Ex. 41.

[86] ; Van Allen II Dep. 68:4-69:8, 70:18-71:13, 78:13-79:1, Ex. 38; Butler I Dep. 135:4-11, Ex. 5; Butler II Dep. 257:11-263:11, Ex. 37; Bishop Dep. 122:8-

15

employees for the training program, but the District Manager made the selection.[87]

Wal-Mart had promotional guidelines, which set forth the minimum requirements for advancement to Assistant Manager. Ex. 66. Candidates had to have an evaluation score of 3.5 or higher and at least one year in an hourly supervisory position, be current on training, not in a "high shrink" department, and willing to relocate. *Id.* The California Regions were required to follow these corporate minimum qualifications but could use additional criteria.[88] The Divisional Vice President had to approve any exceptions to the corporate guidelines.[89] The California Regions used common criteria for selecting trainees from among those who met the Corporate Guidelines including "leadership ability," "confidence," and "goals."[90] Managers in the California Regions did not document which employees were considered for particular promotions or why a particular employee was selected.[91]

Such a subjective "tap on the shoulder" system can and did have an adverse impact on women candidates. *See* discussion *infra* at 19-20. In addition, the relocation requirement also had an adverse impact on women, a problem long recognized by Wal-Mart. As noted, the promotional guidelines required that, to qualify for management, an employee had to be willing to move his or her residence.[92] "[I]f you wanted to be a manager . . . , you basically had to be

123:11, Ex. 27; Ellison Dep. 151:11-19, Ex. 50; Schwindt Dep. 134:19-135:17, Ex. 41 (RPMs are "instrumental" in selecting candidates as management trainees.); Ludwig Dep. 127:25-128:16, Ex. 9 (as RPM, he was involved in the hiring of assistant manager trainees); Martinez Dep. 146:2-148:6, Ex. 33 (RPMs made recommendations and District Manager selected trainee); Miller II Dep. 165:12-166:12, 168:3-22, Ex. 39.

[87] Kocharian Dep. 136:21-137:6, Ex. 46; Evans Dep. 78:17-24; 87:17-88:5; 182:6-19, Ex. 40; Van Allen II Dep. 68:4-69:8, 70:25-71:13, 78:13-79:1, Ex. 38; Butler I Dep. 135:4-11, Ex. 5; Butler II Dep. 257:11-263:11, Ex. 37; Miller II Dep. 165:12-166:12, 166:19-168:22, Ex. 39.

[88] Schwindt Dep. 137:4-140:4, Ex. 41; Butler I Dep. 140:24-142:12, Ex. 5; Van Allen II Dep. 45:7 -15, Ex. 38 (no additional requirements for Region 16); Miller II Dep. 201:10-202:22, Ex. 39.

[89] Van Allen II Dep. 50:6-13, Ex. 38.

[90] Butler II Dep. 265:12-266:6, Ex. 37; Ex. 68 at 371493; Van Allen II Dep. 115:22-118:13, Ex. 38; Ex. 68; Miller II Dep. 208:15-19, Ex. 39 (looking for leadership).

[91] Clark Dep. 278:1-5, Ex. 114; Raps Dep. 131:11-16, Ex. 69; Schwindt Dep. 134:15-18, Ex. 41; Van Allen II Dep. 114:15-115:20, Ex. 38; Butler II Dep. 249:25-250:14, Ex. 37; Miller II Dep. 207:3- 208:2, Ex. 39.

[92] Promotional Guidelines, Ex. 66; Butler II Dep. 235:19-237:7, 239:23-240:10, Ex. 37; Ex.

16

willing to move on a moment's notice . . . ."[93]  Wal-Mart management was aware as early as 1992 that this relocation requirement had an adverse impact on female employees, that it led some managers to avoid considering women for management, but also knew it was *no longer necessary* to meet business demands.  As company founder, Sam Walton, explained:

> Maybe that was necessary back in the old days, and maybe it was more rigid than it needed to be . . . the old way really put good smart women at a disadvantage in our company because at that time they weren't as free to pick up and move as many men were.  Now I've seen the light on the opportunities that we missed out on with women.

Ex. 70 at 217-18; *see* Email re Women in Leadership, Ex. 71; Diversity Ideas, Ex. 72.  Despite the adverse impact and absence of need, California Region managers still required assistant manager candidates to be willing to relocate as a prerequisite to promotion.[94]  This requirement deterred women from pursuing management positions.  L.M. Long Decl. ¶3; Hobson Decl. ¶3.

***Support Manager and Area Manager*** – Support Manager was the highest level hourly supervisory position at Wal-Mart stores.[95]  "Support manager is a leadership role and . . . will be held to all management expectation and standards."[96]  The position served as an important feeder job for the Management Training program.  *Id.* ("Support Manager is a potential candidate to be developed for MTP . . . .").  Support Managers were assigned designated management duties and could "replace an Assistant Manager during absences."  *Id.*  At Sam's Club, the Area Manager served similar functions.[97]

---

120; Van Allen II Dep. 44:6-14, 48:18-49:25, 52:9-20, 57:9-14, Ex. 38; Miller II Dep. 55:14-19, 201:19-202:16, Ex. 39.

[93]  Walton and Huey, Made in America, Ex. 70 at 217.

[94]  Butler II Dep. 235:19-237:7, 239:23-240:11, Ex. 37; Van Allen II Dep. 52:1-20, 57:9-14, Ex. 38; Miller II Dep. 55:14-19, 201:19-202:16, Ex. 39; Relocation Agreement, Ex. 73; Grimm Dep. 142:1-22, Ex. 74 (same at Sam's Club).  Wal-Mart was well aware of the adverse effects of its employment policies on its female employees.  Senior management and the Board of Directors received regular presentations about Wal-Mart's utilization of women in management compared to other retailers.  Peterson Dep. 72:18-73:1, Ex. 75; Ex. 76; Ex. 77; Ex. 78; Ex. 79.  As the Executive Vice President of the People Division candidly put it, "We're behind the rest of the world." Ex. 80 at 363415.

[95]  Harper I Dep. 108:16-109:6, Ex. 3.

[96]  Div. 1A Support Manager Program, Ex. 82.

[97]  Bosler Dep. 44:21-45:12, Ex. 121; Grimm Dep. 74:23-75:8, Ex. 74.

17

Store Managers, in consultation with District Managers, were responsible for selecting Support Managers.[98] DMs had responsibility for "identify[ing] associates with the capacity to advance within the company and become future leaders."[99] Similarly, the Director of Operations for Sam's Club conferred with General Managers and played a large role in deciding who was promoted to Area Manager.[100] Again, the California Regions used a "promotion from within" policy.[101] There was no requirement that Support Manager positions be posted until January 2002.[102] There was also no posting of Area Manager positions.[103]

The Regional Personnel Managers set the criteria for the selection of Support Managers. Candidates were required to have "the capacity, ability and desire to lead" and "a minimum of one-year existing service" in hourly supervisory roles."[104] Area Manager criteria were very similar to those used in selecting MIT candidates.[105]

Plaintiff Edith Arana had more than ten years' retail experience when she began her employment with Wal-Mart in Duarte, California, where she worked from 1995 to 2002. Arana Decl. ¶2. She applied for, but was denied, a Support Manager position in August 1998 and again in October 2000. *Id.* ¶¶19, 31. Plaintiff Dukes was unable to apply for many support manager positions which were not posted, and were filled by men. Dukes Decl. ¶15. Debra Valdez, a department manager, was twice denied promotion to support manager in favor of men with less experience, one of whom she had trained. D. Valdez Decl. ¶2. Kathleen Salvato, a department

---

[98] Butler II Dep. 215:5-22, Ex. 37; Ex. 83 at 22358, 22361.

[99] Butler II Dep. 226:1-7, Ex. 37; Ex. 83 at 22358, 22361; *see also* Butler I Dep. 134:25-135:11, Ex. 5.

[100] Goodwin Dep. 5:3-7, 151:19-153:2, Ex. 43; Bosler Dep. 66:16-20, Ex. 121.

[101] Martinez Dep. 156:12-17, Ex. 33; Annatone Dep. 222:22-223:4, Ex. 84; Wilson Dep. 80:5-8, Ex. 85.

[102] Van Allen II Dep. 17:24-18:2, Ex. 38; Butler II Dep. 206:6-208:16, Ex. 37; Job Announcements Policy, Ex. 86; Drogin Decl. ¶40.

[103] Goodwin Dep. 151:9- 18, Ex. 43; Miller I Dep. 219:23-220:20, Ex. 23.

[104] Div. 1A Support Manager Program, Ex. 82; *see also* Ex. 18 (Support Managers should be "self-starters" with the "ability to direct.").

[105] Miller II Dep. 172:2-5; 201:10-202:21, Ex. 39 (describing MIT criteria, including evaluation score of 3 or above, no coachings).

18

manager with three years' experience at Wal-Mart was denied a promotion to Support Manager in favor of a man who had been collecting the grocery carts in the parking lot and had been at Wal-Mart for only six months. Salvato Decl. ¶4; *see also* Walker Decl. ¶3; Page Decl. ¶7.

As described below, women were selected at a rate far below their representation among eligible candidates for Support Manager positions in Regions 16 and 19, and Area Manager positions in Region 18E, and the pattern was consistently adverse to women across districts within each region.

***Statistical Pattern of Outcomes Adverse to Women*** – Plaintiffs' statistician, Dr. Richard Drogin, conducted a promotion analysis to determine how many women one would expect to have been promoted in the California Regions to the positions at issue in a non-discriminatory system. He analyzed the available pools for promotion, using the proportion of incumbents in each of the historical feeder jobs for the particular promotion, because there was no formal application process or record of who applied. The results showed a consistent pattern of under-promotion of women into each of the higher level jobs in all three regions.

Dr. Drogin found that women received 204 fewer promotions into **Management Trainee** than would be expected, controlling for feeder job, district and year of move. Drogin ¶53, Table 18. Women received fewer promotions than expected in 13 of the 14 districts in Wal-Mart Region 16, 12 of the 13 districts in Wal-Mart Region 19, and 9 of the 10 districts in Sam's Region 18E. Drogin ¶54, Table 19. Further, the disparity was statistically significant in 11 out of 14 districts for Region 16, and 10 out of 13 districts for Region 19, and for each of the three Regions overall. *Id.* With the regional Z-values of up to -10.29, these results are "virtually impossible to occur by chance." Drogin Decl. ¶53.

Dr. Drogin also studied the time that it took employees to reach Assistant Manager. He found that, for the select group of women who do move up the ladder, it consistently took them longer than comparable men. On average, it took women one year longer to be promoted to Assistant Manager than men. Drogin Decl. ¶26.

Dr. Drogin analyzed the promotions into **Support Manager** based on store and district

19

level, where the promotion decisions were made. His analysis found that, in each of the 27 districts in Regions 16 and 19, women received fewer promotions than would be expected from their representation in the feeder jobs. Drogin ¶50, Table 17a. The results were negative for women and statistically significant in 20 out of 27 districts, and for each region (Z-values = -9.86 and -12.48). Drogin Decl. ¶¶49-50.[106] Similarly, Dr. Drogin found that women received fewer promotions to **Area Manager** than expected given their representation in the feeder jobs in Region 18E. The results were negative for women in 6 out of 10 districts, and the overall significance for Region 18E was -3.10. Drogin ¶¶49-50.[107]

F.    California Region Managers Used Uniform Compensation Policies that Consistently Paid Women Less than Men

Managers within the California Regions set compensation for store employees based upon a common set of company guidelines. Those guidelines established basic standards, but also afforded decision-makers "flexibility" to award additional compensation within a prescribed and common framework.[108] California regional and district managers guided the exercise of that discretion. RPMs were responsible for

[109] Under this system, female employees in the stores were consistently paid less than their male counterparts.

1.    Pay for Hourly Employees

The Field Associate Compensation Guidelines, updated annually, established the procedure for paying hourly employees within the California Regions.[110] The Guidelines were

---

[106] Roughly two or more standard deviations (a .05 level of statistical significance) are considered statistically and legally significant and may be sufficient to establish a *prima facie* case of discrimination. *See, e.g., Hazelwood School Dist. v. United States*, 433 U.S. 299, 309-11 & nn.14, 17 (1977); *Segar v. Smith*, 738 F.2d 1249, 1283 (D.C. Cir. 1984). Dr. Drogin refers to standard deviations either as "t-values" or "Z-values."

[107] Wal-Mart did not retain records that would allow separate analysis of the components of the promotion or compensation decisions. *See* discussion *supra* at n. 85.

[108] Ex. 87 at 690.

[109] Ex. 10.

[110] Ex. 88; Ex. 87; Ex. 89; Ex. 90; Ex. 91; Ex. 92 (Sam's guidelines); Miller II Dep. 93:23-95:5, Ex. 39; Butler II Dep. 109:25-110:20, Ex. 37; Van Allen II Dep. 198:16-199:2, Ex. 38.

20

1722749.1

intended to provide "a consistent approach for handling non-exempt Associate pay issues."[111] Store Managers (or General Managers) within the California Regions had the responsibility to set individual pay rates for their hourly employees within pay guidelines. They had authority to set or adjust pay at hire ("start rate"), give raises in connection with performance evaluations ("performance increase"), and to reward "exceptional" performance ("merit increase.").[112]

***Start Rates*** – Wal-Mart established minimum starting pay rates by job category for each store in the California Regions.[113] A Store Manager could then pay a new employee up to $2 per hour above the start rate based on "additional skills, experience or education that will enhance their ability to perform the job."[114] Store Managers were not to consider any other factors in setting starting pay.[115] Moreover, if the increase in start rate was 6% or more over the minimum ($0.50 for Sam's), the District Manager was required to approve that start rate.[116] No written record was created explaining the reasons for setting an employee's starting pay.[117]

***Performance Increases*** – Under the Compensation Guidelines, performance evaluation ratings dictated the raise that an employee received. Store Managers awarded an employee with a standard review ("Meets Expectations") a 4% raise; an above standard review ("Exceeds

[111] Ex. 89 at 152001; Ex. 90 at 1032001; Ex. 92 at 3240.

[112] Ex. 88 at 151977-81; Ex. 87 at 693-97; Ex. 89 at 152003-09; Ex. 90 at 1032002-07; Ex. 91 at 366905-911; Ex. 92 at 3244-52

[113] Ex. 87 at 692 (facility pay structure developed by Corporate and RVP); Ex. 92 at 3243 ; Butler II Dep. 123:13-124:6, 203:19-21, Ex. 37 (Compensation made recommendation and RVP approved); Van Allen II Dep. 204:3-14, Ex. 38 (DM proposed new start rate to RVP for approval); Miller II Dep. 97:18-98:12, Ex. 39 (RPM and Compensation Department set start rate). All hourly positions were grouped into four or five uniform job classes, each of which had a minimum start rate a set amount above the minimum for the store. *See, e.g.*, Ex. 87 at 692, 700-01; Ex. 90 at 1032013; Ex. 92 at 3243; Butler II Dep. 114:4-116:4, Ex. 37; Van Allen II Dep. 201:21-202:22, Ex. 38; Miller II Dep. 98:13-99:7, Ex. 39. All employees with the same job title, such as sales associates, are placed in the same job category regardless of the department in which they work. Ex. 90 at 1032013; Van Allen II Dep. 203:8-19, Ex. 38; Miller II Dep. 113:20-114:3, Ex. 39.

[114] Van Allen II Dep. 210:7-15, Ex. 38; Butler II Dep. 116:12-117:6, Ex. 37; Miller II Dep. 99:14-100:15, Ex. 39.

[115] Arnold Dep. 106:19-25, 108:3-8, Ex. 29.

[116] Ex. 87 at 693; Ex. 89 at 152003; Ex. 92 at 3244; Miller II Dep. 99:18-100:7, Ex. 39; Arnold Dep. 126:4-127:1, Ex. 29.

[117] Butler II Dep. 126:19-127:3, Ex. 37.

21

Expectations") received 5%.[118]

.[119] The Store Manager approved the performance rating; the same evaluation form, with the same criteria, was used for all employees with the same position.[120] A raise that was inconsistent with a performance rating would generate an "exception," described below.

*Merit Increases* – A Store Manager could recommend an additional 5% or 6% merit increase "to an Associate who exhibits exceptional performance above job responsibilities."[121] Exceptional performance is not further defined, granting discretion to Store Managers.[122]

*Oversight of Hourly Compensation Decisions* – If a Store Manager set a pay rate above or below the guidelines, the rate was called an "exception." All hourly pay exceptions were automatically reported to the District Manager, who was charged with investigating the exception,[123] and then to the RPM, who had to either approve or overrule each exception.[124]

---

[118] Ex. 88 at 151981; Ex. 87 at 697; Ex. 89 at 152009; Ex. 90 at 1032007.

[119] Ex. 92 at 3252.

[120] Butler II Dep. 149:3-150:16, Ex. 37; Van Allen II Dep. 222:21-224:7, Ex. 38; Miller II Dep. 102:15-22, Ex. 39.

[121] Ex. 88 at 151980; Ex. 87 at 696; Ex. 89 at 152008 (reducing range to 4-5%); Ex. 90 at 103206; Ex. 92 at 3251                              ; Butler II Dep. 161:9-21, Ex. 37; Van Allen II Dep. 214:8-17, Ex. 38; Miller II Dep. 103:14-104:7, Ex. 39; Crawford Dep. 86:4-21, Ex. 26.

[122] Butler II Dep. 161:22-162:2, 169:6-10, Ex. 37.

[123] Van Allen II Dep. 201:2-4, Ex. 38; Butler II Dep. 122:5-19, 189:8-14, Ex. 37; Ex. 28.

[124] Butler II Dep. 119:23-122:21, Ex. 37; Van Allen II Dep. 201:2-15, Ex. 38; Miller II Dep. 149:10-150:13, Ex. 39; Ex. 87 at 690; Ex. 88 at 151974; Ex. 89 at 152001; Ex. 90 at 1032001; Ex. 91 at 366904. In addition, as noted above, California District Managers performed quarterly audits of each store's compliance with company policies, including compensation policies, which were reviewable at the regional and divisional levels. Wigger Dep. 41:10-18, 42:22-43:5, 109:17-24, Ex. 35; *see, e.g.*, Howard Dep. 162:18-163:24, Ex. 32; Ex. 122. District Managers also periodically generated Store Manager Associate Review Reports ("SMARR") which compared the rate of pay for hourly employees in the same job code. Van Allen II Dep. 254:5-17, Ex. 38; Shatz Dep. 95:24-97:17, Ex. 96. SMARR highlighted the employees whose hourly pay in a job category was more than 10% below or 5 % above the average pay in that class, SMARR was an enhancement of the Wage Review Adjustment Program which preceded SMARR. Van Allen II Dep. 255:11-20, Ex. 38; Shatz Dep. 97:22-99:2, Ex. 96. District Managers approved all WRAP increase recommendations, and RPMs reviewed the WRAP when they were performed. Van Allen II Dep. 251:15-18, 265:9-266:5, Ex. 38.

22

1722749.1

Because all District Managers *within* a region had to consult a single RPM regarding exceptions, the Regional Personnel Managers could ensure that hourly compensation was administered consistently among employees in their region.[125]

While Wal-Mart had oversight systems to check and report concerns up the chain, an RVP admitted he would have no way of knowing if managers were using their discretion to pay men more because they had families to support, and did not recall directing them not to consider sex in setting pay.[126] In May 2004, Wal-Mart adopted substantially different hourly pay guidelines.[127] The guidelines established objective "credits" for pre-Wal-Mart experience, thereby reducing Store Manager discretion to set starting pay. Instead, a formula translated those credits into the employee's start rate.[128]

[129]

## 2.    Pay for Management Employees

As with hourly employees, Wal-Mart issued guidelines each year governing pay for salaried management.[130] Within the California Regions, the RPM determined starting compensation for Assistant Managers and Co-Managers in his or her region.[131] Performance ratings dictated the amount of the performance increase, both of which the RPM and RVP had to approve.[132] The RPM or the RVP were also required to approve merit increases, permitted for

---

[125] Butler II Dep. 24:2-25:16, 179:3-24, 180:16-23, 181:14-23, Ex. 37; Ex. 10; Miller II Dep. 96:5-16, 149:23-150:23, Ex. 39.

[126] Butler II Dep. 189:15-193:25, Ex. 37.

[127] Ex. 95; Van Allen II Dep. 224:11-18, Ex. 38.

[128] Ex. 95 at 136-37; Butler II Dep. 136:17-139:7, 142:4-144:1, Ex. 37; Van Allen II Dep. 225:2-226:25, 228:11-14, Ex. 38.

[129] Ex. 95 at 143.

[130] Ex. 97; Ex. 98; Ex. 99; Ex. 100; Butler II Dep. 67:2-19, Ex. 37; Miller II Dep. 30:22-31:6, 41:22-42:1, Ex. 39.

[131] Ex. 97 at 151945; Butler II Dep. 19:7-21, 24:2-25:16, 71:9-23, 179:3-14, Ex. 37; Van Allen II Dep. 140:2-141:18, 147:22-148:14, 149:8-150:2, Ex. 38; Simpson Dep. 61:13-63:8; 66:5-17, 83:24-84:7, 92:1-7, Ex. 101; Blackburn Dep. 55:20-56:25, 70:7-20, 73:1-10, Ex. 102; Crawford Dep. 126:10-23, 127:14-22, Ex. 26; McNair Dep. 98:2-11, 108:19-109:17, Ex. 103.

[132] Ex. 104; Ex. 97 at 151955; Ex. 105 at 560489; Butler II Dep. 37:13-39:13, Ex. 37; Van Allen II Dep. 161:18-163:11, Ex. 38; Miller II Dep. 59:25-63:1, Ex. 39; Simpson Dep. 124:21-

23

exceptional performance.[133]  For each element of compensation, a single decision-maker (RPM or RVP) in each Region made decisions for all salaried management employees.  Pay was not supposed to vary based on the store areas supervised by the manager.[134]  Divisional or Home Office approval was required for exceptions to the guidelines.[135]

The RPMs were responsible for "monitoring the salaries of Management Associates in their regions to ensure the integrity of the program."[136]  Both hourly and salaried employees were actively discouraged from discussing their salary with others, leaving many women unaware of their unequal pay.[137]

Wal-Mart's own internal studies conducted in 2000, 18 months before this case was filed, clearly documented the stark disparities in pay for women managers.  Wal-Mart's study of retail store management pay concluded that "[g]enerally, average salaries for female and minority males are below the overall average pay for most jobs" and "[a]verage pay increases for minority males and females are generally below overall average income ratio across most jobs."[138]  A similar study of Sam's Clubs showed that female Area Managers and Assistant Managers in Region 18E earned about $3,000 less than their male counterparts each year, even though their average performance ratings were equal or higher than those of comparable men.[139]

---

125:17, Ex. 101; Blackburn Dep. 85:15-19, 89:3-90:15, 92:21-93:2, Ex. 102; Crawford Dep. 172:6-23, Ex. 26; McNair Dep. 119:25-122:13, 122:16-123:1, Ex. 103.

[133]  Simpson Dep. 117:22-118:7, Ex. 101; McNair Dep. 48:25-49:24, Ex. 103; Ex. 99 at 890; Ex. 106; Ex. 107 at 1015139; Van Allen II Dep. 153:24-154:15, Ex. 38; Butler II Dep. 91:3-10, Ex. 37; Ex. 108 at 375231; Miller II Dep. 35:16-37:15, Ex. 39.

[134]  Miller II Dep. 56:14-58:4, Ex. 39; Van Allen II Dep. 299:25-300:12, Ex. 38.

[135]  See, e.g., Miller II Dep. 15:16-17:12, 41:22-42:1, Ex. 39; Butler II Dep. 58:18-24, 93:22-95:2, Ex. 37.

[136]  Ex. 97 at 151945; Ex. 10; Van Allen II Dep. 140:17-141:18, Ex. 38; Butler II Dep. 179:3-14, Ex. 37.

[137]  Butler II Dep. 104:2-105:6, Ex. 37; Van Allen II Dep. 195:25-196:5, Ex. 38; Hourly employees: P. Long Decl. ¶3; MacGregor Decl. ¶3; Pleasant Decl. ¶3; Loew Decl. ¶2; Aragon Decl. ¶3; Burt Decl. ¶2; Walker Decl. ¶6; Mitchell Decl. ¶3; Salvato Decl. ¶8. Salaried employees: Meyer Decl. ¶3; Diener Decl. ¶2.

[138]  Wal-Mart Stores/Supercenter Minority/Gender Pay Analysis FYE 2000, Ex. 109 at 386575.

[139]  Sam's Club Minority/Gender Pay Analysis FYE 2000, Ex. 111 at 374652-53, 374657-58; Sam's Club Minority/Gender Pay Analysis FYE 2000 Executive Summary, Ex. 110.

24

1722749.1

3.    Statistical Pattern of Unequal Pay for Women

Female employees were consistently paid less than male employees in the same position even though women had higher average performance evaluation scores, more seniority and lower turnover rates. Among hourly workers, women in the California Regions earned about $878 - $1298 less than did men in 2001. Drogin Decl. Table 5. For management employees, the gender pay gap was $11,102–$13,700. *Id.* The differences in pay for men and women could not be explained by seniority. Women had longer average tenure (3.59, 3.33, 5.16 years for Regions 16, 19 and 18E, respectively) than do men (2.63, 2.34, 3.54 years). Drogin Decl. ¶25. The differences could not be explained by performance; women in hourly positions on average have higher performance ratings than do men. Drogin Decl. ¶27.

Dr. Drogin also compared the pay for men and women hired in the *same* year into the *same* positions. For employees hired into hourly positions in 1996, the average pay for men was $0.21 to $0.29 per hour more than for women in the Region. Drogin Decl. ¶30. For those 1996 hires who remained through 2002, the gap in pay for men and women increased to $0.46 to $1.78 per hour on average. *Id.* For a Cashier in Region 16, this would mean a woman earning $17,115 instead of $18,480 like her male peer— a significant difference. *Id.*

Dr. Drogin did his regressions on hourly pay rate separately for each store, each year. The analysis controlled for seniority, whether hired within the year, part-time/full-time status, store, job position, whether the employee was ever hired into a retail store management position and gender. Women made 1-2% less per hour than men (depending on region and year) and the disparities were statistically significant (t-values ranged from -6.58 to -11.43 for Wal-Mart regions and -1.41 to -5.19 for Sam's). Drogin Decl. ¶69, Table 21. When he added performance rating as a control factor in the regression analysis, women were paid 1.3-2.3% less than comparable men in 2001 and the results were highly significant with t-values of -11.99, -12.44, and -4.36. Drogin Decl. App. 15h. The disparity increased because women had higher average performance ratings scores than did men. Drogin Decl. ¶27. He completed hundreds of separate regressions, and over 80% of the store-level results were adverse to women in the Wal-Mart

25

Regions, and over 63% in Sam's. Drogin Decl. ¶69 Table 21. These disparities are neither caused by nor limited to a small set of bad apples, but represent consistent, region-wide treatment of women. Drogin Decl. ¶¶70-72.

Dr. Drogin conducted multiple regression analyses of Area Manager, Assistant Manager and Co-Manager pay. His initial regression of total annual earnings for these managers, by region, controlled for seniority, whether hired or terminated during year, whether full or part-time, weeks worked, and gender. The results showed that women were paid 3.1 to 14.1% less than similarly situated men in every year and resulted in a t-values of -1.36 to -5.12. Drogin Decl. ¶62, Table 20. Seven regressions (one per year) were done for each region. Every regression showed women were paid less, and 57.1% to 100% of the region-level results were statistically significant, depending on region. *Id.* These were meaningful differences for managers. For example, compared to a male Assistant Manager earning $31,000/year in Region 19, a female Assistant Manager would take home only $28,179 in 2001. Drogin Decl. App. 15b.

In sum, Dr. Drogin found that women employees in the California regions were paid less than men in every year, even when relevant non-discriminatory factors were considered.[140]

## III.    ARGUMENT

These specific pay and promotion policies violate Title VII under both adverse impact and disparate treatment theories of liability. Fourth Amended Complaint, ¶¶ 143-152. In

---

[140] *See, e.g.,* Clark Decl. ¶14-15 (male assistant managers hired off the street were making about $12,000 more a year than Clark despite her having been Assistant Manager for eight years); Adams Decl. ¶30 (while Co-Manager in Las Vegas, NV, club Adams learned that two male Co-Managers with same experience as her made $3,500 more a year than she did); Kwapnoski Decl. ¶12 (despite 14 years of experience, male co-worker with seven years' experience and less responsibility made virtually the same as she did); Anderson Decl. ¶3 (as Assistant Manager, Anderson saw paystub of male co-worker whom she had supervised but who made $1,000 more a month than she did); Diener Decl. ¶2 (male participant in management training program was making $7,000 more a year than Diener was despite her greater experience and education); Adair Decl. ¶14 (newly-hired male associate was making $15 an hour while no woman, including a department manager with 20-year tenure was making that much); see also Campbell Decl. ¶2; Dukes Decl. ¶19; Surgeson Decl. ¶9; Aragon Decl. ¶2; Brownell Decl. ¶3; Farias Decl. ¶4; Flores Decl. ¶3; Fowler Decl. ¶3; Garcia Decl. ¶3; K. Haney Decl. ¶2; Harper Decl. ¶8; Knoles Decl. ¶2; Loew Decl. ¶2; L.M. Long Decl. ¶2; P. Long Decl. ¶3; Marsh Decl. ¶3; McMenomy Decl. ¶4; MacGregor Decl. ¶3; Meyer Decl. ¶3; Milse Decl. ¶3; Noone Decl. ¶7-8; Pleasant Decl. ¶3; Sanders Decl. ¶2; Stinson Decl. ¶3-4; Strausz Decl. ¶2; D. Valdez Decl. ¶4; O. Valdez Decl. ¶2; Wolsleger Decl. ¶3.

assessing compliance with the Rule 23 requirements, the district court must conduct a "rigorous analysis" to ensure that plaintiffs have met their burden for each element of Rule 23(a) and 23(b). *Gen. Tel. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). Instead, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied." *Id.* at 1195.

### A.    The Proposed Class Is Sufficiently Numerous

The proposed classes are so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The classes are estimated to be over 60,000 for each Wal-Mart Region and nearly 30,000 for Sam's Region 18E. *See* Drogin Decl. ¶4.

### B.    Plaintiffs Have Identified Common Questions of Law and Fact

While "a single [common] question" will meet Rule 23(a)(2), the Supreme Court held that the litigation of a common question must "produce a common answer to the crucial question *why was I disfavored.*" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552, 2556 (2011) (internal quotation marks omitted) (emphasis in original). These questions include: whether, within each of the California Regions, 1) Wal-Mart's "tap on the shoulder" system for making promotions into management trainee and support/area manager positions had an adverse impact on women; 2) a core group of high-level managers engaged in a pattern or practice of intentionally denying women equal opportunity to receive promotions into management trainee and support/area manager positions; 3) Wal-Mart's Field Compensation Guidelines for making hourly pay decisions had an adverse impact on women; 4) Wal-Mart's guidelines for salaried pay decisions had an adverse impact on women; 5) the managers charged with making pay decisions for the hourly and salaried employees engaged in a pattern or practice of intentionally compensating women less than similarly situated men because of their gender.

####     1.    Employment Policies that Incorporate Elements of Discretionary Decision-Making May Still Meet the Commonality Standard After *Dukes*

27

The Supreme Court's decision in this case reaffirmed its earlier holding in *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988), that a system of subjective decision-making may give rise to liability under Title VII "in appropriate cases." *Dukes*, 131 S. Ct. at 2554 (quoting *Watson*, 487 U.S. at 990-91). "'[A]n employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" *Id.* (quoting *Watson*, 487 U.S. at 990-91).

Thus, while assessing candidates based on subjective qualities such as "leadership" or "people skills" may be rational, such assessments will "entail subtle and unconscious mental processes susceptible to bias." *Chin v. Runnels*, 343 F. Supp. 2d 891, 906 (N.D. Cal. 2004), *aff'd sub nom. Chin v. Carey,* 160 F. App'x 633 (9th Cir. 2005). "Courts have recognized that subjective decision-making allows for subtle biases or unconscious stereotyping to affect selection processes." *Id.* (internal citations omitted). As this Court observed in *Chin*, there is "a growing body of social science" that recognizes the pervasiveness of unconscious bias and how it may "lead to biased perceptions and decisionmaking." *Id.* Among those common biases are the stereotypes that women are not aggressive and not well-suited to leadership. *Id.* at 907 n.7. As Judge Posner explained in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir. 2012), decision-makers "tend to base decisions on emotions and preconceptions, for want of objective criteria" and those preconceptions lead them to choose "people who are like themselves." *See also Kimble v. Wisconsin Dep't of Workforce Dev.*, 690 F. Supp. 2d 765, 775-76 (E.D. Wis. 2010) (cataloging stereotyping research). The problem is particularly acute where most of the decision-makers are not members of the protected group. *See, e.g., Pitre v. W. Elec. Co., Inc.*, 843 F.2d 1262, 1271-72 (10th Cir. 1988); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1436 (9th Cir. 1984), *modified*, 742 F.2d 520 (9th Cir. 1984).

In *Dukes*, the Supreme Court articulated the standards necessary to satisfy Rule 23(a)(2) where a Title VII challenge involves employment policies that include an element of subjective decision-making. For a disparate treatment claim, plaintiffs must demonstrate "significant proof that [defendant] operated under a general policy of discrimination." *Dukes*, 131 S. Ct. at 2554

28

(internal quotation marks omitted). For disparate impact analysis (where proof of intent is not required), plaintiffs must identify a "specific employment practice . . . that ties all their . . . claims together." *Id.* at 2555-56 (internal quotation marks omitted). Discretion must have been exercised through a "common mode" or "common direction." *Id.* at 2554-55.

Decisions interpreting *Dukes* have affirmed that commonality may be satisfied where, as here, managerial discretion is exercised "within a framework established by the company." *McReynolds*, 672 F.3d at 488. In *McReynolds*, a race discrimination action, plaintiffs challenged a company-wide "teaming policy," which allowed brokers in its 600 offices to form teams, and an "'account distribution' policy," which awarded accounts based on past revenue generation. *Id.* The Seventh Circuit reversed the denial of class certification, concluding that nationwide certification of a disparate impact challenge was appropriate and consistent with *Dukes* because "the exercise of . . . discretion is influenced by the two company-wide policies . . . ." *Id.* at 489.

Similarly, in *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012), Judge Chen certified a national class challenging two management promotion decisions where plaintiffs identified "specific employment practices . . . implement[ed] companywide under the influence and control of top management." *Id.* at 509. The evidence included "common policies and practices," a "companywide culture that, along with the common policies . . . , guide Costco managers' discretion" and statistical proof demonstrating "classwide effects" across regions. *Id.* at 511. The court identified three employment policies: a promotion from within system, a policy against posting openings, and a "tap on the shoulder" selection process, subject to involvement of regional and corporate executives. *Id.* at 519-21 & n.18.

In *Chen-Oster v. Goldman Sachs & Co.*, No. 10 Civ. 6950, 2012 WL 205875 (S.D.N.Y. Jan. 19, 2012), the district court denied defendant's motion to dismiss a gender discrimination class action, because plaintiffs had properly alleged that "the 360-degree review process, forced quartile rankings, and the tap on the shoulder" promotion system, "in combination with managerial discretion, result in systemic discrimination . . . ." *Id.* at *5.

        2.      Plaintiffs Have Identified Common Questions for the Promotion Claims

29

Plaintiffs have identified specific employment policies, established by the company and used within the California Regions, which guide the discretion of California Region managers in making promotion decisions. For both the Support/Area Manager and Management Trainee position, the Regions use a "promotion from within" policy and a policy not to post openings. Beyond these requirements, the process was conducted through a "tap on the shoulder" without an application process. *See Ellis*, 285 F.R.D. at 519-21; *Chen-Oster*, 2012 WL 205875, at *5. For Management Trainees, decision-makers were required to follow the Promotion Guidelines establishing minimum requirements, including a relocation requirement that was known to have an adverse impact on women candidates. The additional subjective criteria used included "leadership," "confidence," and "goals." *See* discussion *supra* at 16. For Support Managers, the RPMs established specific criteria for selection: "a minimum of one-year existing service" and "the capacity, ability and desire to lead."[141]

There is strong evidence that top management guided and influenced this exercise of discretion. *See* discussion *supra* at 14-19. The Regional Managers had a high level of regular communication about the grooming and selection of candidates for these promotions. The selection decisions were made in the context of a management group that was nearly exclusively male, with shared assumptions (and stereotypes) about women's abilities and their lack of interest in management, uniform training, and a strong common culture.[142] For want of objective criteria, decision-makers chose "people who are like themselves." *See McReynolds*, 672 F.3d at 489. MIT selections were overseen by the RPM, ensuring a consistency in the selection of candidates within the region. *See supra*, n. 86; *see Dukes*, 131 S. Ct. at 2547.

---

[141] Where, as here, defendant did not maintain records of how promotion decisions were made, plaintiffs are not required to prove which component of the promotion system caused the particular outcome. 42 U.S.C. § 2000e-2(k)(1)(B)(i).

[142] The Supreme Court concluded that evidence of Wal-Mart's culture, standing alone, could not demonstrate "[s]ignificant proof that an employer operated under a general policy of discrimination" sufficient to satisfy commonality. *Dukes*, 131 S. Ct. at 2553. Here, plaintiffs offer evidence of the company's culture as part of a broader evidentiary showing that together demonstrates how a group of managers, working closely together with regional executives, made subjective decisions that consistently disfavored women. *See Ellis*, 285 F.R.D. at 520-521.

30

1722749.1

Finally, Plaintiffs have demonstrated that these policies and practices have led to a class-wide pattern of adverse outcomes for women *at the district and regional level.* The pattern is unmistakable. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981-83 (9th Cir. 2011). Within each of the Regions, women have been selected at a rate far below what would be expected in a non-discriminatory system. Anecdotal evidence buttresses these conclusions. *See* Declarations of putative class members, *passim.*

By identifying specific policies, explaining the common mode of exercising discretion, and providing statistics at the store, district and regional level, Plaintiffs have met the burdens created by the Supreme Court.

### 3.   Plaintiffs Have Identified Common Questions for the Pay Claims

The applicable employment policies are even clearer for hourly compensation decisions. The Field Compensation guidelines established a region-wide system for paying hourly associates, but enabled a range of discretion. The Guidelines also dictated the criteria that Store Managers should use in setting pay but afforded the managers discretion in interpreting them. The "exception" reporting process ensured close oversight and supervision of these pay decisions. When higher level managers ratified pay exceptions, they established norms applicable to the entire region permitting exceptions in certain circumstances, and ultimately pay levels that consistently favored men. Overall responsibility for the integrity of the pay decisions within each region was vested in a single individual—the RPM. That oversight role further guided and ensured the consistency of the limited discretion exercised by the Store Managers.[143]

Decisions concerning pay for Assistant Managers and Co-Managers were made above the store level—by the RPMs based on recommendations from the District Managers. By vesting the final decisions in a single decision-maker, discretion was exercised in a common mode. As with promotion decisions, the decisions were made in the context of shared culture, training, and biases. The statistical evidence confirms the common classwide effects on women, who were systemically subject to unequal pay.

---

[143] Butler II Dep. at 179:15-24, Ex. 37.

31

C.   Plaintiffs Have Met Their Burden of Demonstrating that They Are Typical of the Class and Are Adequate Class Representatives

Plaintiffs propose that Edith Arana and Deborah Gunter serve as class representatives for the Region 16 class, Betty Dukes and Patricia Surgeson as the representatives for the Region 19 class, and Christine Kwapnoski as the Region 18E class representative.  Claims of discrimination with respect to compensation are made by Dukes, Surgeson, Arana, Gunter, and Kwapnoski. Dukes Decl. ¶19-20; Surgeson Decl. ¶9, 11; Arana Decl. ¶3; Gunter Decl. ¶11; Kwapnoski Decl. ¶ 12.  Claims of discrimination with respect to promotion are made by Dukes (support manager), Surgeson (MIT), Arana (MIT and support manager), Gunter (support manager), and Kwapnoski (Area Manager, MIT).  Dukes Decl. ¶15, 20; Surgeson Decl. ¶10; Arana Decl. ¶3, 15-17, 26-27, 32; Gunter Decl. ¶ 2, 22-23; Kwapnoski Decl. ¶2, 14-15, 17, 19, 20.

The proposed named Plaintiffs have claims that are typical of the class because "they are reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); Fed. R. Civ. P. 23(a)(3); *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 166-71 (N.D. Cal. 2004).  They will "fairly and adequately protect the interests of the class;" and "their claims are sufficiently interrelated, and not antagonistic, to the claims of the class." *Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D. 379, 387 (D. Kan. 1998); Fed. R. Civ. P. 23(a)(4).  They have each devoted a decade of their lives to fighting this case and remain dedicated to the classes.[144]

The District Court previously found these proposed named Plaintiffs' claims were typical of those of the class challenging pay and promotion practices at Wal-Mart nationwide, and that the women were adequate class representatives. *Dukes*, 222 F.R.D. at 166-70.  The Ninth Circuit affirmed those rulings, 603 F.3d 571, 613 (9th Cir. 2010), and the Supreme Court's decision did not address either typicality or adequacy of representation. *Wal-Mart*, 131 S. Ct. at 2550.  As the case is now significantly *narrower*, these prior determinations should be reaffirmed.

The named Plaintiffs have retained counsel who have the resources and expertise to

---

[144] Supp. Dukes Decl. ¶5; Supp. Kwapnoski Decl. ¶5; Supp. Arana Decl. ¶6; Supp. Gunter Decl. ¶6; Supp. Surgeson Decl. ¶5.

32

1722749.1

prosecute this action vigorously on behalf of the classes. Sellers Decl. ¶¶ 3-12. Plaintiffs request that their counsel be appointed to represent the proposed classes. Fed. R. Civ. P. 23(g).

      D.     The Case Can Properly Be Certified Under Rule 23(b) and Plaintiffs Have Proposed a Manageable Trial Plan

Plaintiffs ask the Court to certify liability, back pay and punitive damages under Rule 23(b)(3) for each regional class, and order notice and opt-out rights for all class members. Plaintiffs are not seeking certification of compensatory damage claims.[145] Plaintiffs propose to try the case using the traditional model for Title VII class actions established under *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361 (1977), and reaffirmed by the Supreme Court. *Dukes*, 131 S. Ct. at 2561 (citing *Teamsters*, 431 U.S. at 361).

Rule 23(b)(3) requires that this court determine whether common issues predominate over individual issues, and whether class treatment will be manageable and the superior method of resolution of the class members' claims.

***Common Issues Predominate*** – As described above, this case challenges Wal-Mart's uniform policies and practices. The individualized issues to be resolved will only arise if Plaintiffs first prove at a Stage I liability trial that Wal-Mart has maintained a discriminatory pay and promotion system, making Wal-Mart liable for monetary relief. Then, at Stage II, the focus will turn to the award of damages individually, with Wal-Mart having the burden to prove, through admissible evidence, that any employee's pay or promotion decision was *not* the result of discrimination. *United States v. City of New York*, 276 F.R.D. 22, 48 (E.D.N.Y. 2011). While Title VII affords Wal-Mart the right to assert defenses to individual claims for relief, whether those defenses will require separate hearings will depend on whether they create credibility issues. *See In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 156 (S.D.N.Y. 2012). Whether such hearings will be needed and, if so, their number and manageability is better left to a determination after liability to the class is determined and the grounds for any such liability are

---

[145] Because class members will receive notice and the opportunity to opt-out under Rule 23(b)(3), their due process rights are fully protected. In this way, Plaintiffs again fully resolve a concern raised by the Supreme Court. *See Dukes*, 131 S. Ct. at 2559-60.

33

established. *See City of New York*, 276 F.R.D. at 48 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)).

**A Class Action Is the Superior Approach** – A class action remains the superior method of litigating these issues, because the Court can resolve the myriad common issues in one proceeding and leave only the individualized issues for additional *Teamsters* proceedings. *City of New York*, 276 F.R.D. at 48-49. Without a class, that significant efficiency will be lost. *Cf. McReynolds*, 672 F.3d at 492 ("[T]he lawsuits will be more complex if, until issue or claim preclusion sets in, the question whether Merrill Lynch has violated the antidiscrimination statutes must be determined anew in each case.").

Plaintiffs' punitive damages claim may properly be certified under Rule 23(b)(3). *Ellis*, 285 F.R.D. at 540-44. Resolving punitive damages in a single class proceeding, after the back pay proceedings, will ensure that the amount of punitive damages awarded among the class is consistent and properly measures the reprehensibility of Wal-Mart's conduct. *Id.* at 544.

The class action procedure is particularly important here because the value of many of the claims is too small to justify individual federal lawsuits. The complex statistical proof necessary to identify a pattern of discrimination, or to meet the requirements of an adverse impact claim, cannot be justified for these small individual claims. Finally, the *Teamsters* model of proof would not be available in any non-class litigation. *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 150 (2d Cir. 2012).

**Issue Certification** – In the alternative, Plaintiffs request that the Court only certify the *liability* issue under Rule 23(c)(4), which authorizes certification of "particular issues." *See McReynolds*, 672 F.3d at 490-92 (certifying injunctive and classwide liability claims under Rule 23(c)(4)); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996); *Ellis*, 285 F.R.D. at 544. Resolution of the common liability question will streamline future claim litigation. *McReynolds*, 672 F.3d at 490-92.

Plaintiffs propose the following trial plan:

STAGE 1 (Part One): The jury decides:

34

- Whether Wal-Mart has engaged in a pattern or practice of discrimination;

- Whether Wal-Mart's conduct meets the standard for an award of punitive damages;

- Whether Wal-Mart is liable to the named Plaintiffs for gender discrimination.

The Court decides:

- Whether Wal-Mart's employment practices have had an adverse impact on the class (prima facie case of disparate impact).

STAGE 1 (Part Two):  The Court would decide:

- Whether Wal-Mart's employment practices were justified by business necessity and if so, whether there was a less discriminatory alternative;

STAGE 2:

- Determine back pay for eligible class members and adjudicate any individual defenses asserted;

- If liable for punitive damages, the aggregate amount of punitive damages owed to the class and the share of those damages owed to each class member.

*See Ellis*, 285 F.R.D. at 543-44.

Without knowing the scope of any Stage I liability findings, it is premature to determine the specific method for resolving remedial issues in Stage II.  Specifically, punitive damages are only available for disparate treatment claims and promotion claims may require different Stage II proceedings than do pay claims.  There may, moreover, be common remedial issues to be resolved before undertaking any individualized assessments. *See Ellis*, 285 F.R.D. at 538 n.38. As one useful guide, Judge Garaufis has established an efficient class-based approach for resolving promotion claims in the race discrimination class action against the New York Fire Department. *City of New York*, 847 F. Supp. 2d at 408-09; *see also In re Vivendi*, 284 F.R.D. at 156 (S.D.N.Y. 2012) (endorsing plan for processing claims in a preliminary phase and appointing Special Master to review individual challenges by defendants in second phase).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs request certification for the classes and claims described.

35

Dated:  April 15, 2013                            Respectfully submitted,


Randy Renick [SBN 179652]                         By: *Joseph M. Sellers*
Anne Richardson [SBN 151541]                      Joseph M. Sellers (*pro hac vice*)
Cornelia Dai [SBN 207435]                         Christine E. Webber (*pro hac vice*)
HADSELL STORMER                                   Jenny R. Yang (*pro hac vice*)
   RICHARDSON & RENICK, LLP                       Peter Romer-Friedman (*pro hac vice*)
128 N. Fair Oaks Avenue                           COHEN MILSTEIN SELLERS & TOLL PLLC
Pasadena, California 91103                        West Tower, Suite 500
Telephone:  (626) 585-9600                        1100 New York Avenue
Facsimile:  (626) 577-7079                        Washington, DC  20005
rrr@hadsellstormer.com                            Telephone:  (202) 408-4600
arichardson@hadsellstormer.com                    Facsimile:  (202) 408-4699
cdai@hadsellstormer.com


Jocelyn D. Larkin (SBN 110817)                    Steven Stemerman (SBN 067690)
Michael Caesar (SBN 280548)                       Elizabeth A. Lawrence (SBN 111781)
THE IMPACT FUND                                   DAVIS, COWELL & BOWE, LLP
125 University Avenue                             595 Market Street, Suite 1400
Berkeley, CA  94710                               San Francisco, CA  94105
Telephone:  (510) 845-3473                        Telephone:  (415) 597-7200
Facsimile:  (510) 845-3654                        stemdcb@aol.com
                                                  elawrence@dcbsf.com


Noreen Farrell (SBN 191600)                       Merit Bennett (*pro hac vice*)
EQUAL RIGHTS ADVOCATES                            THE BENNETT FIRM
180 Howard Street, Suite 300                      460 St. Michaels Drive, Suite 703
San Francisco, CA  94105                          Santa Fe, NM  87505
Telephone:  (415) 621-0672                        Telephone:  (505) 983-9834
NFarrell@equalrights.org                          MB@thebennettfirm.us


Sheila Y. Thomas (SBN 161403)                     Stephen Tinkler (*pro hac vice*)
Law Office of Sheila Thomas                       THE TINKLER LAW FIRM
5260 Proctor Avenue                               309 Johnson Street
Oakland, CA  94618                                Santa Fe, NM  87501
Telephone:  (510) 339-3739                        Telephone:  (505) 982-8533
sheilayt@sbcglobal.net                            set@tinklernm.com


*Attorneys for Plaintiffs*

36

1722749.1