Joseph M. Sellers (Pro Hac Vice)
Christine E. Webber (Pro Hac Vice)
Jenny R. Yang (Pro Hac Vice)
Peter Romer-Friedman (Pro Hac Vice)
COHEN MILSTEIN SELLERS & TOLL, PLLC
West Tower, Suite 500
1100 New York Avenue
Washington, DC 20005
Telephone: 202.408.4600
Facsimile: 202.408.4699
Jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
jyang@cohenmilstein.com
promerfriedman@cohenmilstein.com

Randy Renick [SBN 179652]
Anne Richardson [SBN 151541]
Cornelia Dai [SBN 207435]
HADSELL STORMER
    RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue
Pasadena, CA  91103
Telephone:     626.585.9600
Facsimile:     626.577.7079
rrr@hadsellstormer.com
arichardson@hadsellstormer.com
cdai@ hadsellstormer.com

Attorneys for Plaintiffs

[Additional Counsel Listed on Next Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| BETTY DUKES, PATRICIA SURGESON, EDITH ARANA. DEBORAH GUNTER, CHRISTINE KWAPNOSKI, on behalf of themselves and all other similarly situated,<br><br>Plaintiff(s)<br><br>v.<br><br>WAL-MART STORES, INC.<br><br>Defendant. | Case No. C 01-CV-2252-CRB<br><br>**DECLARATION OF DEBORAH GUNTER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

i

Steven L. Stemerman (SBN 067690)
Elizabeth A. Lawrence (SBN 111781)
DAVIS, COWELL & BOWE, LLP
595 Market Street, Suite 1400
San Francisco, CA 94105
Telephone: 415.597-7200
Facsimile: 415.597-7201
stemdcb@aol.com
elawrence@dcbsf.com
svarela@dcbsf.com

Noreen Farrell (SBN 191600)
Jennifer Reisch (SBN 223671)
EQUAL RIGHTS ADVOCATES
180 Howard Street, CA 94105
San Francisco, CA 94105
Telephone: 415.621.0672
nfarrell@equalrighs.org

Sheila Thomas (SBN 161403)
Law Office of Sheila Thomas
5260 Proctor Ave
Oakland, CA 94618
Telephone 510.339.1934
Facsimile: 510.339.3723
sheilayt@sbcglobal.net

Jocelyn D. Larkin (SBN 110817)
THE IMPACT FUND
125 University Avenue, Suite 102
Berkeley, CA 94710
Telephone: 510.845.3473
Facsimile: 510.845.3654
jlarkin@impactfund.org

Merit Bennett
THE BENNETT FIRM
460 St. Michaels Drive, Suite 703
Santa Fe, NM 87505
Telephone: 505.983.9834
mb@thebenettfirm.us

Steven Tinkler
THE TINKLER LAW FIRM
309 Johnson Street
Santa Fe, NM 87501
Telephone: 505.982-8533
Facsimile: 505.982.6698
set@tinklernm.com

ii

I, DEBORAH GUNTER, declare:

1.      I have personal knowledge of each and every fact set forth in this Declaration, and if called to testify as a witness in this matter, I could and would competently testify to each of these facts.

2.      I was first employed by Wal-Mart, Inc. during the 1993 winter holiday season as a seasonal employee in Texas. I had previously met Sam Walton in Dallas and was very impressed with him and his Company. My full-time career with Wal-Mart began several years later in Southern California. I was employed from April 2, 1996 through August 25, 1999 at three different stores in Riverside, Perris, and Lake Elsinore, California. I am female. I had more than twenty years' experience working in retail, including supervisory and management experience, prior to working for Wal-Mart. During the three years I worked at Wal-Mart, I was repeatedly denied training and management opportunities. I never obtained a department manager or support manager position, much less my goal of becoming a company leader.

3.      I first learned about this lawsuit after watching a television news program during which a named plaintiff and her attorney were interviewed regarding Wal-Mart's employment practices. Everything she said about Wal-Mart was so similar to what I had experienced that I called the news station to get the number of the attorney who was suing the company. I wanted to do whatever I could to support a lawsuit that would end gender discrimination in promotion and pay and open up advancement opportunities for women at Wal-Mart. I became a named plaintiff myself because I too was unfairly denied promotional opportunities, training, and equal pay during my three years with the company. I want to change Wal-Mart's corporate culture and employment practices so that women have the same opportunity to advance with the company as men currently do. Through this lawsuit, I seek to hold Wal-Mart accountable for providing women with equal access to

2

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

the training and mentoring necessary for promotion into the more desirable, higher paying positions; equal opportunity for promotion into store, district and regional level management positions; and equal pay for their work. I understand the responsibilities of a named plaintiff and class representative. I am prepared to fulfill my duties to the women in the class so that they achieve fair and equitable treatment. I am willing to return to Wal-Mart if this lawsuit results in equal opportunities for women to advance in the company so long as Wal-Mart also ends its on-going retaliation against me and other women who have complained about its gender discriminatory practices.

4.      My first job with Wal-Mart was in 1993 as a cashier on the Express Lane during the winter holiday season in Waxahachie, Texas. I was hired as a seasonal employee and worked approximately four months from October 1993 through January 1994. I worked under a female Store Manager, Wendy [last name unknown], and two female Assistant Managers, whose names I no longer remember. I was impressed that the store was run by three female managers and formed the impression that women could advance at Wal-Mart.

5.      In approximately March 1996, I submitted a written application for employment with Wal-Mart. At that time, I was going to school and I had been working a variety of jobs through a temporary service. I had also earned my Certification as a Pharmacy Technician but had been unable to find work in this field. I decided to apply to Wal-Mart because I wanted a permanent job with a company that would offer stability and promotional opportunities. Wal-Mart also had a pharmacy.

6.      The Personnel Manager of the Riverside store called me regarding an open position in the Photo Lab. I had three years of training in photography so I thought this might be an interesting opportunity. I was hired as a cashier in the Photo Lab after interviewing with the Photo Department

3

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Manager, Milford Pyles. I started out part-time on April 2, 1996 at the rate of $5.50 an hour. Wal-Mart defines full-time status as working twenty-eight hours a week. In July 1996, I received a "standard" ninety-day evaluation and a 30-cent raise, which brought my pay rate to $5.80 an hour.

7.     I was excited to begin my career at Wal-Mart. I learned everything I could about the Photo Lab and soon was able handle all aspects of photo processing. This proved to be a liability rather than an asset as I found myself working 12-hour shifts without a single break. I would complain to Mr. Pyles but staffing of the Photo Lab, especially on the weekends, continued to be a problem. I did not receive overtime pay when I worked these long shifts because I was still on part-time status.

8.     On one of my shifts in October 1996, I began having chest pains. I asked Department Manager Pyles if I could be released from work to go to the hospital. Mr. Pyles refused to let me go because there were only two of us working the department that day. When I finished my shift, I went straight to the hospital where I was admitted and given nitroglycerin. My doctor then placed me on the medication Ativan and a two-month medical leave. When I returned, I requested a transfer to a different department. I was interested in a nighttime stocking position because this would leave me free to continue my education during the days.

9.     While I was working in the Photo Lab, I repeatedly asked Mr. Pyles and other Assistant Managers at the Riverside store for training on the Telzon machine, a hand-held computer that scans Wal-Mart merchandise for pricing and inventory purposes. It indicates what products have been reordered, which ones are discontinued, and what an automatic turnaround time will be from the warehouse. I wanted this training because I thought it would help me advance in the company. My requests for Telzon training were denied. Eventually, I taught myself how to use the Telzon.

4

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

10. In February 1997, I was transferred to a stocker position on the night shift after interviewing with the Overnight Manager, Steve Martin. Mr. Martin told me that he had observed my work and he felt that I would be an asset to his shift. My hours during the winter were from 11 p.m. to 7 a.m. and during the summer from 12 a.m. to 8 a.m. In April 1997, I received my first annual evaluation. I was again ranked "standard" and received another 30-cent raise. I was then earning $6.10 an hour.

11. While working the nigh shift, I learned through the grapevine that male stockers were being paid more than female stockers. I also observed that men were most frequently assigned to the receiver position, which pays more than the stocker position. For example, a male co-worker on the night shift, David Williams, told me he was being paid $8.50 an hour. This was more $2.00 more an hour than I was being paid.

12. During the two years I worked on the overnight shift, Mr. Martin encouraged me to apply for Department Manager positions. He knew I wanted to excel with the company and he had told me that the way to get into management was by first becoming a Department Manager or a Support Manager.

13. I had also talked to District Manager Nick Fiello about my desire to become a manager and run a store some day. District Manager Fiello would joke with me during his store tours and once told me that maybe I would end up working in Bentonville, which is where Wal-Mart's corporate headquarters is located. He also told me that I needed to become a Department Manager first and then bid on openings for higher positions as they became available.

14. While I was at the Riverside store, I applied three times for a Department Manager position in the Pets Department. I was very qualified for this position because I had been breeding and raising show dogs since I was a young woman. I had also worked in a pet store in

5

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

approximately 1983. The first time I applied for the position, it was not posted. Overnight Manager Martin told me that it was becoming available and that it would be a perfect opportunity for me to begin my management training. I went to the Assistant Manager over the Pets Department, John [last name unknown] to express my interest in the position. He interviewed me and indicated that he was impressed with my experience. I did not receive the position. The second and third time that the Pets Department position became available, it was not posted either. I only learned it would be available when I heard from other associates that the current manager was stepping down.

15.     At that time, there was no formal application process at the Riverside store. An employee applied by telling a specific manager that you were interested in the position. Despite having told Assistant Manager John [last name unknown] each time the job opened that I was interested and that I had many years experience breeding and raising animals as well as managing businesses, I was passed over three times; twice in favor of men, including Brandon Rapallo and another male whose name I have forgotten. None of these managers remained in the position for very long. Each time I was denied the position, I complained to Overnight Manager Martin and Store Manager Tracey O'Neal. Although Mr. Martin supported me, Store Manager O'Neal simply told me that all applicants had been given a fair opportunity and that more experienced employees were selected. I believe the short length of time these candidates served in the position indicated their lack of experience and qualifications.

16.     In March 1998, I received my yearly evaluation. I received a "standard" ranking. None of the Riverside associates received a raise that year because in February 1998, Store Manager O'Neal informed us that he would be implementing a storewide cost of living adjustment. As a result, my pay rate was increased 30 cents to $6.40 an hour.

6

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

17.    In May 1998, I requested a transfer to the Perris store. I was interested in moving closer to my home and returning to the day shift. I was also still interested in moving up in the company and feeling that there was no place for me to move to in the Riverside store. I told Mr. Martin that I would be willing to go to any of the nearby stores: Fontana, Moreno Valley, Perris. He said he would keep his eyes open for a position for me and later told me there were openings available in the TLE Specialty Division. I told him I was interested in the TLE and later the TLE Managers from both the Perris and Moreno Valley stores contacted me. Both Managers offered me a position in their TLE Departments. I accepted the position at the Perris store because it was closer to my home and because I knew the TLE Manager, John McCann, who had trained the year before at the Riverside store. Mr. McCann offered me a customer service/cashier position on the day shift at $7.00 an hour. My hours were 7 a.m. to 3:30 p.m.

18.    When I began working in the TLE area of the Perris store, there was no Support Manager on the day shift. I quickly learned my own duties and those of a Support Manager as well. I learned what the specific duties of a Support Manager were from the TLE Night Support Manager, Beverly [last name unknown], and from TLE Manager McCann. These duties included setting up the register, counting the money, writing up orders, checking inventory and placing orders on the computers, assisting the TLE District Manager during store visits and TLE meetings, and servicing the customers. At some point, I asked Mr. McCann about whether there would be a day shift Support Manager position and expressed interest in it. He told me that he was trying to get a day Support Manager position and that I could fill it whenever TLE District Manager Mickey Anderson authorized it.

19.    During the summer of 1998, TLE Manager McCann made some sexually explicit comments to me that upset me very much. I complained to Store Manager Kathy Bishop who

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                          Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

7

initially was furious at Mr. McCann. However, during the meeting she arranged between TLE Manager McCann, TLE District Manager Mickey Anderson, her, and me, Mr. Anderson brushed off my claim of sexual harassment as a "misunderstanding." No disciplinary action was taken against TLE Manager McCann.

20. During the fall of 1998, TLE Manager McCann asked me to train a male associate, Dwayne Stockman, regarding the Support Manager's duties. I told Mr. McCann that I had been performing these duties for months without the job title or the pay increase. Mr. McCann again told me he would give me the position when it became available but that he still wanted me to train Mr. Stockman so that I would have a back up.

21. I proceeded to train Mr. Stockman on writing orders, opening and closing the register, using the computer, and researching inventory. Shortly after that, Mr. Stockman was made the Support Manager on the TLE day shift rather than me. Instead, my hours were cut.

22. Some time later, Mr. Stockman was transferred to TLE Support Manager on the night shift and TLE Manager McCann asked me to train another male associate, Jason Devoe, for the Support Manager position. I reminded both TLE Manager McCann and TLE District Manager Anderson that I had been told that I would be given the Support Manager position. They both reassured me that I would be given the position but that they could not rely on me to be there "24/7" so that I needed to train a back-up assistant. I again did as I was asked and trained Mr. Devoe how to be a TLE Support Manager. Shortly thereafter, I was again denied the Support Manager position when Mr. Devoe was promoted into the job and my hours were cut.

23. Upon being denied the position a second time, I complained to Store Manager Kathy Bishop who told me that I needed to go back to TLE Manager McCann and TLE District Manager Anderson. When I asked Mr. McCann when I would be given the Support Manager position and a

8

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    Case No. C-012252 MJJ

pay raise, he told me for the first time that I was not fully qualified for the position. This really angered me because I had asked Mr. McCann for additional training on the computer several times and he had always told me that he was too busy to train me.

24.    In March 1999, I received a "standard" evaluation and a 4% raise that brought my hourly rate to $7.50. By now, working conditions in the TLE area of the Perris store had become very unbearable to me. Although Mr. McCann had not made any more sexually offensive comments to me, he had denied me training, denied me two promotions to a Support Manager position, cut my hours, and generally made me feel like there was no future for me in the Perris TLE. I felt I had no choice but to transfer stores again.

25.    Fortunately, there was a TLE Management Trainee in the Perris store, Doug Clark, who had witnessed what I was going through and who asked me if I wanted to work in his TLE department once he finished his training. We discussed this several times before he was promoted to TLE Manager at the Lake Elsinore store. Once he transferred, I asked Mr. Clark again whether he was still willing to have me work in his department. He responded positively but said he needed about thirty days to get to know his new store and staff before he would transfer me in.

26.    In May 1999, my transfer to the Lake Elsinore TLE Department went through. The Perris TLE Manager, John McCann, told me to my face that he was glad to get rid of me. At the Lake Elsinore store, I worked the swing shift, 3 p.m. to 9 p.m. In addition to the duties I had performed at the Perris store, I was now responsible for replenishing the floor before I went home. This meant walking the floor and refilling any oils or chemicals that were low. Aside from this duty associated with the swing shift, the TLE Department at the Lake Elsinore store operated exactly like the TLE Department at the Perris store. Indeed, the policies and practices were the same at all four

9

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Case No. C-012252 MJJ

of the Wal-Mart stores I worked: Waxahachie, Texas and Riverside, Perris and Lake Elsinore, California.

27.    On June 8, 1999, I was coached for failing to turn in a moneybag the prior evening. I believe this coaching was unfair. On June 7, I was on my way to turn the moneybag in when Assistant Manager Jim [last name unknown] ordered me back to the department to assist a customer. I hid the moneybag in a safe, concealed place under the register and attended to the customer. While I was assisting that customer, several more customers came in and I served them as well before clocking at the end of my shift. I did not remember the moneybag until the next morning when TLE Manager Clark questioned me about it. I apologized for forgetting to turn the moneybag in but no money was missing and it was an honest mistake. Mr. Clark said that he still had to write me up for the incident because TLE District Manager Anderson had ordered him to. This statement caused me concern and made me wonder if Mr. Anderson would continue to retaliate against me for having complained about TLE Manager McCann's sexual harassment of me and his refusal to promote me to the Support Manager position at the Perris store.

28.    In approximately late July or August 1999, TLE Manager Clark asked me to train a male associate named "Pai" [last name unknown], of Asian heritage, on the TLE register and regarding other Support Manager duties. Mr. Clark informed me that "Pai" would be closing the TLE area on the nights when I was not working. I trained "Pai" as requested and then my hours were cut, just as had happened after I trained Dwayne Stockman and Justin Devoe at the Perris store. I was furious and began complaining to Mr. Clark and other Assistant Managers at the Lake Elsinore store that I could not support myself on such reduced hours. In addition to losing wages, my benefits were also at risk of being cut if I did not work enough hours to qualify for coverage.

10

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

29.     In mid-August 1999, I told TLE Manager Clark that he either had to give me my hours back or I would have to resign. I also called District Manager Anderson to request a meeting with him regarding my hours. At first TLE Manager Clark told me that District Manager Anderson would meet with me. Several days later, TLE Manager Clark informed me that District Manager Anderson was not going to meet with me and that my hours were not going to increase. He also had $800 in cash for me for my exit pay and an exit interview form for me to sign.

30.     I believe I was terminated because I complained repeatedly to management when I was passed over for promotions in favor of men who were no more, or less, qualified than me and because I complained when I was sexually harassed by TLE Manager John McCann.

I declare under penalty of perjury of the laws of the United States and State of California that the foregoing is true and correct.

This Declaration was signed by me on April 23 2003, at Perris, California.

Debra Gunter, Declarant
DEBORAH

DECLARATION OF DEBORAH GUNTER IN SUPPORT OF                    Case No. C-012252 MJJ
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION