IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUKES, ET AL., | No. CV 01-02252 CRB |
| Plaintiffs, | **ORDER DENYING CLASS CERTIFICATION** |
| v. | |
| WAL-MART STORES, INC., | |
| Defendant. | |

This case has traveled a long road. Plaintiffs have spent over twelve years pursuing their claims that Wal-Mart discriminated against them and other women in making pay and promotion decisions. For a while, they succeeded in prosecuting the suit as a class action encompassing the claims of some 1.5 million women around the country. But the Supreme Court was not impressed, and in a landmark ruling addressing Federal Rule of Civil Procedure 23(a)(2)'s requirement that a common question tie together the claims of every class member, the Court concluded that Plaintiffs had not established that "all their claims can be productively litigated at once." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).

In response, Plaintiffs returned to the district court and sought to redefine a smaller class that would conform to the Supreme Court's holding. The newly proposed class would include about one hundred and fifty thousand women who worked in what the Plaintiffs call Wal-Mart's "California Regions." This motion is about whether Plaintiffs' retooled class

definition, allegations, argument, and evidence supply the common question that the Supreme Court concluded was missing from the nationwide class. Two themes emerge in the analysis that follows. First, though they have cut down the raw number of proposed class members significantly, Plaintiffs continue to challenge four different kinds of decisions across hundreds of decision makers, inviting failures of proof at multiple points in each region. Second, though Plaintiffs insist that they have presented an entirely different case from the one the Supreme Court rejected, in fact it is essentially a scaled-down version of the same case with new labels on old arguments.

Plaintiffs have amassed substantial evidence of discrimination against women that occurred at Wal-Mart stores during the period at issue in this suit. The Supreme Court, however, required Plaintiffs to make a certain showing in order to litigate all of the class members' claims at once in a single lawsuit, and this Court concludes that Plaintiffs' newly proposed class continues to suffer from the problems that foreclosed certification of the nationwide class. Accordingly, the Court DENIES Plaintiffs' Motion for Class Certification, leaving each member of the class to pursue her claims against Wal-Mart individually.

## I. BACKGROUND

Plaintiffs sued Wal-Mart in 2001, alleging that the company discriminated against them and other women in making certain pay and promotion decisions. In the district court, Plaintiffs succeeded in certifying a nationwide class of Wal-Mart's current and former female employees. See Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137 (N.D. Cal. 2004). Wal-Mart appealed to the Ninth Circuit, which largely affirmed, Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 628 (9th Cir. 2010) (en banc), and then to the Supreme Court, which reversed, holding that Plaintiffs had failed to identify a "common question" tying together the 1.5 million class members' claims. Dukes, 131 S. Ct. at 2556-57.

Returning to the drawing board, Plaintiffs amended their complaint to propose a new class focused on Wal-Mart's "California Regions." See Dkt. 767. Wal-Mart moved to dismiss the revised class allegations on several grounds, including that the Supreme Court's decision had completely rejected Plaintiffs' theory of commonality, foreclosing certification.

2

See dkt. 781. This Court denied that motion, reasoning that the Supreme Court's opinion rested in part on a rejection of Plaintiffs' evidence of commonality, and that Plaintiffs' new complaint made allegations which, if proved, could provide one or more common questions suitable for class treatment. See Dkt. 812. After conducting additional discovery for more than one year, Plaintiffs now move for class certification. See Dkt. 891.

## II. DISCUSSION

This Court has the unique benefit of the Supreme Court's guidance on the application of Rule 23's commonality requirement to the record in this case. Its opinion details the problems that foreclosed certification, and so the question for this Court is whether the changes Plaintiffs have made and the new evidence they present resolve those problems.

Plaintiffs assert Title VII disparate treatment and disparate impact claims, alleging that Wal-Mart discriminated against women in making two types of pay decisions (hourly and salaried) and two types of promotion decisions (Management Trainee and Support Manager). See Mot. at vi. They propose to certify three regional classes of

> [a]ll women employed at any retail store in [Wal-Mart Region 16 or Wal-Mart Region 19 or Sam's Club Region 18E] at any time from December 26, 1998, to December 31, 2002, who were subject to: a) the compensation system for hourly retail sales positions; b) the compensation system for salaried management positions up to and including Co-Manager; and c) the promotion system into Management Trainee/Assistant Manager and Support Manager/Area Manager. The class does not include Store Managers or Pharmacists.

Id.

Plaintiffs identify five common questions that, in their view, tie the proposed class together: whether (1) Wal-Mart's "tap on the shoulder" system for making promotions into Management Trainee and Support Manager positions had an adverse impact on women; (2) a core group of high-level managers engaged in a pattern or practice of intentionally denying women equal opportunity to receive promotions into management trainee and support/area manager positions; (3) Wal-Mart's Field Compensation Guidelines for making hourly pay decisions had an adverse impact on women; (4) Wal-Mart's guidelines for salaried pay decisions had an adverse impact on women; and (5) the managers charged with making pay decisions for the hourly and salaried employees engaged in a pattern or practice of

3

intentionally compensating women less than similarly situated men because of their gender. Mot. at 27. The second and fifth questions go to whether Wal-Mart intentionally discriminated against women, while the first, third, and fourth fall under Plaintiffs' disparate impact claim.

Though Plaintiffs argue at some length in the abstract about the differences between the elements of a disparate treatment claim and a disparate impact claim, their actual argument in support of class certification ultimately makes little distinction between the two. See Mot. at 30-31. Essentially, Plaintiffs argue that the statistics show that women were consistently disfavored, and those outcomes were either a result of intentional discrimination documented in Plaintiffs' cultural and anecdotal evidence (i.e., disparate treatment), or they resulted from newly-identified specific employment practices that had a disparate impact on women.

### A. Wal-Mart's Decision Making Structure

A basic overview of how Wal-Mart structured its business provides a useful starting point for the specifics of each claim. Wal-Mart divided its nationwide operations into six different geographical divisions (and one Sam's Club division); each division contained about six regions, and each region comprised about eleven districts, with six to eight stores per district. E.g., Harper Dep., Pl. Ex. 3, at 141, 215-16. The class proposed in this motion concerns employees from three regions containing a total of 250 stores.

Each region had one Regional Vice President and one Regional Personnel Manager (RPM). See Ellison Dep., Pl. Ex. 50, at 74-75. A District Manager ran each district. Harper Dep. at 162. As pertinent to this motion, the store-level management structure had four tiers, with a single Store Manager at the top, followed by Assistant Managers, then Management Trainees, and finally Support Managers at the bottom.[1] See Harper Dep. at 35-36, 108-09;

---

[1] The structure at Sam's Club was basically the same, but the titles were different; for example, the person in charge of an individual store was called the General Manager instead of the Store Manager. This Order uses the Wal-Mart nomenclature even when referring to the equivalent positions in the Sam's Club region.

4

Schaffner Dep., Pl. Ex. 21, at 79-80. The top three tiers were salaried positions, while Support Managers were paid by the hour. See Pl. Exs. 87, 97.

### B. Disparate Treatment

To show a common question underlying their disparate treatment claims, Plaintiffs must provide "significant proof that Wal-Mart operated under a general policy of discrimination." Dukes, 131 S. Ct. at 2554. The Supreme Court concluded that Plaintiffs' only evidence of such a policy, a declaration from their sociology expert Dr. William Bielby, was not good enough because it did not link the alleged culture of gender bias to the challenged pay and promotion decisions. Id. at 2553-54.

The Supreme Court also reviewed Plaintiffs' statistical and anecdotal evidence of a pattern or practice of discrimination, and found both too weak to support a conclusion that the company operated under a general policy of discrimination. The statistical evidence failed to account for the possibility that discrimination was an isolated problem skewing regional numbers, and the anecdotal evidence collectively represented only one account for every 12,500 class members, and described experiences at only about seven percent of the stores covered by the proposed class. Id. at 2555-56 & n.9. Plaintiffs have now returned with new versions of each of the types of evidence the Supreme Court found inadequate.

Statistics: Plaintiffs say that they have addressed the Supreme Court's criticisms of their statistics by conducting new analyses revealing a consistent pattern of disparities across the relevant decision making levels. In fact, however, the new numbers are underwhelming. Looking first at the promotion statistics, Plaintiffs' analysis shows that for Management Trainees, who were selected by district-level decision makers: 11 of 19 districts in Region 16 showed statistically significant disparities, as did 6 of 13 districts in Region 19, and 2 of 10 districts in Region 18E. Thus, in two regions a majority of districts showed no statistically significant results, and in the last region, only a little over half of the districts had statistically significant disparities.

For Support Managers, who were selected at the store level, Plaintiffs' new statistics show no statistically significant store-level disparities in any of the three regions. Plaintiffs

5

1 say that the numbers for each store were too small to generate significant results, and so they
2 conducted the analysis at the next highest (i.e., district) level, where 16 of 20 districts in
3 Region 16 showed statistically significant disparities, as did 9 of 14 districts in Region 19,
4 and 2 of 18 districts in Region 18E. But elevating the level of analysis runs afoul of the
5 Supreme Court's objection to Plaintiffs' old statistics: district-level disparities may or may not
6 reflect consistent results across stores, which was the level where support managers were
7 actually selected.

8     Regarding pay, Plaintiffs challenge decisions made by store-level decision makers for
9 hourly associates and by regional-level decision makers for salaried managers. Plaintiffs
10 concede that under their own analysis, for each year in the class period at least 74% of
11 individual stores showed no statistically significant disparity in pay. Hr'g Tr. (dkt. 981) at 22
12 . The regional-level data for salaried pay is complicated; Plaintiffs' regression model with
13 the most control variables showed statistically significant results in 42.9% of the years
14 analyzed for Region 16, 71.4% of the years for Region 19, and 71.4% of the years for Region
15 18E. Drogin Decl. (dkt. 895) at 35 tbl.20.

16     Responding to Wal-Mart's emphasis on the lack of statistical significance for many
17 of the challenged decisions, Plaintiffs argue that their statistics nevertheless constitute
18 evidence of disparity because a pattern of statistically insignificant results can still be
19 evidence of a common question. Reply (dkt. 965) at 10-11 (relying on "Sign test" results
20 submitted for the first time with reply brief). Such a pattern surely does constitute <u>some</u>
21 evidence in support of their claim–but the question is whether the new evidence is so strong
22 that it bridges the "worlds away" gap the Supreme Court described between Plaintiffs'
23 previous showing and Rule 23's requirements. <u>Dukes</u>, 131 S. Ct. at 2554.

24     Ultimately, Plaintiffs' numbers are not much stronger than they were when they failed
25 to carry the day at the Supreme Court. They have not identified statistically significant
26 disparities in even a majority of the relevant decision units in any region across the
27 challenged pay and promotion decisions. To be sure, Plaintiffs did better in some places than
28 others; for example, their analysis shows statistically significant disparities in a majority

1  (58%) of districts in Region 16 for the Management Trainee promotion. And so, as alluded
2  to above, if Plaintiffs had been more circumspect in the scope of their proposed class, their
3  statistics may have had a bigger impact. But under the class actually proposed, this Court
4  has little difficulty concluding that the statistics still do not reflect "significant proof" of a
5  "general policy of discrimination" in each region across the challenged decisions. See Ellis
6  v. Costco Wholesale Corp., 657 F.3d 970, 983 (9th Cir. 2011) ("If there is no evidence that
7  the entire class was subject to the same allegedly discriminatory practice, there is no question
8  common to the class.") (emphasis added).[2]

Non-Statistical Evidence: Even if the numbers had been better for them, Plaintiffs have another problem. They argue that "statistical disparities alone may be sufficient to meet [the] burden" of showing significant proof of a general policy of discrimination. Reply at 2 (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339 (1977)). In a rare and extreme case, the statistics might speak for themselves. See Teamsters, 431 U.S. at 337-38 (company had 1,828 line drivers yet prior to the litigation had zero African American drivers).

In the Supreme Court's view, however, this is not one of those cases. Rather, the Court made clear that Plaintiffs could not rely on a simple showing that women consistently faced worse outcomes; to satisfy Rule 23 they had to also show the existence of a "common answer to the crucial question why was I disfavored." 131 S. Ct. at 2552; cf. Gay v. Waiters' & Dairy Lunchmen's Union, 694 F.2d 531, 552-53 (9th Cir. 1982) ("[S]tatistics demonstrating that chance is not the more likely explanation are not by themselves sufficient to demonstrate that [intentional discrimination] is the more likely explanation for an employer's conduct.").

---

[2] Each side has offered a declaration by an expert statistician, and both sides have objected–improperly under the Local Rules, see Civil L.R. 7-3(a)-(c) (requiring that evidentiary objections be included within the body of the opposition and reply briefs)–to the other side's expert evidence (and other evidence). See dkts. 963, 961, 923, 919. The Court DENIES all of the motions as moot; aside from Plaintiffs' statistical expert, the Court need not consider or rely on any of the challenged evidence in ruling on the motion. And as the above discussion makes clear, the outcome of the motion likewise does not turn on the admissibility of Plaintiffs' statistical evidence.

7

At the Supreme Court, Plaintiffs attempted to provide non-statistical evidence that a general policy of intentional discrimination created the disparities by introducing testimony of an expert sociologist. The Supreme Court disregarded that evidence and Plaintiffs have since abandoned it. Plaintiffs also supplied anecdotal accounts that the Supreme Court found "too weak to raise any inference" of a general policy of intentional discrimination. Dukes, 131 S. Ct. at 2553-54, 2556. In place of their sociology expert, Plaintiffs now describe regular communications among management and shared training, which they say contributed to a "strong common culture" and shared stereotypes about women. Mot. at 30.

The Supreme Court did not fault Plaintiffs for failing to demonstrate that Wal-Mart management had some "common culture" or set of shared values reinforced through training. Nor did it deny that through regular interaction and training, managers harboring biases against women and stereotyped views of women might share those views with others. Rather, it ruled that absent some evidence that discrimination against women was actually directed by Wal-Mart, Plaintiffs' evidence of the possibility or even likelihood that individual biases might spread was not "significant proof" of a general policy of discrimination explaining the thousands of employment decisions specifically challenged by Plaintiffs' lawsuit. Dukes, 131 S. Ct. at 2553-55.

In response, Plaintiffs now point to a statement they attribute to Wal-Mart's CEO that was made during a meeting of District Managers. Their evidence of that statement consists of typed notes from a 2004 meeting presided over by Wal-Mart's then-CEO. Plaintiffs say those notes show that the CEO expressed the view that men were better at "focus single objective [sic]" and were more "results driven," and that Wal-Mart should select leaders based on their ability to deliver results. Mot. at 14 (citing Ex. 63). That is one, though not the only, potential reading of the ambiguous notes.

Wal-Mart has offered evidence suggesting that the statements at issue were in fact made by an outside academic consultant invited to speak at the meeting, and that the actual message of the presentation was that companies able to create a culture that leverages the talents of both males and females would be at a competitive advantage. See Brockbank Decl.

8

(dkt. 915-4). At his deposition, the CEO declined to agree with the notion that men were better at focusing on a single objective. Pl. Ex. 113 (dkt. 894-66) at 320-22.

In sum, the notes were cryptic and ambiguous; it is unclear who made them; they apparently reflect statements by an outside speaker, not Wal-Mart's CEO; the alleged statements have no connection to the so-called "California regions" in particular; and the meeting was actually held after the end of the currently proposed class period. Accordingly, the Court concludes that the notes add little to Plaintiffs' showing of significant proof of a general policy of intentional discrimination.

Plaintiffs suggest that even without evidence of a directive by Wal-Mart to discriminate, they have addressed the Supreme Court's criticisms by identifying a core group of biased upper-level managers who influenced all of the challenged decisions by lower-level managers. Mot. at 27, 30-31. Plaintiffs' evidence falls short on two levels: even the smaller group is quite large, and Plaintiffs' evidence of bias among their proposed subgroup of managers remains too weak to satisfy their burden of providing "significant proof" of a general policy of discrimination.

According to Plaintiffs, District Managers, supervised by Regional Personnel Managers, made the selections for the Management Trainee promotion, id. at 15, while Store Managers, supervised by District Managers, made the Support Manager promotions, id. at 18. On the pay side, Store Managers set and adjusted pay rates for hourly employees, id. at 20-23, and Regional Personnel Managers set and adjusted salaries for management, id. at 23-24. At oral argument on this motion, Plaintiffs stated that there were 4 different Regional Vice Presidents, 7 Regional Personnel Managers, 49 District Managers, and 400 Store Managers occupying those positions during the proposed class period across all three regions. Hr'g Tr. at 18-19. So Plaintiffs acknowledge that over 450 different managers were responsible for making the contested decisions.

Plaintiffs argue that "top" level managers in that group exercised a strong influence over the rest through formal oversight responsibility, regular communication with District and Store Managers regarding personnel issues, and a "management by exception" reporting

9

system for pay decisions. But their definition of "top" management is a bit slippery, which probably could not be avoided given the diversity of decisions they challenge. Though Plaintiffs emphasize the role of regional managers, especially Regional Personnel Managers e.g., Hr'g Tr. 13-15, in the challenged decision processes, for at least one of the four challenged decisions (Support Manager promotions), Plaintiffs' own evidence suggests that District Managers were the highest level of management actively involved in individual decisions. See Mot. 18 ("Store Managers, in consultation with District Managers, were responsible for selecting Support Managers."). Thus, "top" management was at least 56 different people even if Plaintiffs' characterization of the decision making process is accurate.

And it is not accurate. Plaintiffs go to great lengths attempting to prove that Regional Personnel Managers actively guided District Managers in making Management Trainee promotion decisions, see Mot. at 15 n.86, but they overstate the strength of their evidence, which makes clear that, in fact, Regional Personnel Managers were not always or even regularly involved in the details of each individual decision in each region. See Martinez Dep., Pl. Ex. 33, at 146 (RPM testified that "as far as being directly responsible for making these decisions, it was made by the district manager"); Van Allen Dep., Pl. Ex. 38, at 69 ("Q: RPM's were involved, correct? A: In some situations; not in all."); Ellison Dep., Pl. Ex. 50, at 151 (District Managers had "the most responsibility" for making selections, though RPM's "would help hire for that role in a college recruiting environment").

And for the Support Manager promotions, which were more numerous and so account for a larger percentage of the class, compare Drogin Decl. tbl.16, with id. tbl.18, Plaintiffs offer only two pieces of evidence that District Managers were involved in the decisions. First, they point to job duty language indicating District Manafers' formal responsibility over staffing issues in their district, see Pl. Ex. 83 at 22358, 22361, which says nothing about whether the practice was to delegate to Store Managers the task of selecting individuals for this particular promotion. Second, Plaintiffs offer deposition testimony from one Regional Vice President who testified that "most" district managers would expect to be kept informed

10

of all Support Manager promotion decisions, but who also testified that "store manager[s] had latitude to make that [Support Manager promotion] choice on their own." Butler Dep., Pl. Ex. 37, at 215.

Wal-Mart provides declarations from Store and District Managers confirming that District Managers were rarely, if ever, actively involved in the Support Manager promotion decisions. See Adams Decl. (dkt. 915-1) ¶ 6 ("As a District Manager, I had very little to do with promotions for the Support Manager position within the stores."); Smoot Decl. (dkt. 915-35) ¶ 17 ("As a District Manager, I had a very limited role in selecting associates for promotion to the Support Manager position."); Roesner Decl. (dkt. 915-28) ¶ 4; Terry Decl. (dkt. 915-38) ¶ 8.

Moreover, as Plaintiffs themselves recognize, they have not amassed sufficient anecdotal evidence of bias and stereotyped thinking among management to establish significant proof of a general policy of discrimination within any management group, "top" or otherwise. At the hearing on this motion, Plaintiffs described their anecdotes as relevant but not necessary to their disparate treatment claim, invoking the Supreme Court's language from Teamsters that real-life examples bring "the cold numbers to life." Hr'g Tr. 15-16; Teamsters, 431 U.S. at 339.

Plaintiffs say that they have anecdotes reflecting stereotyped views expressed by 2 of 4 Regional Vice Presidents, 1 of 7 Regional Personnel Managers, 2 of 49 District Managers, and 7 of 400 Store Managers. Hr'g Tr. at 18-19. Accordingly, Plaintiffs have offered evidence of bias exhibited by about five percent of the "top" level management they say guided lower-level decisions, and three percent of the full pool of managers involved in the decisions. Though Plaintiffs succeeded in illustrating attitudes of gender bias held by managers at Wal-Mart, they failed to marshal significant proof that intentional discrimination was a general policy affecting the entire class.

Plaintiffs' anecdotes by class members do not help their case much. The Supreme Court found Plaintiffs' earlier version of that evidence unpersuasive because "when the claim is that a company operates under a general policy of discrimination, a few anecdotes selected

11

from literally millions of employment decisions prove nothing at all." 131 S. Ct. at 2556 n.9. Though it carefully avoided setting a numerical cut-off, the Supreme Court approvingly cited a case where plaintiffs had submitted one anecdote for every eight class members. 131 S. Ct. at 2556 (citing Teamsters, 431 U.S. 324).

Plaintiffs have added sixty-one new declarations to supplement the previously submitted twenty-five declarations, and have reduced the class size to about 150,000 women, Mot. at 1, 27, meaning that they now have one anecdote for about every 1,745 class members. Plaintiffs' ratio of anecdotes to class members thus remains quite low, and even if all of the anecdotes were by class members who worked during the class period and were spread out evenly over the proposed class–and Wal-Mart says they are not–this Court would not conclude that 86 anecdotes for a 150,000-member class meaningfully improves Plaintiffs' showing.

Accordingly, the Court DENIES Plaintiffs' motion to certify their disparate treatment claims for class treatment.

### C. Disparate Impact

Plaintiffs argued to the Supreme Court that Wal-Mart's practice of delegating discretion over the challenged pay and promotion decisions to local managers resulted in a disparate impact on women in violation of Title VII. The Supreme Court rejected their claim, holding that a "'policy' of allowing discretion by local supervisors over employment matters . . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices." 131 S. Ct. at 2554. The Court faulted Plaintiffs for failing to "identif[y] a common mode of exercising discretion that pervades the entire [class]," and failing to identify a "specific employment practice" they were challenging. Id. at 2554-56. For a large nationwide class, the Court concluded it was "quite unbelievable that all managers would exercise their discretion in a common way without some common direction." Id. at 2555.

Plaintiffs now enumerate what they consider to be five "specific employment practices" guiding local managers' discretion that were responsible for the promotion and pay

1 disparities. They are, for the promotion claims: (1) a "promotion from within" policy, (2) a
2 policy not to post job openings, (3) the use of promotion guidelines with a requirement that
3 candidates be willing to relocate, and (4) common subjective criteria used to select
4 candidates, Mot. at vii, 30; and for the pay claims: (5) Wal-Mart's Field Compensation
5 Guidelines, which enumerated criteria that managers were to consider in making pay
6 decisions, id. at 31.

7 Each of the proposed practices suffers from one of two problems: (1) the evidence
8 indicates that the practice did not actually apply across the proposed class for the proposed
9 class period, or (2) the practice itself boils down to delegating discretion, which the Supreme
10 Court held could not provide the commonality necessary to certify a class.

### 1. Not Applicable Across the Class

At oral argument on this motion, Plaintiffs conceded that the relocation requirement and the failure to post job openings were not actually classwide practices. Hr'g Tr. at 29 ("That [relocation requirement] only applied for Manager in Training selections."); id. ("Is there some evidence that some managers did post job openings, even before January of 2002? And the answer is: Yes, but not much."). Notwithstanding Plaintiffs' characterization that "not much" evidence supports the notion that some managers decided to post Support Manager openings, their own expert concluded that 29.2 percent of openings were posted in 2000 and 43.3 percent of positions were posted in 2001. Id. In fact Wal-Mart actually instituted a requirement that Support Manager openings be posted in January 2002, see Pl. Ex. 86 (dkt. 894-39), yet Plaintiffs seek to certify class covering the period from December 1998 to December 2002. Mot. at vi.

Nor have Plaintiffs established a classwide policy of promoting from within. One Regional Personnel Manager (it is not clear from which region) testified that such a policy was in place. See Wilson Depo., Pl. Ex. 85, at 80. But another–again, Plaintiffs do not indicate from which region–testified as follows: "Q: [I]s it your understanding that there is a preference for promotion from within? A: I don't necessarily think it's a preference, but I think it is a natural course of progression to develop people in conjunction with the growth of

13

the company." Martinez Depo., Pl. Ex. 33, at 156 (emphasis added). That it made good business sense to identify and promote high-performing people does not establish that Wal-Mart preferred internal hires over external hires.

Likewise, the remaining deposition testimony Plaintiffs cite indicates that Wal-mart pitched its career advancement opportunities to its employees, which is neither surprising nor particularly relevant to whether the company actually had a policy of favoring internal candidates when it came time to fill a spot. See Miller Depo., Pl. Ex. 39, at 151-53; Annatone Depo, Pl. Ex. 84, at 222-23. Thus, Plaintiffs' evidence consists of two Regional Personnel Managers who disagreed whether Wal-Mart had a "promotion from within" policy, and other deposition testimony that does not speak directly to the issue. That does not establish the existence of a classwide policy of promoting from within.[3]

Practices that do not apply during the entire class period across the class cannot provide a common question tying the class together.[4]

### 2. Repackaged Delegated Discretion

Plaintiffs say they are challenging the "common subjective criteria" used by managers in making promotion decisions, and the company-imposed Field Compensation Guidelines constraining pay decisions. Plaintiffs' evidence and argument, however, reveal that the constraints were largely illusory, and Plaintiffs continue to challenge Wal-Mart's practice of delegating discretion to local managers.

Specifically, Plaintiffs say that Wal-Mart limited managers' discretion in making the challenged decisions by requiring them to:

- consider whether candidates for the Manager Trainee promotion had "communication skills," "interpersonal skills," "organization skills," "goals," "flexibility," "enthusiasm," "adaptability," "leadership ability," "merchandising skills," and "confidence," Mot. at 16 (citing Ex. 68 at 371493);

---

[3] Also, after the one sentence in their class certification brief asserting that such a policy existed, see Mot. at 15, Plaintiffs never again mention it or make any argument that it could tie the claims of all 150,000 class members together.

[4] This Order does not address whether those practices would support a disparate impact claim if they were in fact used across the class during the proposed class period.

14

- consider whether candidates for the Support Manager promotion possessed "similar" characteristics, including "the capacity, ability, and desire to lead," "high integrity," "maturity," "common sense," "self-starter," "knowledgeable," "ability to communicate," "ability to learn," and "ability to work nights/weekends," Mot. at 18 (citing Pl. Ex. 18);

- consider only an hourly employee's "additional skills, experience, or education" in setting the employee's starting pay rate within a predefined range, Mot. at 21 (citing Field Compensation Guidelines, Pl. Ex. 87);

- consider whether an hourly employee exhibited "exceptional performance above job responsibilities" in deciding whether to grant the employee a merit-related raise, Mot. at 22 (citing Field Compensation Guidelines, Pl. Ex. 88)

Plaintiffs do not identify any particular criteria imposed by the company to be considered in setting starting management salaries, see Mot. at 23, and management raises were based on formal performance ratings. Id.

For only one of the four challenged decisions (hourly employee pay) have Plaintiffs even argued that the supplied criteria were exhaustive, i.e., that Wal-Mart prohibited managers from considering other factors. Some managers explicitly suggested that other considerations came into play. See, e.g., Butler Depo., Pl. Ex. 37, at 266 ("There may be more than that but those are the basics."). More importantly, even if each manager felt obligated to rely only on the enumerated factors, the criteria were so vague or numerous that they imposed no real constraints.

To be sure, certain criteria used by, or imposed on, managers making personnel decisions could have a disparate impact on women. See Dukes, 131 S. Ct. at 2554 ("Other[] [managers] may choose to reward various attributes that produce disparate impact–such as scores on general aptitude tests or educational achievements."). Here, however, Plaintiffs do not argue in substance that the criteria themselves, faithfully applied, led to a disparate impact. For example, Plaintiffs never suggest that prioritizing the "ability to communicate" over some other trait had a disparate impact on women.

15

Instead, Plaintiffs repeatedly complain about the broad discretion managers retained in applying the vague criteria. See Mot. at 31 ("The Guidelines also dictated the criteria that Store Managers should use in setting pay <u>but afforded the managers discretion in interpreting them</u>.") (emphasis added); see also Hr'g Tr. at 4 ("[I]n all three regions Wal-Mart instructed the people making the selections at the district level to consider leadership ability, confidence and goals, <u>without providing any guidance on what those terms mean</u>.") (emphasis added); id. at 5 ("The same is true for the Support Managers. They give factors such as the capacity, ability, and desire to lead . . . with no definition of what those mean; just <u>whatever they think is relevant to the job</u>.") (emphasis added); id. at 9 ("[T]hey give a factor there [for awarding discretionary merit pay increases] for exceptional performance; a common discrete factor that the managers are charged with interpreting, <u>but no guidance on how to interpret</u>.") (emphasis added).

In Plaintiffs view, managers, who were left without meaningful guidance in applying the impossibly vague criteria, fell back on their own stereotyped views of women in making pay and promotion decisions. Mot. at 30 ("For want of objective criteria, decision makers chose 'people who are like themselves.'"); id. at 31 ("As with promotion decisions, the [pay] decisions were made in the context of shared culture, training, and biases."). That is a perfectly logical theory, but it leaves Plaintiffs right back where they started: challenging Wal-Mart's practice of delegating discretion to local managers, which the Supreme Court specifically held was <u>not</u> a specific employment practice supplying a common question sufficient to certify a class. See 131 S. Ct. at 2554-56.

In sum, Plaintiffs have not identified any specific employment practice applicable to the proposed class that ties the claims together in a way the Supreme Court has not already rejected. Accordingly, the Court DENIES Plaintiffs' motion to certify the disparate impact claims for class treatment.

## III. CONCLUSION

Plaintiffs' proposed class suffers from the same problems identified by the Supreme Court, but on a somewhat smaller scale. Indeed, it is revealing that there is no particular

16

logic to the precise scope of the class Plaintiffs now propose. They picked three corporate regions covering a smaller area than the rejected national class, but nothing in Plaintiffs' evidence shows that those three regions are actually different from any other Wal-Mart regions along any relevant dimension. Rather than identify an employment practice and define a class around it, Plaintiffs continue to challenge the discretionary decisions of hundreds of decision makers, while arbitrarily confining their proposed class to corporate regions that include stores in California, among other states. Accordingly, the Court DENIES their motion for class certification.[5] This Order does not consider whether Plaintiffs themselves were victims of discrimination as alleged in their complaint; those individual claims shall proceed in this litigation.[6]

**IT IS SO ORDERED.**

Dated: August 2, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[5] Because this Court concludes that the commonality issue is dispositive, it does not reach Wal-Mart's alternative arguments for why class certification should be denied.

[6] Wal-Mart has moved for partial summary judgment on some of the individual claims. See dkts. 921, 922. This Order does not address those motions.